**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| COUNT US IN, WOMEN4CHANGE INDIANA, and JOSH MONTAGNE, | Case No.: 1:25-cv-864 |
| Plaintiffs, | STATEWIDE RELIEF SOUGHT |
| v. | |
| DIEGO MORALES, in his official capacity as Indiana Secretary of State; PAUL OKESON, in his official capacity as Chair of the Indiana Election Commission; SUZANNAH WILSON OVERHOLT, in her official capacity as Vice-Chair of the Indiana Election Commission; KAREN CELESTINO-HORSEMAN, in her official capacity as member of the Indiana Election Commission; LITANY A. PYLE, in her official capacity as member of the Indiana Election Commission; J. BRADLEY KING, in his official capacity as Co-Director of the Indiana Election Division; ANGELA M. NUSSMEYER, in her official capacity as Co-Director of the Indiana Election Division; and MONROE COUNTY BOARD OF ELECTIONS, | |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**NATURE OF THE CASE**

1.      Ever since Indiana's photo ID law was first enacted in 2005, students at Indiana's public colleges and universities have been able to use student ID to vote, so long as the ID meets the requirements for voter ID generally: it contains the voter's name, photograph, and an expiration date, and it was issued by the United States or the State of Indiana. Ind. Code § 3-5-2-40.5(a).

1

2.      For two decades, tens of thousands of young voters have used student IDs to cast their ballots in Indiana. The election supervisor for Monroe County—home to Indiana University Bloomington, which has an enrollment of nearly 50,000 students—estimated that *two-thirds* of students used student IDs to vote at the on-campus polling place in the 2024 general election.

3.      But on April 16, 2025, Governor Braun signed Senate Bill 10 ("SB 10"), which categorically prohibits the use of student ID—and *only* student ID—for voting. *See id*. § 3-5-2-40.5(c) (eff. July 1, 2025) (the "Student ID Ban"). That is, even if a student ID meets all the other statutory requirements for a valid photo ID (i.e., it contains the voter's name, photograph, and an expiration date), a student cannot use it to vote.

4.      Indiana law does not exclude any other category of ID in this way. In fact, in recent years, the legislature has amended the voter ID law to *expand* the scope of acceptable IDs, even allowing for the use of certain IDs that do not otherwise meet the statutory requirements (for example, military IDs that do not contain an expiration date). SB 10 reverses course, narrowing the types of photo ID acceptable for voting for the first time in Indiana's history.

5.      There is no justification for SB 10's *sui generis* treatment of student IDs, which is, in reality, a surgical attack on young voters. Legislators have attempted to justify the sudden change as a way to ensure that only U.S. citizens and Indiana residents can vote in Indiana elections. But there is no evidence that these are actual problems in Indiana, and even if they were, SB 10 does not require people to use IDs that prove citizenship or residency.

6.      Even after SB 10, voters can continue to use other forms of photo ID—such as a federal Veterans Affairs card—that say nothing about their residence or citizenship status. This makes sense because Indiana's photo ID law is not intended to verify eligibility information, like

residency or citizenship (which is verified when a voter registers), but simply to ensure that the person who appears to vote is who they claim to be.

7.     Nor is there any evidence that the use of student IDs has caused any other election security problems, and the legislative record of SB 10 does not indicate otherwise.

8.     While prohibiting the use of student IDs will not advance any of the legislators' purported rationales, it *will* make it harder for a specific group of people—young voters—to participate in Indiana's elections. Young voters are overwhelmingly more likely to be students than older voters. For example, the average age of an on-campus undergraduate student across the Indiana University system is 21 years old. And young voters are less likely to have other accepted forms of voter ID, such as a passport or an Indiana driver's license or state ID card.

9.     By prohibiting the use of student ID to vote, the Student ID Ban directly targets students and deliberately abridges young voters' right to vote in violation of the Twenty-Sixth Amendment to the U.S. Constitution. And by severely burdening young voters' access to the franchise without any corresponding justification, the Student ID Ban separately violates the First and Fourteenth Amendments. As one legislator described, the Student ID Ban is "about controlling who gets to vote, not protecting elections." Injunctive relief from this Court is necessary to ensure that young Hoosiers can freely exercise their constitutional rights in Indiana's elections.

**JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the U.S. Constitution, specifically by the First, Fourteenth, and Twenty-Sixth Amendments.

11.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matter in controversy arises under the Constitution and laws

of the United States and asserts the deprivation, under color of state law, of rights under the U.S. Constitution.

12.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants are residents of this district, all Defendants are residents of Indiana, and a substantial part of the events that gave rise to Plaintiffs' claims for relief occurred in this district.

13.    This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

14.    Founded in 2020, Plaintiff Count US IN is a Black-led, disability-led, non-partisan, non-profit corporation based in Fort Wayne, Indiana, that aims to encourage diverse voter turnout, including among students; educate citizens on voting rights; combat voter suppression; and elevate citizens' voices across Indiana. Count US IN was founded by students and is led by three staff members and seven board members. While Count US IN serves community members across generations, the dominant age group that requests and utilizes its support and programs is under the age of 30. Count US IN's constituents include tens of thousands of supporters and volunteers registered with the organization who have committed to help people wait in long lines to vote, educate voters of their rights if they are turned away from the polls or experience discrimination, and serve as a resource for voters. Count US IN regularly leads voter registration drives on Indiana college campuses, conducts on- and off-campus voter protection efforts on Election Day, and works to educate students about voting requirements, working in tandem with its volunteers on the ground. Count US IN also works to enhance civic engagement for underserved groups, including people of color and people with disabilities, and works to support and educate communities across Indiana on voting rights.

15. SB 10's Student ID Ban directly harms Count US IN's student constituents by restricting the forms of identification they can use to cast a ballot. And because the Student ID Ban will make voting more burdensome for students and disenfranchise some entirely, it strikes at the heart of Count US IN's organizational mission of encouraging student voter turnout and robust participation in the political process. The added burdens and confusion caused by the Student ID Ban will also impede Count US IN's ability to effectively conduct its core get-out-the-vote efforts.

16. Count US IN therefore must turn its efforts to mitigating the Student ID Ban's effects. Based on its experience working to turn out student voters, and since students have relied on student IDs to vote in Indiana for many years, Count US IN expects that it will need to undertake significant efforts to educate students about the Student ID Ban. To start, Count US IN must redevelop its voter education and informational materials, since they cannot perform their basic function if they do not explain the ban. Count US IN will also need to train volunteers on the ban— including re-training volunteers who were trained before the ban was put in place. It will also need to provide guidance to students on how to obtain alternate forms of ID, and help students obtain alternate forms of ID, none of which was previously essential to Count US IN's get-out-the-vote efforts, but will be once the ban goes into effect. To ensure these voter education efforts are successful, Count US IN expects, based on its experience with voter education, that it will also need to contact students individually to ensure they have an acceptable alternate form of ID before they vote so they are not disenfranchised. On Election Day, Count US IN will then need to assist students who are turned away from the polls and help them get their ballots counted if possible— a resource-intensive effort likely to include informing students about the ID they need, helping them obtain it if possible, and coordinating transportation to the circuit court clerk or county election board to present it, all within the ten days specified under Indiana law. *See* Ind. Code § 3-

11-7-5-2.5. And despite the resources that Count US IN will spend to mitigate the law's effects, the confusion and disenfranchisement caused by the Student ID Ban will still thwart Count US IN's organizational mission of registering, engaging, and turning out young voters.

17.      The efforts Count US IN will undertake to mitigate the Student ID Ban's effects on its core mission and activities will divert time and resources away from other projects that Count US IN would otherwise undertake to increase civic engagement for people with disabilities, people impacted by incarceration, and people of color. Count US IN has already begun this work by (for example) ensuring that polling stations are accessible to people with disabilities by providing chairs and checking that accessible voting machines are available; collaborating with local partners to re-integrate and engage people freed from incarceration; and training people with disabilities, formerly incarcerated people, and people of color in civic engagement and public advocacy. Count US IN is eager to expand this work and build upon its local partnerships to do so. But because of the Student ID Ban, it must instead use its limited resources to ensure that its core voter engagement work is still effective and to protect its core mission.

18.      Plaintiff Women4Change Indiana ("Women4Change") is a non-profit corporation based in Indianapolis, Indiana, with a mission to provide civic education and encourage democratic participation to achieve better outcomes in health, economic mobility, and personal safety for Indiana women. To that end, Women4Change works to support accessible, fair voting access for every citizen and increase voter turnout in the State. Turning out young voters—especially students—is a key focus of the organization's work. Women4Change therefore regularly spends time on voter education and get-out-the-vote initiatives at local high schools and colleges.

19.      Women4Change currently has two employees and approximately 9,000 members who have signed up with the organization to volunteer (including on get-out-the-vote efforts) and

receive updates and educational materials, including on how to vote. Approximately 3,000 of Women4Change's members are students in high school or college, many of whom would use their student IDs to vote if not for the Student ID ban. Women4Change's student members joined the organization because they support its mission and care about civic engagement. But, on information and belief, some of these student members do not possess any form of that ID that would permit them to vote in Indiana, either because they do not have the ID altogether or because they cannot access it readily. And some also cannot readily access the documents they would need to apply for a State-issued ID, like a social security card and birth certificate.

20.     The Student ID Ban impedes Women4Change's mission and injures its members because it makes it harder for students to vote. And it makes the core work that Women4Change does to turn out and educate voters more challenging, burdensome, and ultimately less effective. Based on its experience with get-out-the-vote and voter education initiatives, Women4Change expects that it will need to make continuous and consistent efforts to reduce the Student ID ban's suppressive effect on young voters. These efforts include, but are not limited to: starting voter education efforts in schools and college campuses earlier than usual; redeveloping its voter education materials to explain how students can obtain alternate ID; answering more questions from prospective student voters; and dedicating time and volunteer resources on Election Day to fielding calls from students who are turned away from the polls because they tried to use a student ID to vote. Absent the Student ID Ban, Women4Change would spend more of its time and resources to advance its broader goal of increasing turnout throughout the State, focusing on places where turnout has been historically low. Instead, it must now focus more on high school and college students so that the Student ID Ban does not make Indiana's turnout problem even worse.

21.     Plaintiff Josh Montagne is a resident and citizen of Bloomington, Indiana. Mr. Montagne is 20 years old and a sophomore at Indiana University Bloomington. Mr. Montagne is originally from Missouri, but with the exception of one summer, he has lived in Bloomington since 2023. Mr. Montagne considers himself a Hoosier, and in 2023, he registered to vote in Indiana. To do so, he provided his address in Bloomington and the last four digits of his social security number, and he swore under penalty of perjury that he is a U.S. citizen who is at least 18 years old who has lived in his voting precinct for at least 30 days before the election. Since then, Mr. Montagne has voted in Indiana three times: in a 2023 municipal election, in the 2024 primary election, and in the 2024 general election. Each time, Mr. Montagne used his student ID card issued by Indiana University Bloomington to satisfy Indiana's photo ID requirement. Although Mr. Montagne still has a student ID card, he does not and has never had an Indiana driver's license, an Indiana ID card, or any other form of identification accepted under Indiana's photo ID law following the passage of SB 10. *See* Ind. Code § 3-5-2-40.5. Obtaining one of these documents would be burdensome for Mr. Montagne; he does not have access to a car, and his primary mode of transportation is walking. As a result, the Student ID Ban makes it harder for him to vote.

22.     Defendant Diego Morales is the Secretary of State of Indiana and the chief election official for Indiana. *Id.* § 3-6-3.7-1. As Indiana's chief election official, the Secretary is broadly responsible for performing all ministerial duties related to the administration of elections in Indiana. *Id.* § 3-6-4.2-2(a). The Secretary is also charged with encouraging students to participate in the election process and administering a voter education outreach fund to help inform citizens of photo ID requirements. *Id.* § 3-6-3.7-2–4. The Secretary is being sued in his official capacity for actions taken under color of law to enforce the Student ID Ban.

23.     Defendants Okeson, Overholt, Celestino-Horseman, and Pyle are sued in their respective official capacities as Chair, Vice-Chair, and Members of the Indiana Election Commission, which is a bipartisan four-member commission responsible for administering and interpreting Indiana election laws; adopting rules governing the fair, legal, and orderly conduct of elections; advising and supervising local election officers; issuing advisory opinions; holding hearings; and resolving questions from county election boards in the event of a deadlock. *Id.* §§ 3-6-4.1-14, 3-6-4.1-25. The Indiana Election Commission is also charged with investigating violations of election laws and referring violations to the Attorney General or appropriate prosecuting attorney. *Id.* § 3-6-4.1-21.

24.     Defendants King and Nussmeyer are sued in their official capacities as Co-Directors of the Indiana Election Division. The Indiana Elections Division is responsible for "[c]arry[ing] out the policies, decisions, and recommendations" of the Indiana Election Commission. *Id.* § 3-6-4.2-3(a)(1). Along with the Secretary, the Indiana Election Division is tasked with performing ministerial duties related to the administration of elections, including advising and instructing local election officials on election administration procedures, prescribing a uniform set of election and registration forms for use throughout Indiana, serving as an interpretive resource on election law provisions and issuing advisory opinions regarding election administration issues, and providing information regarding voter registration and absentee ballot procedures to absent uniformed services voters and overseas voters. *Id.* §§ 3-5-4.2-12(4), (8); 3-6-4.2-14.[1]

---

[1] *See also 2024 Indiana Election Administrator's Manual* at 5–6, IND. ELECTION DIV., *available at* https://www.in.gov/sos/elections/files/2024-Election-Administrators-Manual.FINAL.pdf (last visited May 5, 2025).

25.    The Monroe County Board of Elections is responsible for conducting elections and administering the election laws within Monroe County. Ind. Code § 3-6-5-14(a)(1). Its responsibilities include training election officials and counting and certifying votes. *Id.* §§ 3-6-6-40; 3-6-5-15(c). The Monroe County Board of Elections is also responsible for appointing precinct election officials, and may appoint or remove deputy election commissioners, clerks, and other employees (including college students to serve as nonpartisan assistants). *Id.* §§ 3-6-6-11; 3-6-5-20; 3-6-5-23; 3-6-5-35. It is also charged with investigating violations of election laws and referring violations to the Attorney General or appropriate prosecuting attorney. *Id.* § 3-6-5-31.

**STATEMENT OF FACTS AND LAW**

**A.    Indiana's Photo ID Law**

26.    In 2005, the Indiana legislature enacted Public Law 109-2005, which requires photo ID for people voting in person on election day. The law defines "proof of identification" as a document that (1) shows the name of the registered voter, (2) shows a photograph of the registered voter, (3) includes an expiration date and is not expired or expired after the date of the most recent general election, and (4) was issued by the United States or the state of Indiana. Ind. Code § 3-5-2-40.5(a). The law does not specify what particular forms of photo ID are permissible; until SB 10 was enacted, any form of ID that met the statutory requirements was acceptable for voting.

27.    Because student IDs issued by public colleges and universities in Indiana generally meet the statutory requirements, students at public colleges and universities have been using their student IDs to vote for the past 20 years.

28.    Before SB 10, Indiana had never singled out any particular form of photo ID as unacceptable for voting. The legislature had only ever amended the photo ID requirements to *ease* the ID requirements for particular forms of photo ID.

29.     In 2011, for example, the legislature exempted military documents from the expiration date requirement, allowing for the use of military IDs to vote even if they do not display an expiration date. *See* Pub. L. 118-2011, 2011 Ind. Acts 1206. Then, in 2014, the legislature expanded that exemption to include documents from the United States Department of Veterans Affairs. Pub. L. 76-2014, 2014 Ind. Acts 828. Then, in 2021, the legislature again expanded that exemption to include Native American tribal documents. Pub. L. 209-2021, 2021 Ind. Acts 3161.

30.     As a result of these amendments, Indiana voters can use military, Veterans' Affairs, and tribal documents to vote even if those IDs do not include an expiration date.

**B.     SB 10 is a surgical attack on young voters.**

31.     SB 10 amends Indiana Code § 3-5-2-40.5 to, for the first time, *exclude* a particular form of photo ID. And it does so without otherwise altering any of the other requirements for photo ID that have been in place since 2005. It simply singles out one specific form of ID—an ID that is overwhelmingly relied upon by a particular group of voters—by amending the law to state that proof of identification for voting purposes **"does not include a document issued by an educational institution."**[2]

32.     As a result, *any* form of photo ID—except for student ID—that meets the statute's four requirements can be used at the polls. And even certain forms of identification that do *not* meet the statutory requirements are deemed acceptable, including forms of military ID and certain Native American tribal IDs. Only one form of photo ID is categorically excluded as unacceptable: student IDs.

---

[2] *See* Ind. Code § 3-5-2-40.5(c) (eff. July 1, 2025). The term "educational institution" is not defined by SB 10. Indiana law elsewhere defines a "[s]tate educational institution" as a college or university that receives public funding, including Ball State University, Indiana State University, Indiana University, Ivy Tech Community College, Purdue University, University of Southern Indiana, and Vincennes University. *See* Ind. Code § 21-7-13-32.

33.    The Student ID Ban targets students on its face. Because student voters are overwhelmingly young—for example, in 2020, 70% of student voters from Indiana University Bloomington were under 21, and 92% were under 29—the ban also targets young people.

34.    The legislative process yielded numerous concerns with SB 10's targeting of young voters. One legislator called SB 10 "a direct attack on students who are attending schools." During the floor discussion of SB 10, one legislator accurately summarized the intended effect of the Student ID Ban as follows: "[W]hat you're doing here is you're treating students differently. Because what you've said is for every other individual, every other voter in this state, if you can produce a document issued by the state government that [meets the existing statutory requirements,] and it's you, you get to vote. But what we're saying is . . . these elements, it's not good enough for students. We've got to single students out."

35.    At an April 1, 2025, hearing on SB 10, one legislator pointed out that Indiana universities are government entities, which means that student IDs are government issued IDs: "There is absolutely no reason why those students who have a government issued ID that meets all the requirements set in statute should not be able to vote."

36.    Throughout the legislative process, during hearings and on the floor, legislators noted that Indiana does not have a problem with voter fraud and SB 10 would only make Indiana's low voter turnout problem worse. One legislator observed that last year, Indiana was "the eighth worst state in the nation when it comes to turnout." She questioned why the legislature would enact the Student ID Ban against that backdrop: "Why are we making it harder to vote? I think about a student from northern Indiana who maybe is a foster kid, never needed a driver's license because he was never going to own a car and got a scholarship to IU and three years in, lives in Bloomington, isn't going back to Fort Wayne. Suddenly now he's not going to be able to vote.

He's not going to have that credential. It doesn't make any sense. We're hurting our Hoosiers, we're giving them less opportunity to participate in our democratic system."

37.    In response to these concerns, one legislator proposed an amendment to remove the Student ID Ban from the bill, but the amendment was rejected by the House Elections and Apportionment Committee without substantive discussion.

38.    Despite the criticisms and objections, including concerns raised by students who testified in front of the legislature, SB 10 passed the House and Senate with the Student ID Ban intact and was signed into law on April 16, 2025.

39.    The Student ID Ban goes into effect on July 1, 2025.

**C.    The Student ID Ban will make it significantly harder for students and younger Hoosiers to vote.**

40.    The Student ID Ban will eliminate a reliable and secure form of photo ID used to prove identity at the polls, significantly burdening access to the franchise for young people.

41.    Because of the ban, students who would have used their student IDs to comply with Indiana's photo ID requirements cannot vote at all unless they have—or can obtain—another form of acceptable photo ID.

42.    For students, this poses a significant challenge. To start, students are less likely than other Indiana residents to have an Indiana driver's license in the first place. Students who come from out of state are permitted to use out-of-state licenses to drive. *See* Ind. Code. §§ 9-24-1-1, 9-13-2-78(1)(A).

43.    Plus, younger Americans are now less likely to have driver's licenses at all—data from the Federal Highway Administration shows that the percentage of people between 16 and 19 with a driver's license has dropped from 64 percent in 1995 to just under 40 percent in 2021. According to the Federal Highway Administration, only 59.7% of 18-year-olds, 68.3% of 19-year-

olds, and 74.4% of 20-year-olds had a driver's license in 2021. In contrast, more than 90% of 30- to 79-year-olds had a driver's license. Among the reasons for this decline are "graduated" licensing programs that many states have adopted, including Indiana, which place additional restrictions on drivers who are under 21. *See* Ind. Code. §§ 9-24-11-3.5 (limiting drivers under 21 to a probationary license which, among other things, restricts driving after 10 p.m.). Additionally, surges in vehicle, gas, and insurance costs have made driving less feasible, especially for students with low incomes, making a driver's license less common.

44.     Young voters are also less likely to have other accepted forms of voter ID in general. For example, only about a third of Americans of any age have a U.S. passport.

45.     Accordingly, many young voters will need to obtain an alternative form of ID to be able to vote. Students, however, face special barriers to doing so at every step of the process.

46.     For example, one alternative form of ID that satisfies the photo ID law is a driver's license or ID card issued by the Indiana Bureau of Motor Vehicles (BMV). But, as the students who testified against SB 10 before the legislature pointed out, obtaining a state ID card from the BMV requires time, travel, and documentation that can be difficult to obtain and that students are significantly less likely to have than older voters.

47.     Since 2010, pursuant to the federal Real ID Act, Indiana has required all new applicants for Indiana driver's licenses, permits, or ID cards—including people who already have a license from out of state[3]—to provide documents that prove their (a) identity, (b) lawful status in the United States, and (c) residency. Each of these requirements presents significant obstacles for students.

---

[3] A person must also surrender their out-of-state driver's license to obtain an Indiana driver's license. *See New Indiana Residents*, Ind. Bureau of Motor Vehicles, *available at* https://www.in.gov/bmv/licenses-permits-ids/new-indiana-residents/ (last visited May 5, 2025).

48.     The most common way to prove identity to obtain a driver's license is by showing your passport or certified copy of your birth certificate.[4] But many students do not have a passport, and the process for obtaining one is costly and burdensome. It requires (for example) submitting proof of citizenship (typically a birth certificate), providing photos that meet specific requirements, and an in-person meeting; it typically costs $165; and it normally takes at least a month to obtain. In addition, many students who have a passport do not have it with them on campus and cannot easily access a certified copy of their birth certificate.

49.     Students could try to order a certified copy of their birth certificate, but that typically costs money (in Indiana, the price is $10), requires a valid photo ID, and can take several months to obtain. According to the Department of Health website, the processing time to obtain a birth certificate can take 12–16 weeks.

| Processing Time | Indiana Department of Health currently has a processing time of 12–16 weeks *(once all required documents are received and approved)* |
|---|---|

*Excerpt from the Indiana Department of Health website as of May 5, 2025[5]*

50.     To obtain a driver's license or state ID, applicants must also show lawful status through proof of social security in the form of a signed social security card, a W-2 form, or a pay stub, for example. But full-time students are less likely to have a W-2 or pay stub than older voters,

---

[4] The Indiana Bureau of Motor Vehicles provides a complete list of documents it accepts to prove identity, residency, name change, lawful status, and social security. *See Real ID Documentation Checklist*, IND. BUREAU OF MOTOR VEHICLES, https://www.in.gov/bmv/files/BMV_Documentation_List.pdf (last visited May 5, 2025).
[5] Vital Records Online, Ind. Dep't of Health, https://www.in.gov/health/vital-records/order-now/vital-records-online-vitalchek-network (last visited May 5, 2025).

and many either do not have a social security card in their possession or do not have it with them at college.

51.    Students could try to order a social security card, if they possess the required supporting documentation (*e.g.*, a passport, state ID card, health insurance or Medicaid card, certain medical records, or an employee ID card). But again, many students will not have such documentation, particularly if they remain on their parents' health insurance, do not receive their own medical records from their providers, and study full time. Even if they do have the necessary documentation to order a social security card, they still must deal with lengthy wait times: they must get an in-person appointment at the social security office, which took an average of 32 days in 2023. After the appointment, it takes approximately two more weeks to receive a card.

52.    Finally, applicants for a driver's license or state ID must show proof of residency by presenting, for example, a recent bill in the student's name, a bank statement, or a Medicaid or Medicare benefit statement. But again, students are less likely to have these sorts of documents than older voters, given that full-time students are more likely to rent and may have roommates and are thus less likely to pay bills directly. Students are also more likely to be on their parents' health insurance, less likely to have a W-2, and less likely to maintain possession of important identity documents at their college residence.

53.    Even for students who surmount these obstacles, because of the wait-times for various documents, it may be impossible to obtain an alternative form of ID in time to vote—even if the student starts the process of seeking one as early as possible. For example, a freshman who orders a birth certificate immediately at the start of school in August may not obtain it until 16 weeks later, after the November election has already passed.

54.     And as a practical matter, many students will not learn that they cannot use their student IDs until they come to the polls to vote. Without an accessible alternative, these students will almost certainly be disenfranchised. When a person comes to the polls without an accepted form of photo ID, Indiana law allows them to cast a provisional ballot, which will be counted only if the person can produce an accepted ID to the county clerk within ten days after the election. Ind. Code § 3-11.7-5-2.5. It will be very difficult, if not impossible, for students to obtain another valid form of photo ID within a mere ten days.

55.     Nor can students avoid the photo ID requirement by voting absentee. Absentee voting by mail is not broadly available in Indiana; voters need a "specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open," or must meet other specific exemptions. *See id.* § 3-11-10-24.

56.      Ultimately, many students will be disenfranchised—not because they are ineligible to vote, failed to timely register, or are trying to fraudulently vote—but solely because they relied on their student ID, which aside from being issued by an educational institution, otherwise meets all requirements for a photo ID under Indiana law.

57.     When the Indiana legislature debated SB 10, college students—including Plaintiff Josh Montagne—offered public testimony on the barriers they would face to obtain new photo ID in time to vote, noting that students often lack both the necessary documentation and reasonable transportation to the BMV, which may be miles from campus.

58.     Similarly, at the House Committee hearing for SB 10, several other college students offered public testimony on the difficulties of obtaining an alternate form of photo ID. One student at Indiana University Bloomington testified: "Getting a new state ID is notably strenuous for students living on campus who are highly discouraged from having efficient transportation. This

typically leaves one up to the option of taking two buses far away from campus, four miles to be exact. If you manage, even if you manage to have all of your documentation ready, it can very easily take up a whole day just to get an ID processing complete."

59.     Another student at Indiana University Indianapolis explained that, "[f]or many students, a university issued ID is the most accessible form of identification they have. Many of my peers, especially from low-income backgrounds, do not own driver's license[s] or passports. If this bill passes, students who rely on their school IDs to vote would face unnecessary and unfair barriers that serve no purpose other than to suppress voter turnout amongst young people."

**D.  The Student ID Ban does not further any state interest.**

60.     While SB 10 plainly targets the voting rights of young voters, legislators failed to offer any plausible justification for doing so. Instead, they argued that banning student ID was necessary to ensure that only Indiana residents and U.S. citizens vote in Indiana elections—despite no factual evidence that non-resident and non-citizen voting are problems.

61.     During House floor debate on the bill, one legislator asserted that "[j]ust because you have an identification card to a student that has been issued by an educational institution, that does not prove Indiana residency." The Indiana Secretary of State, who came to the floor debate to support the bill, justified it the same way. "Getting an ID at the BMV is claiming Indiana residency," he said. "That's all we're asking students to do."

62.     Another legislator asserted that SB 10 is necessary because "state universities issue student IDs to many individuals who are not residents of Indiana or U.S. citizens."

63.     But there is no evidence that non-residents or non-citizens are voting in Indiana elections. Further, there is no evidence that non-residents and non-citizens are using student IDs to vote. Nor is Indiana's voter ID law structured to confirm voter's residence or citizenship—it merely confirms that the voter appearing to vote is who they say they are.

18

64.     Nor does the state have problems with voter fraud more generally. The Marion County Clerk said in a 2024 interview, "There is zero fraud," and the co-director of the Marion County Board of Voters Registration said they had not received any complaints or had any instances of voter fraud. Indeed, upon information and belief, there has not been a *single* conviction for voter or election fraud involving the use of student ID in Indiana.

65.     Additional recent experience also confirms that Indiana's elections are accurate and secure. Last year, the Indiana Recount Commission concluded an extensive three-month-long recount of two contested primary elections for the state legislature, finding only two miscounted ballots out of thousands. At a meeting of the Recount Commission, counsel for two Republican candidates stated: "As we all can see, this election was fair and there weren't any abnormalities, there weren't issues, there weren't stolen ballots, there weren't any harvested ballots, anything like that. We have a very fair election system in Indiana, and I think everyone needs to recognize that." Against this backdrop, SB 10 is a solution in search of a problem.

66.     And yet, if Indiana truly did have a problem with unqualified voters voting in its elections, categorically prohibiting student IDs from being used to vote would not address it. Indiana's photo ID law is not used to establish a person's qualification to vote in Indiana—that is what the registration process is for. Instead, the purpose of the photo ID law is to confirm that when a person appears at the polls, they are the person they claim to be. The Secretary of State's own Voter Registration Guidebook confirms this. It advises election officials not to "conflate[]" the difference between proof of residency for new registrants and "Indiana's voter ID law, which requires specific types of identification to verify a person's *identity* to cast a ballot on Election

Day." *2024 Indiana Voter Registration Guidebook* at 17, IND. ELECTION DIV., *available at* https://www.in.gov/sos/elections/files/2024Voter-Registration-Guidebook.FINAL.pdf.[6]

67.    A person's citizenship and residency are established when they register to vote, not when they cast their ballot. To register to vote in Indiana, a person must complete a registration form that "[s]ets forth each eligibility requirement for registration" (including citizenship and Indiana residency), requires them to complete "an attestation that the applicant meets each of the eligibility requirements," and further requires "the signature of the applicant, under penalty of perjury" to their qualifications. Ind. Code § 3-7-18-4; *see also id.* §§ 3-7-22-5 (setting forth similar requirements for mail voter registration form); 3-7-13-1 (requiring registrants to have lived in the precinct where they register to vote for at least 30 days before the election). Thus, all registered voters in Indiana must swear under penalty of perjury that they are U.S. citizens and Indiana residents.[7]

68.    In discussing SB 10, no legislator (or anyone else) offered any evidence or meaningful argument that Indiana's existing registration process is inadequate to reliably establish citizenship and residency. Nor did anyone contend that the use of student IDs has resulted in any other form of voter fraud or wrongdoing involving students or the use of student IDs.

---

[6] *See also* Br. of State Respondents, *Crawford v. Marion Cnty. Election Bd.*, No. 7-21, 7-25, 2007 WL 4232930, at *50 (Dec. 3, 2007) (explaining that Indiana's photo ID law is intended to prevent "[v]oter impersonation"); *id.* at *49 ("Without a photo-identification requirement, unless a voter stumbles across an impostor trying to use her identity, or an over-burdened poll worker happens to notice a deviation between signatures, officials will not detect in-person voter fraud.").

[7] Under State law, there are several means of proving residency. For one, the person can put the last four digits of their Social Security Number on the registration form. If Indiana's Statewide Voter Registration System can match that number with an existing Indiana identification record with the same number, name, and date of birth as listed on the application, nothing more is required. A person can also prove residency by submitting (for example) any government document mailed to them at their name and address. Ind. Code §§ 3-7-22-5(5); 3-7-33-4.5.

69.     Even if proving residency and citizenship were a serious concern—and for the reasons discussed above, it is not—the Student ID Ban does not solve it. Even after the Student ID Ban, voters are permitted to vote using photo IDs that do not prove a person's residency or citizenship.

70.     Indiana's photo ID law has not required state-issued ID since it was first enacted in 2005, and the Student ID Ban does nothing to change that. Instead, the photo ID law states that, to be sufficient, the photo ID must be issued "*by the United States or* the state of Indiana." Ind. Code § 3-5-2-40.5 (emphasis added). And of course, photo ID issued *by the United States*, such as a passport, cannot and does not prove Indiana residency. Indeed, the Indiana Secretary of State's website provides examples of valid means of photo ID, including several federally-issued ID cards (like military ID cards) that do not include any information whatsoever about the holder's state of residence:





*Examples of acceptable photo IDs from Indiana Secretary of State – each includes a
name, expiration date, and no residency information[8]*

71.     Despite Indiana's continued acceptance of various federally-issued IDs that have

no bearing on residency, the Student ID Ban prohibits the use of identification that actually *is* state-

issued identification, and which *does* offer some evidence of Indiana residency—certainly more

than any federally-issued ID. To comply with the law, the cards must be issued "by the State of

Indiana," so only ID cards from Indiana's public universities qualify. At minimum, then, they show

that the person attends a public university in the State.

---

[8] *Examples of Photo IDs*, IND. SEC'Y OF STATE, available at
https://www.in.gov/sos/elections/voter-information/files/2023-ID-EXAMPLES-FOR-PW-4-
12.pdf (last visited May 5, 2025).



*Example of previously acceptable student ID issued by Indiana University – including a name and expiration date[9]*

72.     Nor does Indiana's photo ID law, even after SB 10, require a photo ID that confirms citizenship. Many forms of ID that remain permissible under Indiana's photo ID could be issued to non-citizens, including an ID issued by the Indiana BMV.

73.     As Indiana's Attorney General and Secretary of State acknowledged in a recent letter: "[P]ossession of a state-issued identification does not demonstrate that a person is a citizen." In other words, an Indiana driver's license says no more about a person's citizenship status than a student ID does.

74.     Legislators' other justifications for SB 10 were no more plausible than their claims about residency and citizenship. One legislator stated that SB 10 was necessary to ensure that "all voters are treated the same." He described the use of student IDs as an "exception" to the requirements that govern other voters' ID requirements.

75.     This has it backwards. Student IDs have never been an exception to Indiana's photo ID requirements. Instead—like other forms of ID—students could use them at the polls only if they complied with the general requirements for photo ID set out by statute. *See* Ind. Code § 3-5-2-40.5(a).

---

[9] *Id.*

76.     Before SB 10, the relevant statute did not mention student IDs at all. The law did, however, create exceptions from the requirement to include an expiration date for certain other types of photo IDs, such as documents issued by the U.S. Department of Defense, Department of Veterans Affairs, a branch of the uniformed services, the Merchant Marine, the Indiana National Guard, or a Native American Indian tribe or band recognized by the U.S. government. Ind. Code § 3-5-2-40.5(b). None of SB 10's supporters have taken issue with those exceptions.

77.     Supporters of the Student ID Ban also argued that the law is necessary because of differences among universities; namely, some have begun using digital ID, and student ID from private universities is not eligible as a form of photo ID under Indiana law. They claim that these differences result in voter confusion and burden universities. But none of that explains the legislature's choice to eliminate the use of student ID altogether, particularly where such identification otherwise complies with requirements for photo ID under state law. And legislators ignore that any purported confusion can be mitigated by expanding the option for student ID to include private universities, or by improving communication and voter education, rather than eliminating the use of student ID entirely.

78.     Ultimately, SB 10 is an illogical solution to a fanciful set of problems. But it will create a problem that is very real: significantly burdening, and in some cases ultimately depriving, students and young voters of their right to vote.

79.     The Purdue University student government highlighted these concerns in passing a resolution opposing SB 10, stating that SB 10 "unnecessarily burden[s] student suffrage" and urging the legislature to reject the Student ID Ban "and instead prioritize policies that expand, rather than restrict, access to the ballot[.]"

80.    In opposing the bill, one legislator underscored this point. "We should be bending over backwards to invite the next generation into democracy, not closing the door," she argued. "[N]ow we want to take away the most basic tool for voting from our students. This is not election security. This is voter suppression."

## CLAIMS FOR RELIEF

### COUNT I

### Undue Burden on the Right to Vote
**U.S. Const. amend I & XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**

81.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 80 as if fully set forth herein.

82.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must first carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "It then must identify and evaluate the *precise interests* put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789 (emphasis added). The court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id*.

83.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (citation and internal quotation marks omitted). And, "it is especially difficult for the State to justify a restriction that limits political participation by an

identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793.

84.     Here, the Student ID Ban imposes substantial, unjustified burdens on the right to vote for young voters in Indiana in several ways. Primarily, it requires them to obtain alternative documentation that students are less likely to have and that is especially difficult for students to get because many lack the access to required records or necessary transportation, for example. Because Indiana law does not require students to obtain an Indiana driver's license to drive, students are also less likely than other Indiana residents to already have the required documentation in their possession. For many students, it will be impossible to surmount these barriers in time to vote, and they will be disenfranchised altogether.

85.     Because these burdens cannot be justified by any legitimate state interests and are certainly not narrowly tailored to serve any compelling state interests, the Student ID Ban violates Indiana voters' right to vote as protected by the First and Fourteenth Amendment.

## COUNT II

### Denial or Abridgement of the Right to Vote on Account of Age
### U.S. Const. amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202

86.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 85 as if fully set forth herein.

87.     The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

88.     By prohibiting any abridgment of the right to vote on account of age, the Twenty-Sixth Amendment mirrors the Fifteenth Amendment, which provides that voting rights "shall not

be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const., amend. XV, § 1.

89.    Accordingly, at the time the Twenty-Sixth Amendment was adopted in 1971, Congress would have understood its text to have similar scope to the Fifteenth Amendment, which prohibited not only express race-based restrictions, but also facially race-neutral restrictions that were "motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (citing *Guinn v. United States*, 238 U.S. 347 (1915)), *superseded by statute on other grounds*, 96 Stat. 134.

90.    Congress and the courts have also recognized that the Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

91.    The Twenty-Sixth Amendment therefore not only lowers the voting age to eighteen, but also prohibits age discrimination in voting, including facially age-neutral restrictions that are motivated by an age-discriminatory purpose. *League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1222–23 (N.D. Fla. 2018) (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants").

92.    SB 10's Student ID Ban violates the Twenty-Sixth Amendment by targeting student IDs for exclusion as a valid form of photo ID, thus intentionally abridging the voting rights of young voters on account of age. Voters who rely on student ID to vote are overwhelmingly young. These young voters are also less likely to already have an alternate form of ID and face significant hurdles to obtaining one in time to vote. Under the Student ID Ban, young people who have a student ID that satisfies the statutory requirements that apply to all other forms of identification must nevertheless surmount "onerous procedural requirements" that constitute a "material burden on the[ir] exercise of the franchise" in order to obtain an alternate form of ID. *Tully v. Okelson*, 78 F.4th 377, 385, 387 (7th Cir. 2023).

93.    Lawmakers have not offered any plausible explanation for targeting student IDs for exclusion; instead, their justifications had no basis in fact and bore no logical relationship to what SB 10 actually does. The Student ID Ban is inexplicable on any grounds other than targeting young voters. This intentional abridgement of young voters' rights violates the law. *See Int'l Union, et al. v. Johnson Controls, Inc.*, 499 U.S. 187 (finding that a facially discriminatory policy violates equal protection); *Vil. Of Arlington Heights v. Metro. Housing Dev.*, 429 U.S. 252 (1977) (explaining that a law violates equal protection when motivated by a discriminatory purpose).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Student ID Ban violates the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution;

b) enjoining Defendants under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing the Student ID Ban;

c)  awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in

bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)  granting such other and further relief as the Court deems just and proper.


Dated: May 5, 2025                    Respectfully submitted,

                                        /s/ *Jeffrey Macey*
                                        Jeffrey Macey
                                        **Macey Swanson LLP**
                                        429 N. Pennsylvania Street, Suite 204
                                        Indianapolis, IN 46204
                                        jmacey@maceylaw.com
                                        (317) 637-2345

                                        Aria Branch*
                                        Katie Chamblee-Ryan*
                                        William Hancock*
                                        Daniel Cohen*
                                        **ELIAS LAW GROUP LLP**
                                        250 Massachusetts Avenue NW, Suite 400
                                        Washington, D.C. 20002
                                        abranch@elias.law
                                        kchambleeryan@elias.law
                                        whancock@elias.law
                                        dcohen@elias.law
                                        (202) 968-4490

                                        *Attorneys for Plaintiffs*
                                        *\*Motion for Pro Hac Vice forthcoming*