**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| COUNT US IN, WOMEN4CHANGE INDIANA, and JOSH MONTAGNE,<br><br>        Plaintiffs,<br><br>v.<br><br>DIEGO MORALES, in his official capacity as Indiana Secretary of State, et al.,<br><br>        Defendants. | Case No.: 1:25-CV-00864-RLY-MKK |

**PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 2

STANDARD OF REVIEW ................................................................................................ 6

ARGUMENT ..................................................................................................................... 6

    I.    Plaintiffs have plausibly alleged that the Student ID Ban constitutes an unconstitutional burden on the right to vote. ............................................................................ 6

      A.  *Anderson-Burdick* is the proper framework to review the Student ID Ban. .................... 7

      B.  Plaintiffs adequately allege an unconstitutional burden on the right to vote under the *Anderson-Burdick* framework. ...................................................................... 10

        1.    The Student ID Ban will burden the right to vote. ................................................... 10

        2.    The Student ID Ban serves no legitimate state interests. .......................................... 13

    II.  Plaintiffs have plausibly alleged that the Student ID Ban violates the Twenty-Sixth Amendment. ........................................................................................... 18

      A. The Twenty-Sixth Amendment prohibits all voting restrictions that discriminate on account of age. ......................................................................................... 18

      B. The State Defendants' misreading of *Tully* has no bearing on Plaintiffs' Twenty-Sixth Amendment claim. ....................................................................... 21

      C. The Student ID Ban violates the Twenty-Sixth Amendment because it intentionally singles out young student voters for exclusion. ........................................... 24

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

## CASES

*Acevedo v. Cook Cnty. Officers Electoral Bd.*,
  925 F.3d 944 (7th Cir. 2019) ........................................................... 7, 8, 12, 13, 14

*Allen v. Waller County*,
  472 F. Supp. 3d 351 (S.D. Tex. 2020) ......................................................... 21, 25

*AnchorBank, FSB v. Hofer*,
  649 F.3d 610 (7th Cir. 2011) ........................................................................... 6

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ............................................................................... *passim*

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ...................................................................................... 17

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ............................................................................... 7, 8, 11

*Colo. Project-Common Cause v. Anderson*,
  495 P.2d 220 (Colo. 1972) ............................................................................ 20

*Common Cause Ind. v. Marion Cnty. Election Bd.*,
  311 F. Supp. 3d 949 (S.D. Ind. 2018) ............................................................ 12

*Council of Alt. Pol. Parties v. Hooks*,
  121 F.3d 876 (3d Cir. 1997) .......................................................................... 14

*Crawford v. Marion Cnty. Election Bd.*,
  472 F.3d 949 (7th Cir. 2007) ........................................................................... 2

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ............................................................................... *passim*

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ..................................................................... 8, 8

*Democratic Nat'l Comm. v. Bostelmann*,
  466 F. Supp. 3d 957 (W.D. Wis. 2020) ............................................................ 7

*Duke v. Cleland*,
  5 F.3d 1399 (11th Cir. 1993) ........................................................................... 7

*Fish v. Schwab,*
  957 F.3d 1105 (10th Cir. 2020) .............................................................. 14, 16, 17

*Gill v. Scholz,*
  962 F.3d 360 (7th Cir. 2020) ...................................................................... 8

*Harman v. Forssenius,*
  380 U.S. 528 (1965)............................................................................... 22, 23

*Ind. Democratic Party v. Rokita,*
  458 F. Supp. 2d 775 (S.D. Ind. 2006)................................................. 2, 3, 12, 13

*Jean v. Nelson,*
  711 F.2d 1455 (11th Cir. 1983) .................................................................. 25

*Jolicoeur v. Mihaly,*
  488 P.2d 1 (Cal. 1971) ........................................................................... 18, 20

*Kaminski v. Elite Staffing, Inc.,*
  23 F.4th 774 (7th Cir. 2022) ...................................................................... 6

*League of Women Voters of Fla., Inc., v. Detzner,*
  314 F. Supp. 3d 1205 (N.D. Fla. 2018)...................................... 11, 19, 21, 25, 26

*League of Women Voters of Ind., Inc. v. Rokita,*
  929 N.E.2d 758 (Ind. 2010) ........................................................................ 3

*Lerman v. Bd. of Elections in N.Y.C.,*
  232 F.3d 135 (2d Cir. 2000)........................................................................ 15

*Luft v. Evers,*
  963 F.3d 665 (7th Cir. 2020) .................................................................. 13, 19

*March for Our Lives Idaho v. McGrane,*
  749 F. Supp. 3d 1128 (D. Idaho 2024) .......................................................... 24

*McDonald v. Bd. of Election Comm'rs of Chi.,*
  394 U.S. 802 (1969)..................................................................................... 9

*Miller-El v. Cockrell,*
  537 U.S. 322 (2003)..................................................................................... 27

*N.C. State Conf. of NAACP v. McCrory,*
  831 F.3d 204 (4th Cir. 2016) .................................................................. 26, 27

*Nashville Student Organizing Committee v. Hargett,*
    155 F. Supp. 3d 749 (M.D. Tenn. 2015) ........................................................ 24

*Navarro v. Neal,*
    716 F.3d 425 (7th Cir. 2013) ............................................................................... 8

*Ne. Ohio Coal. for the Homeless v. Husted,*
    837 F.3d 612 (6th Cir. 2016) ........................................................................... 8, 9

*One Wis. Inst., Inc. v. Nichol,*
    155 F. Supp. 3d 898 (W.D. Wis. 2015) .............................................................. 7

*One Wis. Inst., Inc. v. Nichol,*
    186 F. Supp. 3d 958 (W.D. Wis. 2016) ...................................................... 19, 25

*Plotke v. White,*
    405 F.3d 1092 (10th Cir. 2005) ....................................................................... 27

*Price v. N.Y. State Bd. of Elections,*
    540 F.3d 101 (2d Cir. 2008) ........................................................................... 8, 9

*Priorities USA v. State,*
    591 S.W.3d 448 (Mo. 2020) ............................................................................ 16

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973) ............................................................................................. 11

*Smith v. City of Jackson,*
    544 U.S. 228 (2005) ........................................................................................ 19

*Soltysik v. Padilla,*
    910 F.3d 438 (9th Cir. 2018) ....................................................................... 7, 15

*Symm v. United States,*
    439 U.S. 1105 (1979) ...................................................................................... 20

*Taggart v. Lorenzen,*
    587 U.S. 554 (2019) ........................................................................................ 19

*Tashjian v. Republican Party of Conn.,*
    479 U.S. 208 (1986) ................................................................................... 15, 17

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ........................................................................... 24

*Tully v. Okeson*,
    78 F.4th 377 (7th Cir. 2023) ............................................................ 21, 22, 23, 24

*Tully v. Okeson*,
    977 F.3d 608 (7th Cir. 2020) ......................................................................... 7, 9

*United States v. Texas*,
    445 F. Supp. 1254 (S.D. Tex. 1978) .............................................................. 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................ 18, 25, 27

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973) ........................................................................... 26

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ......................................................................... 12

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ........................................................................................ 8

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIX ..................................................................................... 18

U.S. Const. amend. XV ....................................................................................... 18

U.S. Const. amend. XXIV ................................................................................... 18

U.S. Const. amend. XXVI ............................................................................ 18, 22

## STATUTES

Ind. Code § 3-5-2-40.5 .......................................................................... 1, 2, 3, 15

Ind. Code § 3-11-10-24 ...................................................................................... 13

Ind. Code § 3-11.7-5-2.5 ...................................................................................... 4

## OTHER AUTHORITIES

117 Cong. Rec. 5817, 5825 (1971) ..................................................................... 26

117 Cong. Rec. 7534, 7539 (1971) ..................................................................... 19

**INTRODUCTION**

For 20 years, Indiana used neutral criteria to determine which forms of identification could be used to confirm a voter's identity at the polls. Under those criteria, any ID issued by either the State of Indiana or the United States could be used to vote so long as it included: (1) the voter's name, (2) the voter's photograph, and (3) an expiration date that is either unexpired or has only expired since the most recent general election. Ind. Code § 3-5-2-40.5(a). Because student IDs issued by Indiana's public colleges and universities generally meet these criteria, over the past two decades, tens of thousands of Indiana students have used their student IDs to cast their ballots.

However, in April of this year, Governor Braun signed Senate Bill 10 ("SB 10"), which categorically prohibits the use of student IDs—and *only* student IDs—for voting. *See id.* § 3-5-2-40.5(c) (eff. July 1, 2025) (the "Student ID Ban"). For other voters in Indiana, the voter ID law has not changed, and any ID that satisfies the law's criteria will still suffice. But Indiana students may no longer use their student IDs to vote even if they meet all other substantive criteria applied to every other form of government-issued ID. After SB 10, student IDs are invalid for one reason and one reason only: because they are "issued by an educational institution." *Id.*

This surgical exclusion of student IDs impermissibly burdens and deliberately abridges young voters' right to vote in violation of the First, Fourteenth, and Twenty-Sixth Amendments, and the allegations in Plaintiffs' Complaint provide robust support for those claims. *See generally* ECF No. 1 ("Compl."). State Defendants' Motion to Dismiss applies the wrong legal standards to Plaintiffs' claims and ignores the substance of Plaintiffs' allegations. Their principal argument is that Plaintiffs are asking the Court to revisit the Supreme Court's decision to uphold Indiana's voter ID law in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). This is patently false. Plaintiffs do not challenge the constitutionality of Indiana's voter ID law as a whole. Instead,

Plaintiffs bring a narrow challenge to the legislature's targeted exclusion of student IDs, which makes it harder for students and young people to vote and will likely deprive many of them of access to the franchise.

Indeed, when Indiana's voter ID law was challenged and ultimately upheld in *Crawford*, student IDs—along with any other form of ID that satisfied the law's criteria—could be used at the polls. And in rejecting the constitutional challenge to the voter ID law, federal courts and the Supreme Court emphasized its neutrality and flexibility. *See, e.g.*, *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 789 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (highlighting "university-issued identification cards" as an example of eligible, state-issued voter ID); *see also Crawford*, 553 U.S. at 202 (emphasizing that the voter ID law did not impose excessively burdensome requirements "on any class of voters"). Plaintiffs do not seek to re-litigate *Crawford* here; to the contrary, awarding Plaintiffs relief in this case would restore the neutral criteria for voter ID that the *Crawford* Court upheld.

For the reasons set forth herein, the Court should deny State Defendants' Motion to Dismiss.

## BACKGROUND

Indiana first enacted its voter ID law in 2005. The law requires voter ID for people voting in person on election day. Compl. ¶ 26. It defines "proof of identification" as a document that: (1) shows the name of the registered voter, (2) shows a photograph of the registered voter, (3) includes an expiration date and is not expired or expired after the date of the most recent general election, and (4) was issued by the United States or the State of Indiana. *Id.* (quoting Ind. Code § 3-5-2-40.5(a)). The law does not specify what particular forms of voter ID are permissible and—until the Student ID Ban was enacted—any form of ID that met the statutory requirements was

2

acceptable for voting. *Id.*

Shortly after Indiana's voter ID law was first enacted, a group of voters brought a facial challenge to the law as a whole. *Rokita*, 458 F. Supp. 2d at 789. The district court granted summary judgment to defendants, and the U.S. Supreme Court affirmed—holding that, "on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes excessively burdensome requirements." *Crawford*, 553 U.S. at 202 (quotations omitted). After *Crawford*, a different plaintiff brought another facial challenge against the entire voter ID law under the Indiana Constitution. *See League of Women Voters of Ind., Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010). The Indiana Supreme Court rejected the facial challenge "without prejudice to future as-applied challenges by any voter unlawfully prevented from exercising the right to vote." *Id.* at 760.

Since passing the voter ID law, the Indiana legislature has twice amended it to ease the criteria for certain types of ID. *See* Ind. Code § 3-5-2-40.5(b). In 2011, the law was amended to exempt military documents from the expiration date requirement. *See* Compl. ¶ 29 (citing Pub. L. 118-2011, 2011 Ind. Acts 1206). In 2014, the legislature exempted documents from the United States Department of Veterans Affairs from the expiration date requirement as well. *Id.* (citing Pub. L. 76-2014, 2014 Ind. Acts 828). Otherwise, the criteria to determine which IDs can be used to vote have remained unchanged.

With the enactment of SB 10 in 2025, the legislature amended Indiana Code § 3-5-2-40.5 to, for the first time, *exclude* a particular form of voter ID. The bill amended the law to state that proof of identity for voting purposes "does not include a document issued by an educational institution." Ind. Code § 3-5-2-40.5(c). None of the requirements for voter ID that have been in place since 2005 have changed—only the fact that student IDs cannot be used at the polls even if they otherwise satisfy those criteria.

The Student ID Ban will have a significant impact on Indiana's student voters and, consequently, its young voters. Because student IDs issued by public colleges and universities in Indiana typically meet the statutory requirements, students at public colleges and universities have been using their student IDs to vote for the past 20 years. Compl. ¶ 27. One election official in Monroe County—home of Indiana University Bloomington—estimated that as many as *two-thirds* of student voters who used the on-campus polling location used a student ID to vote during the 2024 general election. *Id.* ¶ 2. Student voters are predominantly young voters, who are less likely to have alternative forms of voter ID, such as a driver's license or passport. *See id.* ¶¶ 33, 42–45. Without another eligible form of voter ID, they will be disenfranchised.[1] *Id.* ¶ 56. And for students, obtaining an acceptable form of photo ID is particularly burdensome in ways that are not necessarily shared by the general population. *Id.* ¶¶ 45–56. To obtain a driver's license or a state ID card, a voter needs to produce a minimum of three separate verification documents to prove their identity, lawful status, social security number, and residency. *Id.* ¶¶ 47–48. These verification documents can be difficult and time-consuming to obtain and access, especially for students who have relocated to attend school. *Id.* ¶¶ 48–52. For example, it typically takes between 12 and 16 weeks to obtain a copy of an Indiana birth certificate—too long for a newly enrolled student to obtain it in time to vote. *Id.* ¶¶ 49, 53. Other forms of verification documents may not be available at all for many students who remain on their parents' health insurance, rent with roommates, or study full time. *See id.* ¶¶ 48–52. These unique burdens on students are well-documented

---

[1] While Indiana does permit voters without an eligible ID to cast a provisional ballot at the polls, those ballots generally will not be counted unless the voter can produce an eligible ID within ten days of the election. Ind. Code § 3-11.7-5-2.5(b). Voting without an ID is only available to voters who attest, under penalty of perjury, that they either have "a religious objection to being photographed" or are "indigent" and unable to obtain an acceptable form of ID without paying a fee. *Id.* § 3-11.7-5-2.5(c).

throughout the legislative record of SB 10, as student after student explained to the legislature how many young voters lack other acceptable forms of ID and face significant and disproportionate difficulties in obtaining one in time to vote. *See, e.g.*, *id.* ¶¶ 58–59.

By contrast, the legislative record includes no evidence (or even a coherent hypothesis) that banning student IDs would advance the integrity of Indiana elections. *Id.* ¶ 68. None of the bill's proponents could identify a *single* instance of anyone convicted (or even charged) for committing voter fraud involving a student ID. *Id.* ¶ 64. Nor is there any evidence that either non-residents or non-citizens are voting in Indiana elections with student IDs. *Id.* ¶ 63. Legislators' only proffered justification for the law is that student IDs may be issued to students who are not residents of Indiana or citizens of the United States. *Id.* ¶ 62. But the voter ID law does not require people to use IDs that prove citizenship or residency in the first place. Voters can continue using other forms of photo ID—such as a federal Veterans Affairs card—that say nothing about their residence or citizenship status. *Id.* ¶¶ 70, 76. Indeed, Indiana's Attorney General and Secretary of State recently acknowledged that possessing "a state-issued identification does not demonstrate that a person is a citizen." *Id.* ¶ 73. The voter ID law serves to verify identity, not qualifications; a voter's qualifications are verified at the time they register. *Id.* ¶ 67.

On May 5, 2025, Plaintiffs Count US IN, Women4Change Indiana, and Josh Montagne filed this lawsuit challenging the constitutionality of SB 10's Student ID Ban. Plaintiff Count US IN is a student-founded, non-partisan organization dedicated to encouraging diverse voter turnout, educating citizens on their voting rights, and combatting voter suppression. *Id.* ¶ 14. Plaintiff Women4Change Indiana is a civic organization dedicated to encouraging democratic participation to achieve better health and social outcomes for women. *Id.* ¶ 18. Plaintiff Josh Montagne is a rising sophomore at Indiana University Bloomington. Mr. Montagne is registered to vote in

Indiana, but the student ID card he used to vote in the 2024 general election is the only form of ID he possesses that meets the criteria of Indiana's voter ID Law. *Id.* ¶ 21. Count I of Plaintiffs' Complaint alleges that the Student ID Ban places an undue burden on the right to vote and thus violates the First and Fourteenth Amendments, and Count II alleges that it violates the Twenty-Sixth Amendment by intentionally abridging the voting rights of young voters on account of age. *Id.* ¶¶ 81–93.

On July 7, 2025, the State Defendants moved to dismiss. *See* ECF No. 31 ("MTD Br."). One week later, the Republican National Committee ("RNC") filed an amicus brief in support of the State Defendants' motion. *See* ECF No. 34-1 ("RNC Br.").

## STANDARD OF REVIEW

In resolving a Rule 12(b)(6) motion to dismiss, the Court must determine whether the complaint contains sufficient factual matter to state a claim to relief that is plausible on its face. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must accept as true all well-pled facts in the complaint and view those facts "in the light most favorable to the plaintiff." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). The Court must also make "all possible inferences from the allegations in the plaintiff's favor." *Id.* The bar to survive a motion to dismiss "is not high." *Id.* A plaintiff need only plead facts that suggest a right to relief that is "above the speculative level." *Kaminski*, 23 F.4th at 776 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

I.    **Plaintiffs have plausibly alleged that the Student ID Ban constitutes an unconstitutional burden on the right to vote.**

Plaintiffs' robust allegations are more than sufficient to plausibly state a claim that the Student ID Ban places an undue burden on young voters' right to vote in violation of the First and

Fourteenth Amendments. This type of federal right-to-vote claim is evaluated under the *Anderson-Burdick* test, which is a highly contextual and factual test that requires the Court to carefully balance the character and magnitude of the injury to the voter's constitutional rights against the precise justifications put forward by the state for the need to impose those burdens. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). For that reason, right-to-vote claims evaluated under *Anderson-Burdick* are almost never resolvable at the motion to dismiss stage. *See Duke v. Cleland*, 5 F.3d 1399, 1405 & n.6 (11th Cir. 1993) (noting it was "impossible" at the pleadings stage "to undertake the proper review" under *Anderson-Burdick* because the existence of a state interest is "a matter of proof"); *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) ("But without any factual record at this stage, we cannot say that the Secretary's justifications outweigh the constitutional burdens" as a matter of law); *Democratic Nat'l Comm. v. Bostelmann*, 466 F. Supp. 3d 957, 966–67 (W.D. Wis. 2020) (agreeing that *Anderson-Burdick* claim was inappropriate for Rule 12(b)(6) dismissal and collecting cases); *One Wis. Inst., Inc. v. Nichol*, 155 F. Supp. 3d 898, 905 (W.D. Wis. 2015) ("Whether [a challenged law] ha[s] actually burdened . . . voters, and if so, to what degree, is a question of fact that cannot be resolved at the pleading stage." (citing *Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993))). So, too, here: dismissal is not appropriate.

### A. *Anderson-Burdick* is the proper framework to review the Student ID Ban.

When analyzing claims that a voting rule impermissibly burdens the right to vote under the First and Fourteenth Amendments, courts across the country—including the Seventh Circuit—have uniformly applied the framework developed by the Supreme Court in *Anderson* and *Burdick*. *See Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019) (stating that *Anderson-Burdick* "applies to *all* First and Fourteenth Amendment challenges to state election laws"); *see also, e.g.*, *Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020) ("*Tully I*") (quoting *id.*

for same); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) (applying *Anderson-Burdick* test to absentee voting law); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631–32 (6th Cir. 2016) (same); *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (same). The Supreme Court developed the *Anderson-Burdick* framework to harmonize the states' authority to regulate elections with the inevitable burdens those regulations may impose on the very fundamental right they are meant to safeguard—the right to vote, which has long been recognized as "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Under the *Anderson-Burdick* framework, courts must "weigh 'the character and magnitude of the asserted injury' . . . against 'the precise interests put forward by the State.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). "[T]h[is] balancing test requires careful analysis of the facts and should 'not be automatic.'" *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020) (quoting *Anderson*, 460 U.S. at 789). Instead, under *Anderson-Burdick*'s "flexible" standard, the level of scrutiny courts apply depends on "the extent of [the law's] imposition" on the right to vote. *Acevedo*, 925 F.3d at 948. Laws that impose "severe restrictions on voters' rights . . . must be narrowly tailored to advance a compelling state interest," while a state's "important regulatory interests are generally sufficient" to justify "reasonable, nondiscriminatory restrictions." *Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013) (quoting *Burdick*, 504 U.S. at 434). But "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318–19. No matter the severity of the burden, the Court's ultimate task is the same: it must look to the "legitimacy and strength" of the proffered interests to determine "the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Id.* (quoting *Anderson*, 460 U.S. at

789) (emphasis added).

Contrary to Circuit precedent, however, State Defendants rely on the Supreme Court's decision in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), which predates both *Anderson* and *Burdick*, to argue that the Court should apply rational basis review. MTD Br. at 6. This makes little sense. Indeed, in *Crawford*, upon which the State Defendants rely, the Supreme Court reviewed Indiana's voter ID law under the *Anderson-Burdick* framework. Moreover, the *McDonald* Court's approach does not apply to cases like this one, where Plaintiffs allege that a law will burden the right to vote. In *McDonald*, pretrial detainees challenged a law that allowed certain people (like those with disabilities) to vote by absentee ballot but did not allow pretrial detainees to vote by absentee ballot. 394 U.S. at 803. In deciding to apply rational basis review, the Court reasoned that the challenged law made it easier for certain voters to vote, but it did not place new burdens on the franchise for pretrial detainees or otherwise "impact" their ability to vote in any way. *See id.* at 807, 809. Nor did the law single out detainees, since "many other classes of Illinois citizens" were also not granted the right to vote absentee. *Id.* at 809–10. The Seventh Circuit has since confirmed that *McDonald*'s approach is limited to cases where there is no "impact" on a person's right "to cast a ballot in person" at all. *Tully I*, 977 F.3d at 616.[2] Here, Plaintiffs have alleged in detail how the Student ID Ban will impact students' and young voters' ability to cast their ballots *at the polls*. *See, e.g.*, Compl. ¶¶ 40–59. That is the very premise of Plaintiffs' claim. *Id.* ¶¶ 81–85 (alleging that the Student ID Ban impermissibly burdens students' and young people's right to vote). *McDonald* is thus inapposite, and, as the Seventh Circuit has

---

[2] Although the court in *Tully I* applied *McDonald* to a case about absentee voting, in the wake of *Anderson* and *Burdick*, several circuits have rejected *McDonald*'s continued application to the absentee voting context. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318–19 (applying *Anderson-Burdick* test to absentee voting law); *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 631–32 (same); *Price*, 540 F.3d at 109 (same).

unequivocally stated, *Anderson-Burdick* applies.

### B. Plaintiffs adequately allege an unconstitutional burden on the right to vote under the *Anderson-Burdick* framework.

Plaintiffs' allegations are more than sufficient to plead an undue burden claim. State Defendants' arguments to the contrary are premised on their misapprehension of the legal standard and misguided efforts to equate Plaintiffs' challenge to the Student ID Ban with a straw man: a challenge to Indiana's entire voter ID law. These arguments fail.

### 1. The Student ID Ban will burden the right to vote.

To start, Plaintiffs allege that the Student ID Ban will impose a severe burden on students' and young voters' right to vote. *See* Compl. ¶¶ 40–59. For the past twenty years, "tens of thousands of young voters have used student IDs to cast their ballots in Indiana." *Id.* ¶ 2. The election supervisor for Monroe County, where Indiana University Bloomington sits, estimated that *two-thirds* of students who voted at the on-campus polling place in 2024 used their student IDs. *Id.* Because of the Ban, students who would have used their student IDs to vote must use an alternative form of ID that meets the law's requirements. *Id.* ¶ 42. But for many students, doing so is logistically daunting. Students, most of whom are young voters, are less likely to have other accepted forms of ID, like a passport or an Indiana driver's license or state ID card. *Id.* ¶ 8; *see id.* ¶¶ 36–38, 42–44. And as multiple students testified in the legislature, obtaining alternative ID is more challenging for students too, since they often lack the underlying documents required to obtain official identification (or an accessible means to travel to a government office to request one). *See id.* ¶¶ 45–59.[3] Further still, because of the time it takes to obtain acceptable alternative

---

[3] Notably, the process of obtaining State-issued ID is more onerous now than it was when *Crawford* was decided. There, the Supreme Court emphasized that obtaining a state ID was minimally burdensome because it only required presenting "one primary document" at the appropriate state office. *Crawford*, 553 U.S. at 198 n.7 (quotations omitted). Today, however,

voter ID, it may be impossible for new students to do so between the time they arrive on campus in the fall and the date of an election. *Id.* ¶ 53. For example, a freshman who orders a birth certificate immediately at the start of school in August may not obtain it until 16 weeks later, after the November election has already passed. *Id.*; *see also id.* ¶ 49 (processing time for an Indiana birth certificate). These burdens are severe, particularly since they flow from a "*categorical[] prohibit[ion]*" on the use of student IDs, and students are "the *only* class in [Indiana] facing such a prohibition." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216–17 (N.D. Fla. 2018); *see also id.* (finding that categorical ban on placing polling places on college campuses severely burdened students' and young voters' right to vote because of the particular barriers they face in accessing the polls, including that they "are disproportionately without access to cars").

Nor is the Student ID Ban "nondiscriminatory." *Burdick*, 504 U.S. at 434 (quotation omitted). Under *Anderson-Burdick*, election restrictions merit higher scrutiny when they "fall more heavily" on a particular "segment of the community." *Anderson*, 460 U.S. at 793 n.15 (quoting *Bullock v. Carter*, 405 U.S. 134, 144 (1972)); *accord League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216–17 ("Disparate impact matters under *Anderson-Burdick.*"); *see also Crawford*, 553 U.S. at 202 (emphasizing, in finding the voter ID law constitutional, that "on the basis of the record that has been made in this litigation, we cannot conclude that the [voter ID] statute imposes excessively burdensome requirements on any class of voters" (quotations omitted)).[4] The Student

---

Indiana state ID cards require the presentation of no fewer than *three* separate documents to prove identity, lawful status, social security number, and Indiana residency. Compl. ¶¶ 46–48. If a voter does not possess one of the overlapping forms of documentary proof, it can require as many as *five* different documents—all with matching names and addresses—to obtain a state ID card. *Id.*

[4] Importantly, to warrant higher scrutiny, a plaintiff need not allege that the law discriminates against a suspect class, as is required under the traditional Equal Protection Clause analysis.

ID Ban targets students on its face. And since "[y]oung voters are overwhelmingly more likely to be students than older voters" (the average age of an undergraduate at Indiana University Bloomington is 21), it will also "make it harder for a[nother] specific group of people—young voters—to participate in Indiana's elections." Compl. ¶ 8. It is "especially difficult" for states to justify voting restrictions where the effects are "unevenly distributed across identifiable groups 'whose members share a particular viewpoint, associational preference, economic status,' . . . age [or] health." *Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp. 3d 949 (S.D. Ind. 2018), *consent decree vacated*, 925 F.3d 928 (7th Cir. 2019) (quoting *Anderson*, 460 U.S. at 793); *cf. Williams v. Salerno*, 792 F.2d 323, 327–28 (2d Cir. 1986) (holding that the equal protection clause "does not, of course, permit a state to discriminate against students by denying them the right to vote or by subjecting them to more vigorous registration requirements than are generally applied"). Unlike in *Crawford*, where the record lacked any "concrete evidence" that the voter ID law would make voting more difficult for certain groups of voters, 553 U.S. at 200, Plaintiffs here have alleged the particular burdens the Student ID Ban will impose on students and youth in detail, *see* Compl. ¶¶ 40–59; *see also Rokita*, 458 F. Supp. 2d at 824 (emphasizing that no evidence supported the plaintiffs' claims that the law would have a disparate impact).

State Defendants dispute none of this. Because they fail to even recognize the appropriate legal framework, they never engage with Plaintiffs' detailed allegations of burden at all. *See* MTD

---

Instead, such scrutiny is warranted whenever a voting restriction creates a "disparity in voting power," even if the impacted "segments of the community" are not "discrete and precisely defined." *Anderson*, 460 U.S. at 793 n.15 (quoting *Bullock*, 405 U.S. at 144). Thus, the Court in *Anderson* favorably quoted its decision in *Bullock* that certain "filing fees were unconstitutional because of the 'obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community,'" *id.* (quoting *Bullock*, 405 U.S. at 144), even though the Supreme Court has held that wealth-based classifications are normally assessed under rational basis review, *see San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973).

Br. at 5–9. Instead, in their cursory discussion of *Anderson-Burdick* (to argue they prevail even if that test applies), State Defendants suggest that this Court should ignore the burdens associated with the Student ID Ban altogether. According to State Defendants, the only question this Court can assess is whether "Indiana's voting requirements *as a whole* 'severely restrict[]' voting rights under *Anderson-Burdick*." MTD Br. at 8 (emphasis added). For this point, they invoke *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), where the court observed that, under *Anderson-Burdick*, "[c]ourts weigh" the burden a law imposes "against the state's interests by looking at the whole electoral system." *Id.* (quoting *Luft*, 963 F.3d at 671–72). But as *Luft* itself makes clear, this just means that laws that restrict voting rights must be viewed in context, and burdens may be less meaningful when a state's election system makes voting easier in other ways. *See id.* Thus, for example, in *Crawford*, the district court found that, even though the voter ID law might be more burdensome on elderly and disabled voters, the impact was mitigated by the fact that these voters are eligible in Indiana to vote by absentee ballot, which does not require photo ID. *Rokita*, 458 F. Supp. 2d at 828–29. In contrast, here, under Indiana law, students and young voters are generally *not* eligible to vote absentee absent a "specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open." Compl. ¶ 55 (quoting Ind. Code § 3-11-10-24). Rather than mitigating the burden like in *Crawford*, in this case, the context confirms the severity of the burden the Student ID Ban imposes.

### 2. The Student ID Ban serves no legitimate state interests.

The second step in applying the *Anderson-Burdick* test is to weigh the burdens imposed by the Student ID Ban against "the precise interests identified by the State." *Acevedo*, 925 F.3d at 948 (quoting *Anderson*, 460 U.S. at 789). "However slight th[ose] burden[s] may appear . . . [they] must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (internal quotations omitted). To perform this analysis,

courts must determine the "legitimacy and strength" of the state's interests and "the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Acevedo*, 925 F.3d at 948 (quoting *Anderson*, 460 U.S. at 789) (emphasis added). Even if a state interest is "legitimate in the abstract," Defendants must put forward "concrete evidence" providing that "such an interest" justifies the "burden [on] voters' rights." *Fish v. Schwab*, 957 F.3d 1105, 1132–33 (10th Cir. 2020). If a state cannot "articulate how achieving [its] goals makes it at all necessary or desirable to" burden the right to vote, then there is "nothing to weigh on the [state's] side" of "the *Anderson-Burdick* balancing analysis." *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 881 (3d Cir. 1997).

Here, Defendants have not offered any sufficient justification for the burdens the Student ID Ban imposes on students and young voters. Compl. ¶¶ 60–80. Without a cogent, much less compelling, justification for the law, the Student ID Ban cannot survive the *Anderson-Burdick* analysis even if this Court finds it imposes only a minimal burden on the right to vote. *Crawford*, 553 U.S. at 191.

In the legislature, proponents of SB 10 suggested that banning student ID was necessary to ensure that only Indiana residents and U.S. citizens vote in Indiana elections. Compl. ¶¶ 60–62. But "there is no evidence that non-residents or non-citizens are voting in Indiana elections," nor is there evidence that "non-residents and non-citizens are using student IDs to vote." *Id.* ¶¶ 63, 68. Moreover, Indiana's voter ID law is designed to confirm a voter's *identity*, not their residency or citizenship. *Id.* ¶¶ 63, 66–67. The Secretary of State's own Voter Registration Guidebook advises election officials not to "conflate[]" the difference between proof of residency for new registrants

and "Indiana's voter ID law, which requires specific types of identification to verify a person's identity to cast a ballot on Election Day." *Id.* ¶ 66.[5]

Regardless, even if voting by non-residents or non-citizens were a problem, the Student ID Ban would not solve it. Indiana's voter ID law has not required ID establishing in-state residency since it was first enacted in 2005, and the Student ID Ban does nothing to change that. *Id.* ¶ 70. Instead, the voter ID law states that, to be sufficient, the photo ID must be issued "*by the United States* or the state of Indiana." *Id.* (quoting Ind. Code § 3-5-2-40.5) (emphasis added). And of course, photo ID issued by the United States, such as a passport, cannot and does not prove Indiana residency. *Id.* Nor does the voter ID law—before or after SB 10—require a photo ID that proves citizenship. *Id.* ¶ 72. As Indiana's Attorney General and Secretary of State acknowledged in a recent letter: "[P]ossession of a state-issued identification does not demonstrate that a person is a citizen." *Id.* ¶ 73. In other words, an Indiana driver's license says no more about a person's citizenship status than a student ID does. Where, as here, the state cannot show that the challenged law actually advances its asserted state interests, those interests cannot justify even the slightest burden on the right to vote. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 219–22 (1986) (holding that State's interests in preventing party raiding and voter confusion, though "legitimate" in the abstract, could not justify a burden because the challenged statute did not actually advance those interests).[6]

---

[5] *Accord* Br. of State Respondents*, Crawford v. Marion Cnty. Election Bd.*, Nos. 7-21, 7-25, 2007 WL 4232930, at *50 (U.S. Dec. 3, 2007) (explaining that Indiana's voter ID law is intended to prevent "[v]oter impersonation").

[6] *See also Soltysik*, 910 F.3d at 447 (holding even an "important government interest" insufficient because the court "struggle[d] to understand how [the challenged statutes] . . . advance[d] that goal"); *Lerman v. Bd. of Elections in N.Y.C.*, 232 F.3d 135, 149 (2d Cir. 2000) ("[T]he fact that the defendants['] asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994))).

Ignoring the legislature's justifications for the law, State Defendants now offer two different purported state interests to justify the Student ID Ban. First, they invoke "the problem of fraud," citing *Crawford* for the point that "[t]here is no question about the legitimacy or importance of a State's interest in counting only eligible voters' votes." MTD Br. at 6–7 (quoting the Syllabus from *Crawford*). No one disputes that preventing fraud is a legitimate state interest. But State Defendants have not even attempted to make any connection between fraud and the Student ID Ban, as the second step of *Anderson-Burdick* requires. Nor can they. The Student ID Ban does not serve the "State's interest in counting only eligible voters' votes" because voter ID confirms only a voter's identity, not their *eligibility*—which is determined during the registration process. *See supra* at 14–15. And regardless, even *after* SB 10, Indiana's voter ID law still allows forms of identification that do not contain information about a voter's residency or citizenship. *See supra* at 15.

More broadly, nothing in the record suggests that there is a "problem of fraud" in Indiana at all. In fact, the allegations in the Complaint show the opposite. Indiana officials have confirmed the integrity of its elections, and recent audits confirm their accuracy. *See* Compl. ¶¶ 64–65. Nor is there any evidence to suggest there has ever been an instance of voter fraud in Indiana that involved student ID. *Id.* ¶ 64. In sum, "[a]lthough the State has an interest in combatting voter fraud," the Student ID Ban is "not a reasonable means to accomplish that goal." *Priorities USA v. State*, 591 S.W.3d 448, 455 (Mo. 2020). It therefore "does not pass muster under any level of scrutiny." *Id.*; *accord Fish*, 957 F.3d at 1124 (explaining that even minimal burdens must be justified by "relevant" State interests) (quoting *Crawford*, 553 U.S. at 191).

State Defendants also argue that the Student ID Ban is necessary to address "[a] concern about the variety of student identification cards" and a generalized need for "consistency." MTD

Br. at 7. This is belied by the law itself. The Student ID Ban did not eliminate inconsistency; it created it. Before SB 10, Indiana's voter ID law applied neutral criteria (the ID must contain the voter's name, photo and an appropriate expiration date) to determine whether an ID was acceptable, and any form of ID that satisfied the criteria could be used. By the same token, any form of ID that did *not* meet the criteria would be insufficient under the law. Thus, like any other form of ID, some student IDs passed muster under the law and others did not. The same is true of any other type of ID, whether the identification is, for example, a State employee ID that lacks an expiration date, a federal benefits card that lacks a photo, or an expired driver's license. State Defendants' purported consistency justification thus carries no weight. *See Tashjian*, 479 U.S. at 219–22.

Finally, State Defendants and the RNC suggest that a court applying the *Anderson-Burdick* test must be deferential to the state legislature's policy judgments. But the U.S. Supreme Court has said the opposite: "a court must identify and evaluate the interests put forward by the State . . . and then make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190. Contrary to the RNC's suggestion, it is not enough for a state to simply invoke the specter of voter fraud. *See, e.g.*, RNC Br. at 6.[7] To the contrary, courts can and frequently do consider whether there is actual evidence of a fraud problem when applying the fact-intensive analysis *Anderson-Burdick* demands. *See, e.g.*, *Fish*, 957 F.3d at 1134 (finding inadequate evidence to justify law requiring voters to provide documentary proof of citizenship at registration where, at most, only 67 noncitizens had registered or attempted to register over the last 19 years). Here, the State has

_____

[7] The RNC cites *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021), in support, but that case addressed Section 2 of the Voting Rights Act, not a burden on the right to vote claim, which is assessed under *Anderson-Burdick*.

not even raised a plausible theory as to how the Student ID Ban relates to preventing voter fraud.

## II. Plaintiffs have plausibly alleged that the Student ID Ban violates the Twenty-Sixth Amendment.

As Plaintiffs allege in the Complaint, the Student ID Ban violates the Twenty-Sixth Amendment because it deliberately denies and abridges the right to vote on account of age. Compl. ¶¶ 86–93. Like the Fifteenth and Nineteenth Amendments, which served as models for the Twenty-Sixth, the Twenty-Sixth Amendment bars both express age discrimination in voting and facially neutral laws passed with an intent to discriminate on account of age. To identify discriminatory intent, a growing consensus of courts use the framework set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). And under that framework, Plaintiffs' allegations plausibly establish that suppressing the youth vote is not merely a byproduct of the Student ID Ban, but a motivation for it.

State Defendants' cursory counterarguments mischaracterize Plaintiffs' claim as a demand for students to have a "unique status" under the law. MTD Br. at 9. To the contrary: it is SB 10's specific and targeted ban on student IDs that discriminates against students and treats them differently than any other group of voters. Denying or abridging the right to vote by "singling minor voters out for special treatment" is "precisely . . . [w]hat Congress sought to avoid" in passing the Twenty-Sixth Amendment. *Jolicoeur v. Mihaly,* 488 P.2d 1, 7 (Cal. 1971) (en banc).

### A. The Twenty-Sixth Amendment prohibits all voting restrictions that discriminate on account of age.

The Twenty-Sixth Amendment provides, in relevant part: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." U.S. Const., amend. XXVI. This language precisely mirrors the Fifteenth and Nineteenth Amendments, which provide that the right to vote "shall not be denied or abridged . . . on account of" race or sex. U.S. Const., amends. XV, § 1; XIX; XXIV, § 1.

This was intentional. As the drafters and proponents of the Twenty-Sixth Amendment explained: "Just as the 15th amendment prohibits racial discrimination in voting and just as the 19th amendment prohibits sex discrimination in voting, the [Twenty-Sixth Amendment] prohibit[s] age discrimination in voting." 117 Cong. Rec. 7534 (1971) (statement of Rep. Richard Poff); *see also id.* at 7539 (statement of Rep. Claude Pepper) (stating that the goal in drafting the Twenty-Sixth Amendment was to do "exactly what [they] did . . . in the 15th amendment and . . . the 19th amendment"). Thus, the Twenty-Sixth Amendment was intended not only to ensure that 18-year-olds are permitted to vote, but also to "guarantee[] that citizens who are 18 years of age or older *shall not be discriminated against on account of age.*" *Id.* at 7534 (statement of Rep. Richard Poff) (emphasis added). In short, by "transplant[ing]" language from previous amendments into the text of the Twenty-Sixth, Congress intentionally "br[ought] the old soil with it.'" *Taggart v. Lorenzen,* 587 U.S. 554, 560 (2019) (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018)); *see also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two [laws] having similar purpose . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

In keeping with these principles, courts—including the Seventh Circuit—have recognized that the Twenty-Sixth Amendment prohibits age discrimination in voting. *See, e.g.*, *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 976–77 (W.D. Wis. 2016), *aff'd in part, rev'd in part on other grounds*, *Luft*, 963 F.3d at 665 (finding that plaintiffs could survive summary judgment on their Twenty-Sixth Amendment claim challenging a law that required college students to "provide more documentation than other voters have to provide, both to register and to cast a ballot"); *see also, e.g.*, *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222–23 (holding plaintiffs were substantially likely to succeed on merits of Twenty-Sixth Amendment claim in challenge to

restrictive state guidance that prohibited early voting sites on college campuses, finding the prohibition "unexplainable on grounds other than age because it bears so heavily on younger voters"); *Colo. Project-Common Cause v. Anderson*, 495 P.2d 220, 223 (Colo. 1972) (holding based on "[h]istory and reason" that the Twenty-Sixth Amendment's "prohibition against denying the right to vote to anyone eighteen years or older by reason of age applies to the entire process involving the exercise of the ballot and its concomitants"); *Jolicoeur*, 488 P.2d at 4 (finding a Twenty-Sixth Amendment violation where minors were subject to different procedures and qualifications for voting); *United States v. Texas*, 445 F. Supp. 1254, 1249–62 (S.D. Tex. 1978) (three-judge court finding that county official violated the Twenty-Sixth Amendment by refusing to register college students who lived in dormitories to vote, excluding them from the residency requirements that applied in every other context), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979).

Moreover, consistent with the Fifteenth Amendment, the Twenty-Sixth Amendment's prohibition on age-based discrimination applies to facially neutral restrictions that are motivated by an age-discriminatory purpose. *See, e.g.*, *Jolicoeur*, 488 P.2d at 4 ("The Twenty-Sixth Amendment, like the Twenty-Fourth, Nineteenth, and Fifteenth before it, 'nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise . . . although the abstract right to vote may remain unrestricted.'" (quoting *Lane v. Wilson*, 307 U.S. 269, 275 (1939))).

Ignoring all this, the State Defendants argue instead that the Twenty-Sixth Amendment was passed merely to "lower[] the voting age from 21," and "was 'less a recognition of basic human rights' than 'a change in the condition of young Americans' who were not only being called to fight in Vietnam, but were also 'generally marrying earlier, traveling more widely and taking a

greater interest in government than ever before.'" MTD Br. at 11 (quoting *Walgren v. Bd. of Selectmen of the Town of Amherst, Mass.*, 373 F. Supp. 624 (D. Mass. 1974)). This perspective cannot be squared with the explicit intent of the Twenty-Sixth Amendment's drafters, *supra* at 18–19, and consequently, with the growing consensus of federal courts that have considered the issue, *see Allen v. Waller County*, 472 F. Supp. 3d 351, 363 (S.D. Tex. 2020) (recognizing this consensus); *League of Women Voters of Fla., Inc.*, 314 F. Supp. 3d at 1221 (same).

### B. The State Defendants' misreading of *Tully* has no bearing on Plaintiffs' Twenty-Sixth Amendment claim.

The State Defendants sidestep Plaintiffs' allegations of intentional discrimination and instead attempt to shoehorn this case into the Seventh Circuit's holding in *Tully v. Okeson*, 78 F. 4th 377 (7th Cir. 2023) ("*Tully II*"). The State Defendants misread *Tully II* and misapply it here.

To start, State Defendants claim that the Seventh Circuit in *Tully II* "rejected" an approach that "import[s] Fifteenth Amendment jurisprudence to its analysis of [a] Twenty-Sixth Amendment claim." MTD Br. at 10 (citing *Tully II*, 78 F.4th at 385–86). By the court's express terms in *Tully*, it did not. Though the Court of Appeals agreed that the Fifteenth Amendment was a model for the Twenty-Sixth, it upheld a facially-discriminatory law that extended the right to vote by absentee ballot to people over the age of 65, but not to younger voters. *Tully II*, 78 F.4th at 379. In its analysis, the court expressly "agree[d] . . . that the Supreme Court's interpretation of the equivalent language in the Fifteenth and Twenty-Fourth Amendments is a good starting place for our analysis." *Id.* at 382. It then reviewed Supreme Court cases interpreting the Fifteenth Amendment and found that, in those cases, courts were concerned with discrimination in "the right to register, the right to cast a ballot, and the right to have that ballot counted," not with the option of voting absentee. *Id.* at 383–84. Next, it considered Supreme Court cases interpreting the Twenty-Fourth Amendment, which also mirrors the Twenty-Sixth, to interpret the term "abridge."

*Id.* at 385. Finally, applying the interpretive framework it gleaned from these cases, the court concluded that "*accommodating*" seniors with an absentee voting option did not abridge younger voters' rights. *Id.* at 387–88. *Tully II* therefore did not "reject" the interpretive approach Plaintiffs advance here; it exemplified it.

State Defendants also argue that the Student ID Ban cannot violate the Twenty-Sixth Amendment because it does not "abridge" the right to vote. MTD Br. at 10 (citing *Tully II*, 78 F.4th at 377). As an initial matter, State Defendants' argument about the meaning of "abridge" has little practical import. Plaintiffs have alleged that many young voters will be *denied* the right to vote under the Student ID Ban, since those who do not have and cannot obtain alternative ID will not be permitted to cast their ballots. *See, e.g.*, Compl. ¶ 56 (alleging that "many students will be disenfranchised" because of the Student ID Ban). Plaintiffs' claim thus survives regardless of whether the Student ID Ban also "abridges" the right to vote. *See* U.S. Const., amend. XXVI (stating that "the right . . . to vote shall not be denied *or* abridged" on account of age (emphasis added)).

Regardless, relying on *Tully II*, the State Defendants argue the Student ID Ban does not "abridge" the right to vote because it does not "impose a material requirement" on young voters. MTD Br. at 10. Even under this narrow reading of *Tully II*, the State Defendants' argument fails. Although the court in *Tully II* did not define "material requirement," its reasoning, as well as the specific facts before the court, clarify how it understood this term. To understand the meaning of "abridge," the court in *Tully II* relied on the Supreme Court's "seminal Twenty-Fourth Amendment case," *Harman v. Forssenius*, 380 U.S. 528 (1965); *see Tully II*, 78 F.4th at 385–87. There, the Court indicated that an abridgement occurs when a law "imposes a material requirement" on certain voters in that it "erects a real obstacle to voting" for people that engage in protected activity

or who have a constitutionally protected status. *Harman*, 380 U.S. at 541.

In *Tully II*, the plaintiffs could not satisfy this standard. The *Tully II* plaintiffs challenged a law that made absentee voting available for senior citizens, but not for younger voters. *Tully II*, 78 F.4th at 379. This did not "erect a[ny] real obstacle" to the exercise of their rights; it merely conferred a special *benefit* on voters over the age of 65. *Id.* at 387–88 (quoting *Harman*, 380 U.S. at 541). In contrast, the Student ID Ban targets the population the Twenty-Sixth Amendment protects and "erects a real obstacle to voting" that other voters need not surmount. *Harman*, 380 U.S. at 541. All other Indiana voters can use any state ID that satisfies the neutral requirements of Indiana's voter ID law, whether it is a state employee ID, a federal benefits card, or other ID. But students who have a state-issued student ID cannot use it to vote, even if it satisfies the requirements that otherwise apply; they must present (and in many cases, obtain) a different form of identification. *See* Compl. ¶¶ 40–59 (describing the burdens associated with obtaining an alternative form of voter ID). In short, the law in *Tully II* did not "erect obstacle[s] to voting" for younger voters; as Plaintiffs allege in detail, the Student ID Ban does. *See* Compl. ¶¶ 40–59.

Moreover, the premise of the State Defendants' argument—that a law can only ever "abridge" the right to vote if it "imposes a material requirement" on certain voters—overreads *Tully.* The State Defendants suggest that retrogression—when a law makes voters "worse off"— is never sufficient to "abridge" the right to vote. MTD Br. at 10 (citing *Tully II*, 78 F.4th at 385–86). But *Tully* does not say that. There—challenging a law that did not involve any retrogression— the plaintiffs argued that the Twenty-Sixth Amendment did not "*require* retrogression" to establish that a law "abridges" the right to vote. *See* Pls.' Br., *Tully II*, 2022 WL 17476443, at \*26 (7th Cir. Nov, 28, 2022) (emphasis added); *see id.*, at \*25–26. The court agreed that the test for "abridgment" cannot be simply boiled down to whether or not a law makes certain voters "worse

off," since "[f]ocusing *just* on retrogression for purposes of the Fifteenth Amendment would preclude relief to individuals who, even before the passing of the act in question, had not enjoyed fully the right to vote." *Tully II*, 78 F.4th at 387 (emphasis added). Beyond this, the *Tully II* court does not define the precise circumstances when retrogression "abridges" the right to vote (since retrogression was not at issue in that case). And it has nothing to say about a case like this one, where the state excises a voting method that young voters have relied upon for decades. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 190–91 (5th Cir. 2021) (stating that a law that "makes voting *more difficult* for that person than it was before the law was enacted or enforced" abridges the right to vote under the Twenty-Sixth Amendment).

For similar reasons, State Defendants' reliance on *Nashville Student Organizing Committee v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015), is misplaced. While the district court in *Hargett* dismissed a Twenty-Sixth Amendment claim, it did so under substantially different circumstances. Tennessee had *never* permitted voters to use student IDs to vote. *Id.* at 757.[8] By contrast, Indiana—after 20 years of students using their IDs to vote—made "voting more difficult for [student voters] than it was before the law was enacted." *Tex. Democratic Party*, 978 F.3d at 191.[9] The retrogression absent in *Hargett* is present here.

### C. The Student ID Ban violates the Twenty-Sixth Amendment because it intentionally singles out young student voters for exclusion.

Although the State Defendants make no attempt to address Plaintiffs' intentional

---

[8] The RNC also cites *Hargett* to argue that, even if SB 10 is found to be "discriminatory on the basis of age, it is still subject only to a rational basis standard of review." RNC Br. at 16 (quoting *Hargett*, 155 F. Supp. 3d at 755). That statement was made in the context of discussing an equal protection claim under the Fourteenth Amendment, not a Twenty-Sixth Amendment claim.

[9] The only other case Defendants cite for this point, *March for Our Lives Idaho v. McGrane*, is currently pending appeal in the Ninth Circuit on the Twenty-Sixth Amendment claim. *See March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1135 (D. Idaho 2024), *appeal pending March for Our Lives Idaho v. McGrane*, No. 24-6376 (9th Cir. filed Oct. 16, 2024).

discrimination allegations, this is the heart of Plaintiffs' Twenty-Sixth Amendment claim: that the Student ID Ban was passed with a discriminatory purpose. To assess claims of age discrimination in voting, "[m]ost [courts] have applied the *Arlington Heights* factors." *Allen*, 472 F. Supp. 3d at 363, the same framework that courts use to determine whether facially neutral laws were passed with the intent to discriminate based on race, *see Vill. of Arlington Heights*, 429 U.S. at 252; *see also, e.g.*, *One Wis. Inst.*, 186 F. Supp. 3d at 976 (finding that "[t]he textual and structural similarities" between the Twenty-Sixth and Fifteenth Amendments "suggest that the *Arlington Heights* framework is the appropriate mechanism for evaluating plaintiffs' age discrimination claims."); *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221 (finding that "[a] consensus has been emerging" regarding the proper analytical framework "as recent courts have applied the *Arlington Heights* standard for Twenty-Sixth Amendment claims").

The *Arlington Heights* framework requires courts to consider all "circumstantial and direct evidence of intent as may be available" to determine whether intent to discriminate was a "motivating factor" in the challenged action (even if it was not the sole factor). *Vill. of Arlington Heights*, 429 U.S. at 265–66. The Court also identifies factors that might evidence intent, including a stark discriminatory impact, the historical background of the challenged law, and relevant legislative history. *Id.* at 266–68. Courts may also find discriminatory intent when a law's disparate impact was "foreseeab[le]," particularly if it was also unnecessary to serve the interests at stake. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979) and *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978)).

Plaintiffs' allegations support a finding of discriminatory intent under several *Arlington Heights* factors. To start, the Student ID Ban will plainly have a disparate impact on young voters.

As Plaintiffs allege, "tens of thousands of young voters have used student IDs to cast their ballots in Indiana," and will be forced to find an alternative voter ID. Compl. ¶ 2. Moreover, young voters are "overwhelmingly more likely to be students than older voters." *Id.* ¶ 8. For example, the average age of an on-campus undergraduate student across the Indiana University system is 21 years old. *Id.* And, even within the subset of students, younger voters are more likely to lack "other accepted forms of voter ID, such as a passport or an Indiana driver's license or state ID card." *Id.*; *see also id.* ¶¶ 43–59. Given these circumstances, the Student ID Ban "is unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222.[10]

Moreover, the legislative history shows that SB 10's proponents knew the Student ID Ban would burden young voters and passed it anyway. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230 (4th Cir. 2016) (finding discriminatory intent where legislators had data showing which voting practices Black voters most employed and then acted to restrict those same practices). As Plaintiffs have alleged, student after student detailed the barriers to the franchise they would face if they could no longer use student ID to vote. *See* Compl. ¶¶ 57–59. "If this bill passes," one student testified, "students who rely on their school IDs to vote would face unnecessary and unfair barriers that serve no purpose other than to suppress voter turnout amongst young people." *Id.* ¶ 59.

Legislators' implausible (and illogical) justifications for the Student ID Ban also suggest a discriminatory purpose. As courts have found in a multitude of contexts, "implausible or fantastic

---

[10] *See also Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (noting, based on the legislative record, that the Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment.") (citing 117 Cong. Rec. 5817, 5825 (1971) (statements of Sens. Charles Percy and Edward Brooke)).

justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)); *accord, e.g.*, *McCrory*, 831 F.3d at 230 (treating the State's "unpersuasive" race-neutral explanations for its actions as evidence of its discriminatory intent); *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005) (explaining that "implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons for a challenged action can show that those reasons were a pretext for discrimination).

In response to Plaintiffs' Twenty-Sixth Amendment claim, the RNC introduces a slew of calculations that purportedly show the numbers of young people who might be affected by SB 10. Not only are these factual assertions improper for consideration at the pleading stage, they also misunderstand the legal inquiry for an intentional discrimination claim.[11] In short, the RNC suggests that the Student ID Ban cannot be a form of intentional discrimination against young voters because there are (1) young voters who may not be harmed—either because they possess alternate forms of ID or because they have no intention of voting in Indiana—and (2) older voters who may also be affected. RNC Br. at 16. But the discriminatory intent inquiry does not ask whether the targeted group is the *only* group affected; it simply asks whether the challenged law "bears more heavily on one [group] than another." *Vill. of Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). The Student ID Ban inarguably does that here.

---

[11] If anything, the RNC's figures—which show that over 70% of out-of-state students are between the ages of 18 to 24, RNC Br. at 16—support Plaintiffs' allegations about the disparate impact the Student ID Ban will have on young voters.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny the State Defendants' Motion to Dismiss.

Dated: July 28, 2025

Respectfully submitted,

/s/ *Aria Branch*
Aria Branch*
Katie Chamblee-Ryan*
William Hancock*
Daniel Cohen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
abranch@elias.law
kchambleeryan@elias.law
whancock@elias.law
dcohen@elias.law
Tel: (202) 968-4490

Jeffrey Macey
**Macey Swanson LLP**
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN 46204
jmacey@maceylaw.com

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*