UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COUNT US IN, *et al.*,                )
                                      )
                    Plaintiffs,       )
                                      )
        v.                            )        No. 1:25-cv-00864-RLY-MKK
                                      )
DIEGO MORALES, in his official capacity as  )
Indiana Secretary of State, *et al.*,  )
                                      )
                    Defendants.       )

**ENTRY DENYING DEFENDANTS' MOTION TO DISMISS**

Indiana requires voters to present photo identification to confirm their identity when voting in person. For twenty years, student IDs issued by public universities and colleges satisfied Indiana's neutral requirements for photo identification. Then lawmakers enacted Senate Bill 10. That law does not amend those requirements. Instead, it specifically exempts "document[s] issued by educational institutions." As a result, Indiana students can no longer use their school-issued IDs to verify their identities at the polls. Plaintiffs allege that this law imposes an undue burden on their right to vote and discriminates on the basis of age in violation of the First, Fourteenth, and Twenty-Sixth Amendments. Defendants move to dismiss Plaintiffs' claims, arguing that concerns about voter fraud and the variety of student IDs justify the amendment. For the reasons explained below, the court **DENIES** Defendants' Motion to Dismiss.

## I.    Background

### A.    Indiana's Voter ID Law

In 2005, the Indiana legislature enacted a voter ID law.  (Filing No. 1, Compl.

¶ 26).  That law requires voters to present a form of photo identification before they vote,

(*id.*), and it had defined "proof of identification" as a document that (1) shows the name

of the registered voter, (2) shows a photograph of the registered voter, (3) includes an

expiration date and is not expired or expired after the date of the most recent general

election, and (4) was issued by the United States or the State of Indiana.  Ind. Code § 3-5-

2.1-84(a).

Shortly after enactment, a group of voters brought a facial challenge to Indiana's

voter ID law.  *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006).

The district court granted summary judgment to the defendants, which the United States

Supreme Court affirmed in *Crawford v. Marion County Election Board*, 553 U.S. 181

(2008).

Indiana previously accepted any form of identification that met the statutory

requirements, including student IDs issued by public colleges and universities in Indiana.

(*Id.* ¶¶ 26–27).  Student IDs issued by private colleges and universities, in contrast, did

not meet the statutory requirements.  (*Id.* ¶ 77).  In the years since the law's passage,

Indiana has amended it to permit the use of certain documents lacking an expiration date,

including documents issued by a branch of the uniformed services, the United States

Department of Veterans Affairs, or a Native American tribe recognized by the United

States government.  (*Id.* ¶ 29).

### B.    Senate Bill 10

In the most recent Indiana legislative session, lawmakers, through Senate Bill 10 ("SB 10"), removed student ID as a permissible form of identification.  (*Id.* ¶ 31). Indiana did not alter the law's pre-existing requirements.  (*Id.*).  Rather, it singled out this one specific form of ID by amending the law to state that proof of identification for voting purposes "does not include a document issued by an educational institution." *See* Ind. Code § 3-5-2.1-84(c).  Student IDs are therefore the only form of identification that may not be used at the polls despite otherwise meeting the law's neutral requirements. (Compl. ¶ 32).

### C.    Legislative Justifications for Senate Bill 10

In passing SB 10, legislators argued that banning student ID was necessary to ensure that only Indiana residents and U.S. citizens vote in Indiana elections.  (*Id.* ¶ 60). During House floor debate on the bill, one legislator asserted that "[j]ust because you have an identification card to a student that has been issued by an educational institution, that does not prove Indiana residency."  (*Id.* ¶ 61).  Diego Morales, the Indiana Secretary of State ("Secretary"), justified SB 10 the same way: "Getting an ID at the BMV is claiming Indiana residency. That's all we're asking students to do."  (*Id.*).  But Indiana offered no evidence that non-residents or non-citizens are voting in Indiana elections or using student IDs to vote.  (*Id.* ¶ 63).

Another legislator suggested that SB 10 was necessary to ensure that "all voters are treated the same," describing the use of student IDs as an "exception" to the requirements that govern other voters' ID requirements.  (*Id.* ¶ 74).  And other SB 10

supporters argued that ID differences among universities necessitated the law. (*Id.* ¶ 77). They noted that some universities have begun using digital ID, while student IDs issued by private universities are ineligible as a form of photo ID under Indiana law. (*Id.*). Such discrepancies, they claimed, led to voter confusion and burdened universities. (*Id.*).

### D.    Senate Bill 10's Alleged Impact

Plaintiffs allege that SB 10 will have a significant impact on Indiana's students and young voters by eliminating a reliable and secure form of identification used to prove identity at the polls. (*Id.* ¶ 40). Students who would have used their student IDs to comply with Indiana's voter ID law cannot vote unless they have—or can obtain— another form of acceptable identification. (*Id.* ¶ 41). This is particularly challenging for students because they are less likely than other Indiana residents to have an Indiana driver's license in the first place, and less likely to have a driver's license at all. (*Id.* ¶¶ 42–43). Many young voters will therefore need to obtain an alternative form of identification to be able to vote. (*Id.* ¶ 45). But students seeking alternative forms of identification face special barriers at every step of the process. (*Id.*).

For one, obtaining a state ID card from the Indiana Bureau of Motor Vehicles ("BMV") requires time, travel, and documentation that can be difficult to obtain and that students are significantly less likely to have than older voters. (*Id.* ¶ 46). Moreover, Indiana requires all new applicants for Indiana driver's licenses, permits, or ID cards to provide documents that prove their (a) identity, (b) lawful status in the United States, and (c) residency. (*Id.* ¶ 47). Each of these requirements presents significant obstacles for students—obstacles the Complaint describes in detail. (*See id.* ¶¶ 48–54). And because

absentee voting is not broadly available in Indiana, students cannot avoid the photo ID requirement by voting by mail. *See* Ind. Code § 3-11-10-24.

During legislative debate about SB 10, college students offered public testimony describing the barriers they would face obtaining a new photo ID in time to vote. (Compl. ¶ 57). Students offered similar testimony at the House Committee hearing for SB 10. (*Id.* ¶ 58). One student at Indiana University Indianapolis explained that "[i]f this bill passes, students who rely on their school IDs to vote would face unnecessary and unfair barriers that serve no purpose other than to suppress voter turnout amongst young people." (*Id.* ¶ 59).

### E.    Procedural History

Plaintiff Count US IN is a non-profit corporation based in Fort Wayne, Indiana, that aims to encourage diverse voter turnout, educate citizens on voting rights, and combat voter suppression. (*Id.* ¶ 14). Plaintiff Women4Change is "a non-profit corporation based in Indianapolis, Indiana, with a mission to provide civic education and encourage democratic participation to achieve better outcomes in health, economic mobility, and personal safety for Indiana women." (*Id.* ¶ 18). And Plaintiff Josh Montagne is a 20-year-old sophomore at Indiana University Bloomington. (*Id.* ¶ 21). Plaintiffs filed this action against the Secretary, the individuals who serve on the Indiana Election Commission, the Co-Directors of the Indiana Election Division, and the Monroe County Board of Elections. (*Id.* ¶¶ 22–25). They allege that SB 10 imposes an undue burden on their right to vote in violation of the First and Fourteenth Amendments and denies or abridges their right to vote on account of age in violation of the Twenty-Sixth

Amendment.  Defendants move to dismiss Plaintiffs' Complaint under Rule 12(b)(6) for failure to state a claim.

## II.    Legal Standard

A Rule 12(b)(6) motion "test[s] the sufficiency of the complaint" rather than "the merits" of the lawsuit.  *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  A court may only grant a 12(b)(6) motion to dismiss where the complaint lacks "enough facts to state a claim to relief that is plausible on its face" such that the claims have not been "nudged . . . across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility exists where the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court accepts all well-pleaded facts as true and draws all reasonable inferences for the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## III.    Discussion

### A.    Undue Burden on the Right to Vote

The First Amendment and the Fourteenth Amendment's Equal Protection Clause prohibit states from imposing undue burdens on the right to vote.  Plaintiffs argue that SB 10—by eliminating student ID as an acceptable form of identification for voting— unconstitutionally burdens their right to vote.

The parties disagree on the appropriate test for Plaintiffs' claim under the First and Fourteenth Amendments.  Plaintiffs argue that the court should analyze SB 10 using the balancing test established by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780

6

(1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). But Defendants argue that the court should apply rational basis review consistent with *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). The court first addresses why the *Anderson-Burdick* framework applies before considering whether Plaintiffs have stated a claim under that framework.

### 1. *Anderson-Burdick* Applies

Defendants argue that rational basis review applies because Plaintiffs have not alleged that they would be absolutely prohibited from voting in Indiana. But Defendants' argument misinterprets the Seventh Circuit's distinction between the *Anderson-Burdick* test and *McDonald*'s rational-basis test. *See Tully v. Okeson*, 977 F.3d 608, 615–16 (7th Cir. 2020) ("*Tully I*").

In *Tully I*, the Seventh Circuit harmonized these standards to account for the Supreme Court's continued approval of both. Despite its earlier proclamation that the *Anderson-Burdick* "test applies to *all* First and Fourteenth Amendment challenges to state election laws," *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019), the court recognized that "rational-basis scrutiny applies to election laws that do not impact . . . the right to cast a ballot in person," *Tully I*, 977 F.3d at 616; *see McDonald*, 394 U.S. at 807–10 (applying rational basis review to law that allowed certain groups of people, but not pretrial detainees, to vote by absentee ballot). So even though Indiana's absentee-voting laws made it easier for elderly Hoosiers to vote, those laws did not make it harder for the plaintiffs to vote. *Tully I*, 977 F.3d at 616. And since

"Indiana's absentee-voting laws . . . [did] not make it harder for anyone to cast a ballot," rational basis review applied. *Id.*

To put it differently, both *McDonald* and *Tully I* involved challenges to laws that made voting easier for some groups. Rational basis review applied in those cases because the challengers argued only that they too deserved the law's benefits. SB 10 operates differently; by eliminating student IDs as an acceptable form of identification for voting, the law allegedly *does* make it harder for some Hoosiers to vote—particularly students and young voters. And Plaintiff's Complaint describes how in detail. (*See. e.g.*, Compl. ¶¶ 40–59). The court therefore agrees with Plaintiffs that the *Anderson-Burdick* framework governs this case.

### 2.    SB 10 and *Anderson-Burdick*

Under the *Anderson-Burdick* framework, the court engages in a two-step inquiry. First, the court considers "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Second, the court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule" and weigh these interests against the burdened rights. *Id.* This analysis recognizes the "legitimacy and strength" of the proffered interests and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* "Courts weigh these burdens against the state's interests by looking at the whole electoral system." *Luft v. Evers*, 963 F.3d 665, 671–72 (7th Cir. 2020). And the court's analysis should "not be automatic." *Anderson*, 460 U.S. at 789. Instead, when evaluating state electoral

8

regulations, the court's analysis should be "fact-intensive." *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020).

### a.    Burden Imposed by SB 10 on the Right to Vote

Plaintiffs assert that the inability to use student IDs to cast ballots in Indiana "will impose a severe burden on students' and young voters' right to vote." (Filing No. 42, Pls.' Resp. Br. at 10). Defendants counter that such burdens are no more severe than the burdens other Hoosiers already face identifying themselves at the polls—burdens the Supreme Court approved in *Crawford*.

As discussed above, the first step of the *Anderson-Burdick* analysis requires the court to determine the size of the burden imposed by a challenged voting rule. Severe restrictions on First and Fourteenth Amendment rights must be narrowly drawn to further a compelling interest. *Burdick*, 504 U.S. at 434. But a state's important regulatory interests are generally sufficient to justify "reasonable, nondiscriminatory restrictions." *Id.* Here, SB 10 imposes at least a moderate burden on students' and young voters' right to vote.

*Crawford* provides a helpful starting point. That case involved a constitutional challenge to Indiana's voter ID law, which requires voters to present photo identification issued by the government. *Crawford*, 553 U.S. at 185. The burdens relevant there were "those imposed on persons who [were] eligible to vote but [did] not possess a current photo identification that complie[d]" with Indiana's voter ID law. *Id.* at 198. Those burdens did not qualify as "substantial" given the slight inconvenience of "making a trip

to the BMV, gathering the required documents, and posing for a photograph." *Id.* And importantly, Indiana's BMV issued photo ID cards at no cost. *Id.*

In many ways then, Defendants are correct that the burdens imposed by SB 10 are indistinguishable from the slight burdens imposed by the voter ID law in *Crawford*; public college and university students can still obtain an otherwise acceptable photo ID for free without experiencing more than a slight inconvenience. But to dismiss the Plaintiffs' case as duplicative of *Crawford* at this stage would require the court to overlook the heavier burden that SB 10 will allegedly have on students and young voters.

Under *Anderson-Burdick*, a facially neutral and nondiscriminatory electoral regulation may nonetheless warrant a higher degree of scrutiny when an identifiable "class of voters" bears its effects. *See id.* at 191, 200; *Bullock v. Carter*, 405 U.S. 134, 144 (1972); *see also Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp. 3d 949, 968, 968 n.18 (S.D. Ind. 2018), *consent decree vacated*, 925 F.3d 928 (7th Cir. 2019) (explaining how a six-Justice majority in *Crawford* found that whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups "matters" in the *Anderson-Burdick* analysis); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."). In *Crawford*, for example, the Court recognized that certain groups—including elderly voters, indigent voters, and voters with religious objections to being photographed—may have faced a heavier burden under Indiana's voter ID law. 553 U.S. at 199. Without sufficient evidence demonstrating the particular difficulties those classes of voters faced, however, the Court could not determine the law's ultimate impact

10

on those groups. *Id.* at 201. It therefore focused its analysis on the magnitude of the law's burden on "all Indiana voters." *Id.* at 203.

But Plaintiffs do not allege that SB 10 imposes a burden on *all* Indiana voters. Instead, they allege that the law's burdens will be borne by a particular *class* of voters—students and young persons. (*See* Compl. ¶ 40–59). The Complaint discusses how students are less likely than other Indiana residents to have an Indiana driver's license and how younger Americans are less likely to have a driver's license at all. (*Id.* ¶¶ 42–43). It also describes how students and young voters face greater inconveniences obtaining an alternative ID. (*Id.* ¶¶ 46–59). In other words, Plaintiffs allege that they are unlike "most voters." *Crawford*, 553 U.S. at 198. Instead, they constitute a "limited number of persons" that SB 10 subjects to "a somewhat heavier burden." *Id.* at 199. That claim failed with respect to elderly and indigent voters in *Crawford* for lack of sufficient evidence. *Id.* at 201. But unlike the groups in that case, which was decided at the summary judgment stage, Plaintiffs have not had the opportunity to produce evidence demonstrating how SB 10 imposes a heavier burden on them.

Defendants argue that Plaintiffs' *Anderson-Burdick* theory must fail under *Luft v. Evers* because courts applying this test "must not evaluate each clause [of a State's election code] in isolation." 963 F.3d at 671. Instead, the court "must consider Indiana's electoral scheme as a whole." *Tully I*, 977 F.3d at 617. And as Defendants point out, SB 10 only eliminates one form of identification. Students at public universities and college can therefore still identify themselves to vote in the same manner relied on by non-students and students who attend private universities. But to dismiss Plaintiffs'

11

*Anderson-Burdick* claim because students who previously relied on their student ID can obtain alternative forms of ID would require the court to ignore their allegations explaining why those alternatives are more difficult for them to obtain. Moreover, while students without photo IDs "may cast provisional ballots that will ultimately be counted," *Crawford*, 553 U.S. at 199, students and young voters generally do not qualify for absentee voting under Indiana law, *see* Ind. Code § 3-11-10-24.[1] The burden imposed by the inability to vote absentee therefore offsets any mitigation to the burden created by the availability of provisional ballots.

After considering the burdens imposed by SB 10 in the context of Indiana's electoral scheme, and accepting Plaintiffs' allegations as true, the court finds that Plaintiffs have sufficiently alleged that SB 10 will impose at least a "somewhat heavier burden" on students and young voters than those recognized in *Crawford*. *Id.* at 199.

### b.    Indiana's Asserted Justifications for the Burden

Before weighing the burdens imposed by SB 10 against "the precise interests put forward by the State," *Acevedo*, 925 F.3d at 948 (quoting *Anderson*, 460 U.S. at 789), the court first identifies what those interests are in this case. The first is a general concern

---

[1] The Seventh Circuit in *Tully I* explained that:

> Indiana allows absentee voting by mail for all Hoosiers that qualify in one of thirteen categories, which include voters who are disabled, will be confined due to illness or injury, will be confined caring for another person, lack transportation to the polls, are age sixty-five or older, expect to be absent from the county on election day, and more.

977 F.3d at 617.

with voter fraud.  The second is a concern about the variety of student identification cards.

### *Voter Fraud*

Defendants first argue that "limiting the forms of identification available" addresses the problem of fraud.  (Filing No. 31, Defs.' Br at 6).  But since they do not explain how SB 10 prevents fraud, the court assumes that "[t]he only kind of voter fraud that [SB 10] addresses is in-person voter impersonation at polling places."  *Crawford*, 553 U.S. at 194.  Plaintiffs argue that nothing in the record suggests that there is a problem of fraud.  But even when a record contains no evidence of fraud, "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."  *Id.* at 196.

### *Variety of Student ID Cards*

Defendants also argue that SB 10 addresses concerns about "the variety of student identification cards."  (Defs.' Br. at 7).  For instance, student IDs from private universities are ineligible as a form of photo ID under Indiana law.  (Compl. ¶ 77).  And some universities have begun using digital ID.  (*Id.*).  Defendants claim that these inconsistencies justify a wholesale prohibition on the use of student IDs.  But for reasons discussed in greater detail in the following section, the court does not find this interest to be particularly strong.

### c.    Weighing the Burdens Against the Interests

Having identified the interests offered in support of SB 10, the court now "weigh[s] the asserted injury to the right to vote against the precise interests put forward

13

by the State as justifications for the burden imposed by its rule." *Crawford*, 553 U.S. at 190 (quoting *Burdick*, 504 U.S. at 434) (quotations omitted). "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). And even if a state interest is "legitimate in the abstract," Defendants must put forward "concrete evidence" providing that "such an interest" justifies "the burden [on] voters' rights." *Fish v. Schwab*, 957 F.3d 1105, 1132–33 (10th Cir. 2020).

The court begins with Defendants' interest in preventing voter fraud. Because the court assumes that SB 10 addresses in-person voter impersonation at polling places, the court considers only the extent to which SB 10 addresses Defendants' concern that voters appearing to vote are who they say they are. With that in mind, the court struggles to understand how SB 10 addresses Indiana's concern with unqualified voters voting in its elections, especially in light of "Indiana's electoral scheme as a whole." *Tully I*, 977 F.3d at 617. Speaking in support of SB 10 during a House floor debate on the bill, the Secretary suggested that student IDs do not prove that a voter is an Indiana resident. (Compl. ¶ 61).

But the purpose of Indiana's voter ID law is to confirm that when a person appears at the polls, they are the person they claim to be—not that they are an Indiana resident. *See 2024 Indiana Voter Registration Guidebook* at 17, Ind. Election Div., *available at* https://www.in.gov/sos/elections/files/2024Voter-Registration-Guidebook.FINAL.pdf ("Indiana's voter ID law . . . requires specific types of identification to verify a person's

*identity* to cast a ballot on Election Day.").  Besides, even if Indiana sincerely believes that nonresidents are engaging in voter fraud by using student IDs, SB 10 does not solve this concern.  For Indiana's voter ID law still permits photo IDs issued "*by the United States or* the state of Indiana."  Ind. Code § 3-5-2.1-84 (emphasis added).  Photo IDs issued by the United States, however, cannot prove that a voter is an Indiana resident.  So they present the same concerns as student IDs.

An interest in deterring and detecting voter fraud justified Indiana's original voter ID law notwithstanding a lack of evidence that voter fraud had occurred in Indiana. *Crawford*, 553 U.S. at 194–96.  But the court fails to see how—absent any indication of fraud unique to student IDs—general fraud concerns can likewise justify the elimination of a form of photo ID that has been accepted for 20 years and otherwise complies with the voter ID law's neutral requirements.

Similar issues undermine Defendants' consistency rationale.  True, SB 10 resolves inconsistencies between student IDs issued by public universities, which are eligible, and private universities, which are ineligible.  But Defendants merely swap one inconsistency for another.  Before SB 10, a voter could use any form of ID that met the criteria established by Indiana's voter ID law.  And other provisions in Indiana's electoral scheme recognize exceptions for military, Veterans' Affairs, and Native American tribal documents, even though those IDs do not satisfy Indiana's identification requirements. (Compl. ¶ 29).  After SB 10, however, student IDs from a public university, despite otherwise meeting the voter ID law's requirements, are categorically excluded. Defendants have no problem with permitting other types of ID that do *not* comply with

15

the law's requirements.  Thus, their argument that *all* student IDs need to be prohibited because *some* student IDs do not comply with the law's requirements carries little weight.

Defendants may believe that their asserted interests warrant greater deference from the court.  *See, e.g.*, *Luft*, 963 F.3d at 671.  After all, the Court upheld Indiana's voter ID law in *Crawford* despite no evidence of fraud.  And more recently, the Court has doubled down on the idea that states can take action to prevent voter fraud without any evidence of voter fraud.  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).  But both of those cases are distinguishable.  *Brnovich* involved a different analytical framework because that case involved a claim under § 2 of the Voting Rights Act.  *Id.* at 687.  Courts reviewing First and Fourteenth Amendment challenges to state election laws, however, need not accept claims of voter fraud at face value.  *See, e.g.*, *Fish*, 957 F.3d at 1134–36 (requiring defendant to substantiate election fraud concerns with evidence because the challenged law imposed a more serious burden than the burden in *Crawford*).  Evidence may be unnecessary when a law imposes only a slight burden on the right to vote.  The law in *Crawford*, for instance, imposed only a limited burden on voters, so the Court accepted the State's interest in combatting voter fraud "without requiring evidence that these interests were at risk in Indiana or remedied by the photographic-identification requirement at issue."[2]  *Id.* at 1135; *Crawford*, 553 U.S. at 191–97.  But the court has

---

[2] The court also notes the extent to which *Crawford*'s *Anderson-Burdick* analysis relied on the limited evidence of a burden on the right to vote.  *See Crawford*, 553 U.S. at 189 ("[T]*he evidence in the record* is not sufficient to support a facial attack on the validity of the entire statute." (emphasis added)); *id.* at 200 ("[O]*n the basis of the evidence in the record* it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." (emphasis added)).  The "fact-

already explained how the Complaint alleges that SB 10 imposes at least a "somewhat heavier burden" on students and young voters than those recognized in *Crawford*. *Id.* at 199. And a heavier burden requires stronger scrutiny of the state's asserted interests. *See id.* at 210 (Souter, J., dissenting) ("[W]e have avoided preset levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue.").

The Defendants' interests in preventing fraud and consistency, though legitimate in the abstract, cannot justify the burden imposed by SB 10—at least at this stage—because Plaintiffs have plausibly pleaded that SB 10 does not actually advance those interests. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 219–22 (1986); *Lerman v. Bd. of Elections in N.Y.C.*, 232 F.3d 135, 149 (2d Cir. 2000) ("[T]he fact that the defendants['] asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994))). Plaintiffs have therefore stated a claim under the First and Fourteenth Amendments.

## B.    Twenty-Sixth Amendment Claim

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by

---

intensive" nature of the inquiry makes claims evaluated under *Anderson-Burdick* especially difficult to resolve at the motion to dismiss stage. *See Gill*, 962 F.3d at 365 ("These cases reject cursory or perfunctory analyses; precedent requires courts to conduct fact-intensive analyses when evaluating state electoral regulations); *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) ("But without any factual record at this stage, we cannot say that the Secretary's justifications outweigh the constitutional burdens . . . as a matter of law.").

the United States or by any State on account of age." U.S. Const. amend. XXVI. Plaintiffs argue that SB 10 violates the Twenty-Sixth Amendment by targeting student IDs for exclusion as a valid form of photo ID, thus intentionally denying or abridging the voting rights of young voters on account of age.

The Supreme Court has not yet provided an extensive analysis of the Twenty-Sixth Amendment. But several courts, including the Seventh Circuit, have recently grappled with the Amendment's meaning. *See Tully v. Okeson*, 78 F.4th 377 (7th Cir. 2023) ("*Tully II*"). "As with the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, the Twenty-Sixth Amendment 'provide[s] an individual right to be free from the denial or abridgement of the right to vote based on the classification described in the Amendment." *Id.* at 383 (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184 (5th Cir. 2020)). Thus, "the Twenty-Sixth Amendment confers an individual right to be free from the denial or abridgment of the right to vote on account of age." *Id.* (quoting *Abbott*, 978 F.3d at 184). The court first explains how Plaintiffs have plausibly alleged an abridgement of their voting rights before analyzing their claim under *Arlington Heights*— a framework commonly employed to determine whether discrimination was a motivating factor in a government decision.

### 1. Abridgement

To state a claim under the Twenty-Sixth Amendment, plaintiffs must plausibly allege that a challenged law denies or abridges their right to vote on account of age. Plaintiffs allege that SB 10 will *deny* many young voters the right to vote. (Compl. ¶ 56).

But the parties spend much of their briefs discussing abridgement. So the court begins its analysis there.

To understand the term "abridge" in the Twenty-Sixth Amendment, the Seventh Circuit in *Tully II* examined the Supreme Court's seminal Twenty-Fourth Amendment case, *Harman v. Forssenius*, 380 U.S. 528 (1965). The court read *Harman* to hold "that an 'abridgement' must involve the imposition of a 'material requirement.'" *Tully II*, 78 F.4th at 386. The court also rejected an attempt to equate "abridgement" with "retrogression," i.e., whether an action renders a group of voters "worse off." *Id.* at 386–87. But the court did not suggest that retrogression is *never* sufficient to "abridge" the right to vote. Instead, it recognized that "[f]ocusing *just* on retrogression for purposes of the Fifteenth Amendment would preclude relief to individuals who, even before the passing of the act in question, had not enjoyed fully the right to vote." *Id.* at 387 (emphasis added).[3] Having analyzed the meaning of "abridge," the court found that Indiana's absentee voting provisions did not abridge the right to vote of those under the age of sixty-five because Indiana imposed no material requirement by extending the benefit of absentee voting to the elderly, but not to younger voters. *Id.* at 387.

Unlike the challenged law in *Tully II*, however, SB 10 does not extend a benefit to one group of voters without extending that same benefit to others. Rather, SB 10 makes

---

[3] A similar concern about pre-existing barriers on the right to vote influenced the Fifth Circuit's holding in *Abbott*. 978 F.3d at 192. ("[T]he right to vote under the Twenty-Sixth Amendment is not abridged unless the challenged law creates a barrier to voting that makes it more difficult for the challenger to exercise her right to vote relative to the *status quo*, or unless the *status quo* itself is unconstitutional.").

it harder for Plaintiffs to vote by eliminating a previously accepted form of identification. While all other Indiana voters can vote using any state ID that satisfies the neutral requirements of Indiana's voter ID law, students with a state-issued student ID that otherwise satisfies those same neutral requirements must obtain a different form of identification to vote.

Defendants argue that "all other Hoosier[s] were previously excluded from the ability to use student IDs except students at public colleges and universities." (Filing No. 46, Defs.' Reply Br. at 8). But nothing about Indiana's voter ID law itself provided "special treatment" to students at public institutions. Student IDs issued by public universities simply met the law's neutral requirements. SB 10, however, changes that calculus. By removing a form of identification used by "tens of thousands of young voters" in Indiana, (Compl. ¶ 2), SB 10 makes "voting *more difficult* for [student voters] than it was before the law was enacted," *Abbott*, 978 F.3d at 191. And unlike in *Nashville Student Organizing Committee v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015), where Tennessee had never permitted voters to use student IDs to vote, Indiana has allowed students to use their IDs to vote for twenty years. Plaintiffs have therefore plausibly alleged that by eliminating student ID as an acceptable form of identification, SB 10 abridges their right to vote under the Twenty-Sixth Amendment.

## 2. *Arlington Heights*

Having concluded that SB 10 abridges the right to vote under the Twenty-Sixth Amendment, the court now considers whether Plaintiffs have sufficiently pleaded that Indiana enacted SB 10 with a discriminatory purpose. Because the Amendment's text

20

mirrors the Fifteenth Amendment's,[4] a growing number of courts have considered Twenty-Sixth Amendment challenges under the *Arlington Heights* framework, particularly when the challenged law is neutral on its face. *See, e.g., League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221; *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016).[5]

An "official action will not be held unconstitutional solely because it results in a . . . disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). Rather, under *Arlington Heights*, a constitutional violation does not occur absent a showing that the governing body had a discriminatory intent or purpose, which was a "motivating factor" in its decision. *Id.* at 265–66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Relevant factors guiding this inquiry include disparate impact, the historical background of a challenged law, and relevant legislative history. *Id.* at 266–68.

---

[4] "The right of citizens of the United States to vote *shall not be denied or abridged* by the United States or by any State *on account of race, color, or previous condition of servitude*." U.S. const. amend. XV, § 1 (emphasis added).

[5] The District of Idaho rejected *Arlington Heights*' analytical framework and instead "rel[ied] on more recent case law addressing whether voting laws abridge voting rights under the Twenty-Sixth Amendment," like *Tully II* and *Hargett*. *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1140 (D. Idaho 2024). But the court does not understand these analyses to be mutually exclusive. Rather, as the court understands it, a court only engages in an *Arlington Heights* analysis if it determines that a law denies or abridges the right to vote. Thus, *Tully II* and *Hargett* did not engage in an *Arlington Heights* analysis because neither court found the challenged law to abridge the right to vote, not because they disagreed that *Arlington Heights* applied.

With these factors in mind, the court holds that Plaintiffs' have plausibly alleged that SB 10 was passed with discriminatory intent.  First, Plaintiffs allege that the impact of SB 10 will bear more heavily on young voters.  They note that "tens of thousands of young voters have used student IDs to cast their ballots in Indiana," and will be forced to find an alternative ID.  (Compl. ¶ 2).  And young voters are "overwhelmingly more likely to be students than older voters."  (*Id.* ¶ 8).  Accordingly, SB 10's "target population is unambiguous and its effects are lopsided."  *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222.  The court thus gives credence to Plaintiffs' claim that SB 10 "is unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters."  *Id.*

Second, legislators enacted SB 10 despite extensive testimony by students describing how the law would make it more difficult for them to vote.  (Compl. ¶ 57–59). That legislators enacted SB 10 anyway provides additional support for Plaintiffs' allegations of discriminatory intent.  *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230–31 (4th Cir. 2016) (finding discriminatory intent where legislators had data showing which voting practices Black voters most employed and then acted to restrict those same practices).

Finally, "[t]he historical background of the decision" demonstrates how SB 10 contradicts Indiana's earlier efforts to ease its identification requirements.  *Arlington Heights*, 429 U.S. at 267.  Indiana has exempted various forms of identification that do not otherwise meet its neutral requirements for voter identification.  (Compl. ¶ 29).  SB

22

10 thus "stands as a shady contraction" in a context of exemptions—"the *only*

contraction, in fact." *Leage of Women Voters of Fla.*, 314 F. Supp. 3d at 1223.

Plaintiffs have not alleged anything problematic about the "specific sequence of

events leading up to the challenged decision" or that Defendants "[d]epart[ed] from the

normal procedural sequence" in enacting SB 10. *Arlington Heights*, 429 U.S. at 267.

Still, given their allegations addressing other relevant factors, Plaintiffs have plausibly

alleged that SB 10 was motivated by intentional age discrimination in violation of the

Twenty-Sixth Amendment.

## IV.    Conclusion

Plaintiffs have alleged facts that plausibly suggest that they are entitled to relief

under the First, Fourteenth, and Twenty-Sixth Amendments.  Defendants' Motion to

Dismiss (Filing No. 30) is therefore **DENIED.**

**IT IS SO ORDERED** this 14th day of October 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.