# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

COUNT US IN, WOMEN4CHANGE
INDIANA, and JOSH MONTAGNE,

        Plaintiffs,

v.

DIEGO MORALES, in his official capacity
as Indiana Secretary of State, *et al.*,

        Defendants.

Case No.: 1:25-CV-00864-RLY-MKK

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

STATEMENT OF ISSUES .......................................................................................................... vii

INTRODUCTION ........................................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 2

    I.    For twenty years, Indiana students used their student ID cards to vote............................. 2

    II.    Indiana legislators surgically targeted student IDs for exclusion. ..................................... 5

    III.    Students face unique barriers to obtaining voter ID. .......................................................... 9

    IV.    Plaintiffs filed this lawsuit challenging the Student ID Ban.............................................. 13

LEGAL STANDARD..................................................................................................................... 14

ARGUMENT ................................................................................................................................. 14

    I.    Plaintiffs are likely to establish standing. ....................................................................... 15

    II.    Plaintiffs are likely to succeed on the merits. .................................................................. 18

        A.    Plaintiffs are likely to prevail on their First and Fourteenth Amendment claim. .... 18

            1.    The *Anderson-Burdick* framework applies. .................................................... 18

            2.    The Student ID Ban burdens students' and young voters' right to vote......... 19

            3.    The State's interests cannot justify the Student ID Ban. ................................ 23

        B.    Plaintiffs are likely to prevail on their Twenty-Sixth Amendment claim................ 26

            1.    The Student ID Ban abridges the right to vote on account of age. ................ 27

            2.    The Student ID Ban was enacted with a discriminatory purpose. ................. 29

    III.    The Student ID Ban imposes imminent irreparable harm on Plaintiffs............................ 34

    IV.    The public interest and the balance of the equities favor preliminary relief. ................... 35

CONCLUSION............................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Acevedo v. Cook Cnty. Officers Electoral Bd.*,
    925 F.3d 944, 948 (7th Cir. 2019) ............................................................. 18, 23

*ACLU of Ill. v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ............................................................................ 35

*Am. Council of Blind of Ind. v. Ind. Election Comm'n*,
    No. 1:20-CV-03118-JMS-MJD, 2022 WL 702257 (S.D. Ind. Mar. 9, 2022) .................. 34

*Am. Hosp. Ass'n v. Harris*,
    625 F.2d 1328 (7th Cir. 1980) .......................................................................... 33

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ...................................................................................... 18–21

*Bost v. Ill. State Bd. of Elections*,
    No. 24-568, 607 U.S. ___, ___ S. Ct. ___, 2026 WL 96707 (Jan. 14, 2026) .................. 15

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ......................................................................................... 18

*Carey v. Wis. Elections Comm'n*,
    624 F. Supp. 3d 1020 (W.D. Wis. 2022) ........................................................... 35

*Common Cause Ind. v. Lawson*,
    327 F. Supp. 3d 1139 (S.D. Ind. 2018) ............................................................ 35

*Common Cause Ind. v. Lawson*,
    937 F.3d 944 (7th Cir. 2019) ........................................................................... 16

*Common Cause Ind. v. Marion Cnty. Election Bd.*,
    311 F. Supp. 3d 949 (S.D. Ind. 2018) .............................................................. 21

*Council of Alt. Pol. Parties v. Hooks*,
    121 F.3d 876 (3d Cir. 1997) ............................................................................ 26

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) ........................................................................... 16

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ................................................................................. passim

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ........................................................................ 18

*Eakin v. Adams Cnty. Bd. of Elections*,
    149 F.4th 291 (3d Cir. 2025) ............................................................................. 18–19, 24

*Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co., LLC*,
    No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024) .............. 16

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................................. 15

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) .................................................................. passim

*Foster v. Chatman*,
    578 U.S. 488 (2016) .................................................................................. 25, 32–33

*Gray v. Sanders*,
    372 U.S. 368 (1963) ............................................................................................ 15, 17

*Harman v. Forssenius*,
    380 U.S. 528 (1965) .............................................................................................. 27–28

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .............................................................................................. 15

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) .............................................................................. 14

*Ind. State Conf. of the NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018) ................................................................ 34

*Jeagr Ventures, LLC v. Does 1-54*,
    No. 1:21-CV-05900-RMD, 2022 WL 1450384 (N.D. Ill. May 9, 2022) ......................... 2

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ......................................................................... 31

*Jud. Watch, Inc. v. King*,
    993 F. Supp. 2d 919 (S.D. Ind. 2012) ............................................................... 15

*League of Women Voters of Fla., Inc., v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...................................................... passim

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ............................................................................. 24, 34

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ............................................................................ 29, 33

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ........................................................................................ 32

*Miller El v. Dretke*,
    545 U.S. 231 (2005) ........................................................................................ 33

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..................................................................... 30, 33

*Ne. Ohio Coal. for the Homeless v. Brunner*,
    652 F. Supp. 2d 871 (S.D. Ohio 2009) ............................................................ 17

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................ 14

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ..................................................................... 25, 34

*One Wis. Inst., Inc. v. Nichol*,
    186 F. Supp. 3d 958 (W.D. Wis. 2016) ..................................................... 17, 29

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ........................................................................................ 31

*Reps. Comm. for Freedom of the Press v. Rokita*,
    751 F. Supp. 3d 931 (S.D. Ind. 2024) ............................................................. 16

*Reps. Comm. for Freedom of the Press v. Rokita*,
    147 F.4th 720 (7th Cir. 2025) .......................................................................... 14

*S.D. Farm Bureau, Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ........................................................................... 32

*SEC v. Cherif*,
    933 F.2d 403 (7th Cir. 1991) ............................................................................. 2

*Shango v. Jurich*,
    681 F.2d 1091 (7th Cir. 1982) ......................................................................... 30

*Smith v. Boyle*,
    144 F.3d 1060 (7th Cir. 1998) ......................................................................... 30

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) ........................................................................... 24

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ........................................................................................ 26

*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986) ........................................................................................ 24, 26

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2021) ......................................................................... 27, 28

*Tully v. Okeson*,
    977 F.3d 608 (7th Cir. 2020) ......................................................................... 18, 23

*Tully v. Okeson*,
    78 F.4th 377 (7th Cir. 2023) ......................................................................... 26–28

*UAW v. Brock*,
    477 U.S. 274 (1986) ............................................................................................. 17

*United Food & Com. Workers v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ............................................................................................. 17

*United States v. Texas*,
    445 F. Supp. 1245 (S.D. Tex. 1978) ................................................................... 28

*United States v. Viveros-Chavez*,
    114 F.4th 618 (7th Cir. 2024) ............................................................................. 29

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................................................ 34

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................................ 29–32

*Washington v. Davis*,
    426 U.S. 229 (1976) ............................................................................................. 29

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ................................................................................ 19

**United States Constitution**

U.S. Const. amend. XIX .............................................................................................. 26

U.S. Const. amend. XV ............................................................................................... 26

U.S. Const. amend. XXVI ........................................................................................... 26

**State Statutes**

Ind. Code § 21-7-13-20 ............................................................................................... 15

Ind. Code § 3-11-10-24 ............................................................................... 23

Ind. Code § 3-11.7-5-2.4 .................................................................. 13, 22, 27

Ind. Code § 3-5-2-40.5 (2005) ..................................................................... 2

Ind. Code § 3-5-2.1-84 ....................................................................... passim

Ind. Code § 3-7-13-1 ................................................................................... 9

Ind. Code § 9-13-2-78 ................................................................................. 4

H.B. 1109, 117th Gen. Assemb., 1st Reg. Sess. (Ind. 2011), *enacted as* Pub. L. No. 118-2011, 2011 Ind. Acts 1206 ............................................................................ 6

H.B. 1318, 118th Gen. Assemb., 2d Reg. Sess. (Ind. 2014), *enacted as* Pub. L. No. 76-2014, 2014 Ind. Acts 828 .............................................................................. 6

H.B. 1485, 122d Gen. Assemb., 1st Reg. Sess. (Ind. 2021), *enacted as* Pub. L. No. 2021-209, 2021 Ind. Acts 3161 ............................................................................ 6

**State Regulations**

Ind. Admin. Code § 9-24-16-10 ................................................................. 10

**Other Authorities**

117 Cong. Rec. 7534 (1971) .................................................................. 26, 27

117 Cong. Rec. 7539 (1971) ...................................................................... 26

*Election Fraud Map*, Heritage Found., https://electionfraud.heritage.org/ [https://perma.cc/DR7K-JUPV] (last visited Feb. 6, 2026) ................................................................... 5, 32

*Expenditure Search: American Legislative Exchange Council*, Ind. Sec'y of State, https://perma.cc/ZS9Z-ACQG (last visited Feb. 6, 2026) ................................ 6

*More than Half of College Students Voted in 2024*, Tufts Circle (Nov. 12, 2025), https://perma.cc/3ZE3-3GMU ...................................................................... 5

Ryan Quinn, *Education Dept. Tells Universities Not to Use Student Voting Data*, Inside Higher Ed (Feb. 5, 2026), https://perma.cc/SB85-YUKY ....................... 5

*Voter ID Laws, Table 2*, Nat'l Conf. of State Leg. (July 2, 2025), https://www.ncsl.org/elections-and-campaigns/voter-id#table-2 ....................... 5

## STATEMENT OF ISSUES

1. Are Plaintiffs likely to succeed on the merits of their claim that the Student ID Ban is an unconstitutional burden on the right to vote, in violation of the First and Fourteenth Amendments?

2. Are Plaintiffs likely to succeed on the merits of their claim that the Student ID Ban intentionally discriminates against young voters, in violation of the Twenty-Sixth Amendment?

3. Are Plaintiffs likely to suffer irreparable harm in the absence of preliminary relief?

4. Do the equities and the public interest favor an injunction?

## INTRODUCTION

For decades, tens of thousands of students at Indiana's public colleges and universities could vote using the student ID cards they carry with them every day. Senate Bill 10 changed that. The new law bars students—and only students—from using the IDs most accessible to them (the "Student ID Ban"). Every other form of ID that meets the voter ID law's neutral criteria remains valid, and some IDs qualify even without meeting them. Student ID is the singular exception.

The Constitution does not permit states to single out a class of eligible voters and make voting harder for them without sufficient justification. Nor does it permit states to target young voters because of their age. As this Court explained at the motion-to-dismiss stage, these principles—set forth in the First, Fourteenth, and Twenty-Sixth Amendments—govern this case.

The evidence now confirms that the Student ID Ban violates each of these constitutional provisions. Voter data shows that students are far less likely to possess alternative forms of ID, and common features of student life make obtaining one systematically more difficult for students. Data also shows that Indiana's voters between ages 18 and 24 are concentrated on college campuses; thus, burdening students effectively diminishes the voting power of the state's youngest voters. And while Defendants invoke concerns about uniformity and voter fraud, they have yet to produce *any* evidence to substantiate those concerns—or show how the Ban would address them.

Plaintiffs include an individual the Ban directly affects—Josh Montagne, a junior at Indiana University—and two organizations, Count US IN and Women4Change, that serve and represent the students and young voters the Ban targets for exclusion. With elections fast-approaching, each Plaintiff faces immediate harm: The Student ID Ban will prevent Mr. Montagne from voting and impede Count US IN and Women4Change from carrying out core work central to their missions—helping students register and successfully cast their ballots. A preliminary

1

injunction is necessary to prevent these harms and ensure that Indiana's youngest voters can participate in the political process on equal terms.

Because the Student ID Ban unconstitutionally burdens the franchise for a discrete group of eligible voters and inflicts irreparable constitutional harm, this Court should promptly enjoin the Ban prior to the May 2026 primary election.

## STATEMENT OF FACTS[1]

### I.    For twenty years, Indiana students used their student ID cards to vote.

In 2005, Indiana enacted a voter ID law, requiring voters to present photo ID to cast ballots at the polls. Any photo ID sufficed if it satisfied four criteria: the ID had to (1) display the voter's name; (2) include the voter's photograph; (3) display an expiration date; and (4) have been issued by the government of the United States or Indiana. Ind. Code § 3-5-2.1-84(a) (2025) (formerly codified at Ind. Code § 3-5-2-40.5(a) (2005)). A wide range of IDs satisfied these requirements, Ex. 1, including student IDs issued by many Indiana public universities, *see id.* at 5; Ex. 2 at 18 (Mayer Decl.).[2]

For nearly two decades, hundreds of thousands of students at those universities were able to use student ID cards to vote. Students regularly did so. *See* Ex. 5 ¶¶ 8–12 (Kuhl Decl.); Ex. 6 ¶¶ 11–18 (Vargas Decl.); Ex. 7 ¶¶ 6–8 (Montagne Decl.). The election supervisor for Monroe

---

[1] Discovery remains ongoing, and Plaintiffs have not yet received complete responses to their outstanding discovery requests, nor have they deposed Defendants and relevant third-party witnesses. Accordingly, this Motion relies on the evidence available to date, mindful that "evidentiary rules are relaxed at the preliminary injunction stage, and the Court has substantial discretion to hear and receive evidence . . . whether or not that evidence complies with formal rules and procedures." *Jeagr Ventures, LLC v. Does 1-54*, No. 1:21-CV-05900-RMD, 2022 WL 1450384, at *3 (N.D. Ill. May 9, 2022) (citation omitted); *see SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) (noting that "hearsay can be considered in entering a preliminary injunction").

[2] Of the approximately 250,000 students enrolled in Indiana's public universities, Ex. 3, nearly 200,000 attend schools with IDs that qualified before the Ban, Ex. 2 at 11 (Mayer Decl.).

County, which includes Indiana University-Bloomington, estimated that in the November 2024 general election about two-thirds of voters at the on-campus polling place used student IDs. Ex. 8.

Indiana institutions understood the importance of student ID to students' exercise of the franchise—and acted on it. For years, both governmental and educational organizations encouraged students to use their student IDs to vote. *See, e.g.*, Exs. 1, 9–13. Likewise, civic organizations—including Plaintiffs Count US IN and Women4Change—emphasized that students can use their student IDs when helping them register. *See* Ex. 6 ¶¶ 12–13 (Vargas Decl.); Ex. 14 ¶¶ 10, 12 (Klitzsch Decl.); Ex. 5 ¶¶ 8–12 (Kuhl Decl.).

Several universities took steps to ensure their student IDs conformed to the voter ID requirements. After Indiana passed its voter ID law, public colleges and universities contacted state and local officials to confirm that their student IDs satisfied it. Ex. 15 at 1–2. In 2016, Indiana University at South Bend updated its student ID to comply with the voter ID law. Ex. 16. In 2019, Purdue University—a public university with over 50,000 students—did the same. *See* Exs. 17; 3 at 2. Purdue's bursar explained, "[I]f we can . . . make voting more convenient for students, we want to do so." Ex. 17. And when Purdue shifted to mobile ID cards in 2023, it provided physical, "vote ready" ID cards that could be printed on-site at polling locations. Ex. 18 at 9.

For many students who relied on it, student ID was more than a convenience; it made the difference in whether they could vote. *See, e.g.*, Ex. 7 ¶¶ 6–8 (Montagne Decl.); Ex. 5 ¶¶ 8–12 (Kuhl Decl.). As data confirms, students are far less likely than other voters to possess the most common alternative forms of ID, such as an Indiana driver's license or ID card. Statewide, almost 90 percent of Indiana voters used an Indiana driver's license or state ID card to register to vote. Ex. 2 at 13 (Mayer Decl.); Ex. 19. But only 73.4 percent of Hoosiers between the ages of 18 and 24—the predominant age group among Indiana college students, *see* Ex. 2 at 12–14 (Mayer

Decl.)—have a driver's license at all, *see id.* at 12–13. Students from out of state, who constitute more than one-third of students at Indiana schools with qualifying IDs, are even less likely to have an Indiana license or state ID, particularly since Indiana law does not require students to secure an in-state license. *Id.* at 11; *see, e.g.*, Ex. 7 ¶¶ 10–11 (Montagne Decl.); Ex. 5 ¶ 9 (Kuhl Decl.); Ind. Code § 9-13-2-78(1)(A) (exempting students "[a]ttending a postsecondary educational institution" from being required to obtain an Indiana driver's license).

Monroe County's election-day check-in data illustrates the point. Although the County does not record the specific type of voter ID each person presents, voters who present Indiana driver's licenses or state IDs check in at the polls by scanning them, making the scans a reliable proxy. Exs. 20 at 2; 21 at 12; 22 at 12; 2 at 15–16 (Mayer Decl.). In the 2022 and 2024 general elections, all but 5.1 percent of Monroe County voters scanned an Indiana driver's license or state ID at the polls on election day. Ex. 2 at 15 (Mayer Decl.). But in precincts on or adjacent to Indiana University's campus, that number roughly triples—and in one case, nearly quadruples. In 2022, *20 percent* of voters at one precinct on the IU-Bloomington campus did not present an Indiana license or state ID at the polls. *Id.* at 15–16. And in both years, nine of the ten precincts with the highest proportion of voters who did *not* scan an Indiana driver's license or state ID at the polls were located on or next to the IU-Bloomington campus. *Id.* at 16. In other words, campus-area precincts are outliers—and they are outliers in precisely the way one would expect since students are less likely to have Indiana driver's licenses and state IDs. Student ID helped bridge that gap.

Because most students are young, restrictions that disproportionately burden students necessarily fall hardest on Indiana's youngest voters. At Indiana's public colleges and universities, 74.1 percent of voting-age students are between 18 and 24. *Id.* at 12. Statewide, only 9.5 percent of residents fall within that age range. *Id.* at 13. Moreover, Indiana's young voters are not spread

evenly throughout the electorate—they are highly geographically concentrated on college campuses. *Id.* Across Indiana's thousands of precincts, Ex. 23, only 20 have populations where more than 30 percent of voters are ages 18 to 24; all but one sits on or adjacent to a college campus (the sole exception is a military base). Ex. 2 at 13–14 (Mayer Decl.).

## II.    Indiana legislators surgically targeted student IDs for exclusion.

The use of student ID to vote is a common practice nationwide; more than half of states with a voter ID requirement accept student ID for voting.[3] There is no evidence that this practice has resulted in fraud.[4] Yet, as student turnout rates have grown,[5] students have increasingly become the target of voter suppression efforts, premised on purported concerns about election security. In 2025 alone, multiple states considered or enacted measures that restrict the use of student ID at the polls. Ex. 24; *see also* Exs. 25–26. States have also considered or adopted a spate of other proposals that limit students' ability to vote in the communities where they live, such as tightening residency rules for student voters or limiting on-campus polling locations. *See* Exs. 24–28.[6]

---

[3]    *See Voter ID Laws, Table 2,* Nat'l Conf. of State Leg. (July 2, 2025), https://www.ncsl.org/elections-and-campaigns/voter-id#table-2.

[4]    *Election Fraud Map*, Heritage Found., https://electionfraud.heritage.org/ [https://perma.cc/DR7K-JUPV] (last visited Feb. 6, 2026) (national database showing *no* examples of fraud involving student ID).

[5]    *More than Half of College Students Voted in 2024*, Tufts Circle (Nov. 12, 2025), https://perma.cc/3ZE3-3GMU.

[6]    This trend is ongoing. Just this week, on February 5, 2026, the U.S. Department of Education issued a warning to colleges and universities nationwide not to share data with the National Study of Learning, Voting, and Engagement, which aims to promote civic engagement through analysis of student voting behavior, warning that violations could compromise access to federal funding. *See* Ryan Quinn, *Education Dept. Tells Universities Not to Use Student Voting Data*, Inside Higher Ed (Feb. 5, 2026), https://perma.cc/SB85-YUKY. In a statement, Education Secretary Linda McMahon said, "American colleges and universities should be focused on teaching, learning, and research—not influencing elections." *Id.*

National political actors have encouraged such efforts. At an April 2023 retreat for donors to the Republican National Committee, activist Cleta Mitchell—who has complained that student voters' participation "manipulat[es] . . . election outcomes," Ex. 29 at 10–12—called for changes to how states handle student voting, including by banning student ID as voter identification. Ex. 27; *see also* Ex. 28. At a July 2024 meeting of the American Legislative Exchange Council ("ALEC"),[7] Mitchell urged state lawmakers to "introduce a bill to get rid of the student ID" as acceptable voter identification. *See* Ex. 101 at 2. By the following month, Indiana Senator Blake Doriot had begun drafting what would eventually become SB 10. Ex. 30 at 10.

The new law, which was enacted in April 2025, amended Indiana's voter ID law to exclude student ID cards. Ind. Code. § 3-5-2.1-84(c). It did not do so by changing the law's four longstanding criteria for acceptable photo ID. Instead, it added a targeted rule that carved out student IDs—and *only* student IDs—for exclusion: "proof of identification" for voting purposes "**does not include a document issued by an educational institution**." *Id.* (emphasis added). Before SB 10, Indiana's voter ID law allowed voters to use *any* document that met its neutral requirements. Now, student ID is unacceptable whether it satisfies the neutral criteria or not.

Prior to SB 10, every amendment Indiana made to its voter ID law moved in the opposite direction, *easing* the criteria for certain types of ID. In 2011, the General Assembly amended the law to exempt military documents from the expiration date requirement. H.B. 1109, 117th Gen. Assemb., 1st Reg. Sess. (Ind. 2011), *enacted as* Pub. L. No. 118-2011, 2011 Ind. Acts 1206. Three years later, it did the same for identification issued by the U.S. Department of Veterans Affairs ("VA"). H.B. 1318, 118th Gen. Assemb., 2d Reg. Sess. (Ind. 2014), *enacted as* Pub. L. No. 76-

---

[7] ALEC has provided financial support to Indiana legislators, including SB 10's sponsor, Senator Doriot. *See Expenditure Search: American Legislative Exchange Council*, Ind. Sec'y of State, https://perma.cc/ZS9Z-ACQG (last visited Feb. 6, 2026).

2014, 2014 Ind. Acts 828. In 2021, the Legislature exempted tribal identification cards from the expiration-date requirement as well. H.B. 1485, 122d Gen. Assemb., 1st Reg. Sess. (Ind. 2021), *enacted as* Pub. L. No. 2021-209, 2021 Ind. Acts 3161. Each of these changes passed with overwhelming (or unanimous) bipartisan support. *See* Exs. 31–36. And in each case, *no one* raised substantive concerns about the exemptions. *See generally* Exs. 37–39.

SB 10 marked a shift: for the first time, the Legislature singled out a previously acceptable form of ID and barred its use at the polls. *Any* other form of ID that satisfies the statute's neutral criteria—and even some that do not—remains valid. *See* Ex. 1 at 1–10 (Secretary of State website showing nine examples of ID that are acceptable for use as voter ID). The result is a carve-out aimed at one population alone. Active-duty and retired service members and National Guard members in Indiana, *see* Ex. 40, can still use their military IDs to vote. Ex. 41 at 5. Veterans — roughly 7 percent of Indiana's adult population—may use retired military identification or identification issued by the VA. Exs. 42 at 3; 41 at 8–9. Members of federally recognized tribes in Indiana—approximately 25,000 people—may use tribal identification cards. Ex. 43. Even Indiana legislators receive official identification that satisfies the statute's criteria. Ex. 44 at 2. Only students are told that their widely held, government-issued ID does not count.

When the Student ID Ban was debated in the Legislature, legislators heard directly from students, civic organizations, and election officials about how the bill would impact student voters. Representatives from civic groups testified that many students rely on their university-issued IDs as their primary form of identification and would struggle to obtain another ID to vote. *See* Ex. 45 at 36–46, 66–78. Students—including Plaintiff Josh Montagne—echoed these concerns. *Id.* at 46–66. As one student explained, "For many students, a university issued ID is the most accessible form of identification they have. Many of my peers, especially from low-income backgrounds, do

7

not own driver's license[s] or passports. If this bill passes, students who rely on their school IDs to vote would face unnecessary and unfair barriers that serve no purpose other than to suppress voter turnout amongst young people." *Id.* at 117–18.

Election officials also warned legislators about the bill's harmful effects. Defendant Angie Nussmeyer, Co-Director of the Indiana Election Division, in a written review of pending legislation, warned that SB 10 would "severely limit public state college and university students," Ex. 46 at 1, and "foreclose . . . many college students . . . from being able to vote," *id.* at 4. She further explained that, for some students, "their student ID may be the only form of identification to vote in person on or before Election Day." *Id.* at 1.

Supporters of the Student ID Ban described it primarily as an election-integrity measure. *See, e.g.*, Exs. 47 at 6–7; 45 at 32–33; 48 at 9; 49 at 29. But none of the bill's proponents presented evidence that student ID has caused any election-integrity problem. *See generally* Exs. 45, 47–52. Nor have Defendants produced *any* such evidence in this litigation. In discovery, neither the Secretary of State, nor the Indiana Election Commission, nor the Indiana Elections Division has identified even *one* example of student ID being used to commit voter impersonation (or any other misconduct). Exs. 53–55. Marion and Monroe Counties—both home to major public universities, Exs. 56–57—reported no cases of fraud involving student ID. Exs. 58–59. Nor did any other county that has responded to Plaintiffs' subpoenas (which include most counties in the state).

Proponents of SB 10, including its sponsor, Senator Doriot, also framed the Student ID Ban as a means of ensuring that only Indiana residents and U.S. citizens vote in Indiana elections. *See* Ex. 47 at 7. But a voter's qualifications—including residency and citizenship—are determined at *registration*, not when the voter presents identification at the polls. *See* Exs. 60 at 77; 47 at 42. The purpose of the voter ID law is to confirm that the person appearing at the polls is the same

person who is registered. *See* Ex. 61 at 56 (Brief of State Respondents in *Crawford v. Marion Cnty. Election Bd.*, Nos. 07-21, 07-25 (2007) (stating that the purpose of the voter ID law is "*identifying* voters" (emphasis added))). As such, other forms of identification that remain acceptable as voter ID do not establish whether the holder is an Indiana resident (e.g., Veteran's Affairs Cards) or a U.S. citizen (e.g., an Indiana driver's license, Ex. 63).

Finally, SB 10's proponents suggested that poll workers might struggle to determine which student IDs were valid for voting. *See* Ex. 47 at 14. Again, they offered nothing to substantiate this concern. *See* Exs. 45, 47–52. And poll worker training materials suggest the opposite: guidance for election workers addresses student ID only briefly, noting the basic voter ID requirements and sometimes listing the schools whose identification qualifies. *See, e.g.*, Exs. 63–69.

The legislative debate also reflected another concern: skepticism about whether college students—particularly those from out of state—should vote at all in the communities where they attend school. Indiana law provides that students may register and vote in Indiana once they have resided in the state for 30 days. Ind. Code § 3-7-13-1; Ex. 70. Yet legislators repeatedly questioned whether students who came to Indiana for school have sufficient ties to the state to participate in its elections. Exs. 45 at 7–8, 10–13, 15, 49–50, 62; 49 at 18; 52 at 12, 45. After a student testified about how SB 10 would affect him and his peers, one legislator asked him to estimate how many of his friends who attended IU "later move[d] here and bec[a]me permanent residents." Ex. 45 at 49–50. A representative of the Secretary of State's office similarly suggested that students whose "permanent residen[ce]" address was elsewhere should be "voting at their home address and not the university address." *Id.* at 22–23.

## III.    Students face unique barriers to obtaining voter ID.

The Legislature's decision to exclude student ID for voting creates genuine obstacles for the students it affects. Obtaining a student ID is a routine and accessible part of student life. Indiana

University, for example, issues them for free, and students can obtain one by presenting *any* government-issued ID, along with proof of their status as a student. Ex. 71; *see also* Ex. 72 (Purdue requiring the same). By contrast, other forms of ID that satisfy Indiana's voter ID law require obtaining certain documents that students, in particular, are less likely to possess. This is especially so because the Legislature increased the requirements for obtaining State-issued driver's licenses and ID cards after the voter ID law was adopted, adding layers of documentation that pose particular challenges for students. *See* Exs. 73 at 5–6; 74 at 4–5.[8]

For example, to obtain an Indiana driver's license or state ID card, an applicant must submit: (1) a document proving identity, such as a U.S. birth certificate or unexpired passport; (2) a document proving lawful status in the United States; (3) a document proving the person's Social Security number; and (4) two documents proving Indiana residency, such as a bank statement or utility bill. Exs. 75–76; Ind. Admin. Code § 9-24-16-10. Each of these requirements calls for documents that students are less likely to have readily available, if they possess them at all.

To start, many students do not have ready access to their birth certificates while at school. *See* Ex. 7 ¶ 12 (Montagne Decl.); Ex. 2 at 8 (Mayer Decl.); Ex. 5 ¶ 9 (Kuhl Decl.). Obtaining a birth certificate itself requires identification and fees. For example, to obtain an Indiana birth certificate, an applicant must provide a form of identification listing an address that matches the mailing address for the certificate. Ex. 77. But since many students live on campus or in short-term housing, they do not have a form of identification that reflects their current address. *See* Ex.

---

[8] Before changes to the law went into effect in 2008, Indiana driver's license applicants were required to present either one primary form of identification (like a birth certificate); one secondary document, which could include anything from a school report card to a gun permit; and one proof of residency, which was satisfied by *any* primary or secondary document that listed the applicant's address. Exs. 73 at 5–6; 74 at 4–5. Requirements for obtaining a state ID card issued by the Bureau of Motor Vehicles ("BMV") have also become substantially more burdensome. *See infra* at 12.

78 at 2; Exs. 79–80.[9] Processing times are a problem too. An Indiana birth certificate can take up to 16 weeks to obtain. Ex. 81. As a result, a student who orders a birth certificate after arriving on campus when school starts in August may not receive it in time to obtain an ID and vote in November (and at minimum, may be unable to vote during the early-voting period like other Hoosiers). *See* Ex. 82.

Because it is challenging for students to obtain their birth certificates—especially in time to vote—proof of lawful status is also a problem. Aside from a birth certificate, the only documents accepted to prove lawful status are a U.S. passport (which requires a birth certificate to obtain) or various immigration documents. Ex. 76. Indiana has one of the lowest rates of passport possession in the nation—only 35.5 percent of Hoosiers of any age have a valid passport. Ex. 83 at 1. And obtaining one costs $165 and takes 6 weeks or longer. Exs. 84–85.

Proof-of-residency documents present similar challenges. Students who live in on-campus housing often do not have a mortgage, rental contract, homeowner's insurance, or utility bills in their own names. *See, e.g.*, Exs. 76; 86–87. Many students also do not receive medical bills at their campus address, in part because young people may remain on their parents' health insurance until age 26. Ex. 88. Full-time students are also less likely to be employed, which means they are also less likely to have pay stubs or tax forms tied to their residence. *Compare* Ex. 89 at 2 (showing 39.6 percent employment rate for full-time college students between ages 18 and 24), *with* Ex. 90 at 1 (showing 83.6 percent employment rate for ages 25 to 54).

Finally, to prove a Social Security number, an applicant must present a Social Security card, W-2 form, or pay stub—documents full-time students are less likely to have. Ex. 76. And

---

[9] At Purdue, 42 percent of the nearly 45,000 undergraduates live on campus. Ex. 80. At Indiana University, all freshmen are required to live on campus, Ex. 78 at 2, and a total of 30 percent of its approximately 38,000 undergraduates (including freshmen) live on campus, Ex. 79.

unless a student already has a state-issued ID, obtaining a Social Security card requires documentation that many students do not possess—such as a passport, health insurance card, or an employee ID card—plus an in-person visit to a Social Security office. *See* Ex. 92; *see supra* at 11. Appointments for those visits can take more than a month to secure. Ex. 91 at 10 n.29.

These document requirements operate alongside other constraints on students. Many students have inflexible class schedules, limited access to transportation, and limited funds. *See* Ex. 7 ¶ 16 (Montagne Decl.); Ex. 93 ¶ 14 (Sand Decl.). Travel to the BMV to get a license or ID can take hours, making it difficult for students to make the trip without missing classes. Ex. 48 at 18–19; *see also* Ex. 94. This can have consequences; at Indiana University, faculty have discretion to set attendance policies, and many penalize students for missing classes. Ex. 95 (describing attendance policies, including one where the professor "will deduct 0.7% of your final grade for each absence incurred, without exception for illness or emergency").

Students also cannot typically rely on the safety valves designed for voters who lack identification. Since Indiana adopted its voter ID law, its BMV has offered a free Indiana "Identification Card" that can be used to vote. Ex. 96. But the requirements for obtaining one have increased. In 2007, the General Assembly amended the law to require applicants for a free ID to present "valid documentary evidence" of the applicant's lawful status in the United States *and* of the applicant's Social Security number—neither of which had been required before. Exs. 73 at 5–6; 74 at 4; *see supra* at 10 n.8. And while the ID card *itself* is free, the documents required to obtain it are not. *See* Ex. 2 at 9–10 (Mayer Decl.). A birth certificate, for example, costs $10 in Indiana, plus another $12.95 for ordering it online. *Id.* at 9. For context, Alabama's poll tax was $1.50— equivalent to about $15.29 today—when a federal court declared it unconstitutional; the cost of

the documents required to obtain even a "free" Indiana ID for voting can be significantly more than that. *Id.* at 10–11.

Nor can students who lack ID readily resolve the issue by casting a provisional ballot. Indiana law permits a voter without ID to cast a provisional ballot, which, absent narrow exceptions, will be counted only if the voter later provides proof of identification to the circuit clerk or county election board within 10 days of the election. *See* Ind. Code § 3-11.7-5-2.5(a)–(b). This provision assists voters who have qualifying ID but did not bring it to the polls; it does not address the challenges faced by students who do not have a qualifying ID in the first place. Students also generally cannot avoid the voter ID requirement by voting absentee by mail. Absentee voting is limited to voters who meet specific statutory criteria, such as an expectation of being absent from the county for the entire time polls are open on election day. *Id.* § 3-11-10-24.

Students and younger voters already face unique challenges, and the Student ID Ban only adds to them. Students and younger voters move more frequently, requiring them to update their registration more often, and many have less experience navigating the voting process. Ex. 2 at 8 (Mayer Decl.). The same constraints on time and transportation that make obtaining identification difficult can also make voting more burdensome. Ex. 5 ¶ 12 (Kuhl Decl.). Consistent with these dynamics, turnout among younger voters is significantly lower than among older populations. Ex. 2 at 8 (Mayer Decl.). Indiana is no exception; in 2024, turnout for voters between ages 18 and 29 lagged behind voters aged 30 and up by nearly 18 points. *Id.* at 19–20.

### IV.    Plaintiffs filed this lawsuit challenging the Student ID Ban.

Shortly after the Student ID Ban was enacted, Plaintiffs filed this lawsuit challenging the Ban on the grounds that it: (1) unconstitutionally burdens the right to vote in violation of the First and Fourteenth Amendments, and (2) intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment. *See* Compl., Dkt. No. 1. Defendants moved to dismiss in July,

13

*see* Br. in Supp. of Defs.' Mot. to Dismiss, Dkt. No. 31, and in October, this Court denied the motion, *see* Entry Denying Defs.' Mot. to Dismiss, Dkt. No. 57 ("Order").

While Defendants' motion to dismiss was pending, the parties commenced discovery. On July 3, 2025, they jointly submitted a Case Management Plan, which Magistrate Judge Klump entered, setting trial for January 2027. Case Management Plan, Dkt. No. 28; Scheduling Order at 9, Dkt. No. 37. Because the parties could not agree upon a schedule that would resolve the case before the 2026 elections, the Plan provides that Plaintiffs would begin discovery immediately in preparation for a preliminary injunction in early 2026. Case Management Plan at 7–8. The parties later submitted a joint proposed briefing schedule for the Motion, which Magistrate Judge Klump also entered. Joint Prop. Briefing Schedule, Dkt. No. 73; Scheduling Order, Dkt. No. 82. Discovery remains ongoing.

## LEGAL STANDARD

A preliminary injunction is warranted when plaintiffs show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" favor relief, and (4) "an injunction is in the public interest." *Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720, 729 (7th Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The balance-of-equities and public-interest factors "merge" when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To prove likelihood of success on the merits, "the applicant need not show that it definitely will win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

## ARGUMENT

The Student ID Ban prohibits a group of eligible voters—students—from using an otherwise qualifying form of ID they have relied on for decades. By doing so, it imposes unconstitutional burdens on students and young voters in violation of the First and Fourteenth

Amendments and violates the Twenty-Sixth Amendment's ban on intentional age-based discrimination in voting. Plaintiffs have standing to challenge it, and all four preliminary injunction factors favor relief.

**I.        Plaintiffs are likely to establish standing.**

To establish standing, Article III requires a concrete, traceable injury that a favorable decision can redress. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379–81 (2024). Plaintiffs satisfy this standard several times over.

Josh Montagne is a registered Indiana voter and a junior at Indiana University-Bloomington. Ex. 7 ¶¶ 3–5 (Montagne Decl.). His student ID satisfies all four neutral requirements of Indiana's voter ID law: it was issued by the state, *see* Ind. Code § 21-7-13-20, displays his name and photograph, and includes an expiration date. Ex. 7 ¶ 5 (Montagne Decl.); *see* Ind. Code § 3-5-2.1-84(a). Before the Ban, he used that ID to vote. Ex. 7 ¶ 6 (Montagne Decl.). After the Ban, Mr. Montagne no longer has acceptable voter ID. He does not possess a U.S. passport, Indiana driver's license, or any other qualifying voter ID. *Id.* ¶ 7. As a result, he will be unable to vote in the 2026 primary and general elections if the Ban remains in effect. *Id.* ¶ 8. That is a textbook injury in fact. "There can be no question that a plaintiff who alleges that his right to vote has been burdened by state action has standing to bring suit to redress that injury." *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012); *see also Gray v. Sanders*, 372 U.S. 368, 375 (1963) ("[A]ny person whose right to vote is impaired has standing to sue.") (citations omitted). Standing is therefore satisfied. *See Bost v. Ill. State Bd. of Elections*, No. 24-568, 607 U.S. ___, ___ S. Ct. ___, 2026 WL 96707, at *3 n.15 (Jan. 14, 2026) ("[O]nly one plaintiff needs standing for a suit to proceed.").

Plaintiffs Count US IN and Women4Change have organizational standing. An organization suffers a cognizable injury when an action "perceptibly impair[s]" its core services and activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *accord All. for Hippocratic Med.*, 602

U.S. at 379–81. The Seventh Circuit has applied that rule to voter-assistance organizations, finding standing where voting restrictions impeded their voter-registration, education, or election-day assistance efforts. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019). These impediments need not be severe: "[T]he Seventh Circuit has held that organizational standing 'requires only a minimal showing of injury.'" *Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co., LLC*, No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997, at *3 (S.D. Ind. Aug. 19, 2024) (quoting *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)).

Plaintiffs Count US IN and Women4Change fall squarely within this precedent. Both Plaintiffs are nonprofits that register voters, educate students about voting, and provide election-day assistance, with a focus on young voters and students. Ex. 6 ¶¶ 3–5 (Vargas Decl.); Ex. 14 ¶¶ 3–4 (Klitzsch Decl.). Because of the Ban, carrying out Plaintiffs' core activities now requires spending additional time and resources educating students about the Ban, helping them obtain qualifying ID, revising educational materials, retraining volunteers, and assisting turned-away voters on election day. Ex. 6 ¶¶ 8–13 (Vargas Decl.); Ex. 14 ¶¶ 12–14 (Klitzsch Decl.). This reduces the number of voters that Plaintiffs can reach, and makes their work less effective, since— among other things—many students who lack ID will be discouraged from registering and voting, and at least some students they have already registered will be unable to cast their ballots. Ex. 6 ¶¶ 8–9, 12–13 (Vargas Decl.); Ex. 14 ¶¶ 13–14 (Klitzsch Decl.). That is a classic organizational injury. *See, e.g.*, *Common Cause Ind.*, 937 F.3d at 949–53 (holding that voter-assistance organizations had standing where a law forced them to educate voters, address election-day problems, and rendered some voters they helped register unable to vote); *Crawford*, 472 F.3d at 951 (holding that a political party had standing where voter ID law likely discouraged supporters from voting); *Reps. Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 940–42 (S.D.

Ind. 2024) (holding that an organization had standing where conducting its activities in light of a law required it to publish new educational materials, host additional trainings, and respond to "an increased need for legal advice and representation"), *aff'd and remanded*, 147 F.4th at 734.

Women4Change also has associational standing. An organization may sue on behalf of its members when at least one member has standing in their own right, the claims are germane to the organization's mission, and the relief sought does not require individual participation. *UAW v. Brock*, 477 U.S. 274, 282 (1986). Women4Change has approximately 10,000 members, including registered Indiana voters who are students at public colleges and universities. Ex. 14 ¶¶ 5, 9 (Klitzsch Decl.). These members have standing to challenge the Ban since, as one student member attests in her declaration, it removes student ID as a way to satisfy the voter ID law. Ex. 97 ¶¶ 5, 7 (Qaddoura Decl.); *see Gray*, 372 U.S. at 375; *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 965–66 (W.D. Wis. 2016) (holding that plaintiffs had standing to challenge voter ID law even though they possessed the required ID); *see also Ne. Ohio Coal. for the Homeless v. Brunner*, 652 F. Supp. 2d 871, 880 (S.D. Ohio 2009) (holding that any voter has standing where "every voter [is] subjected to the challenged barrier, i.e., the requirement that they produce photo identification"), *modified on reconsideration*, No. 2:06-CV-00896-ALM-CMV, 2009 WL 10663619 (S.D. Ohio July 30, 2009). Promoting student voting is central to Women4Change's mission, Ex. 14 ¶ 4 (Klitzsch Decl.), and it seeks only equitable relief, so individual participation is unnecessary. *United Food & Com. Workers v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

In sum, the Ban burdens Mr. Montagne, impairs Count US IN and Women4Change's core activities, and harms Women4Change's members. That is more than sufficient under Article III.

II.      **Plaintiffs are likely to succeed on the merits.**

   A.      **Plaintiffs are likely to prevail on their First and Fourteenth Amendment claim.**

      1.      **The Anderson-Burdick framework applies.**

To assess burdens on the right to vote, courts apply the framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Tully v. Okeson*, 977 F.3d 608, 615–16 (7th Cir. 2020) ("*Tully I*"); *see also* Order at 7–8. The *Anderson-Burdick* analysis proceeds in two parts. First, the court assesses the "character and magnitude" of the burden. Order at 8 (quoting *Anderson*, 460 U.S. at 789). Second, the court "'evaluate[s] the precise interests put forward by the State as justifications for the burden imposed by its rule' and weigh[s] these interests against the burdened rights." *Id.* (quoting *Anderson*, 460 U.S. at 789).

In weighing these interests, the level of scrutiny applied depends on "the extent of [the law's] imposition" on the right to vote. *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019). Thus, "heavier burdens will require closer scrutiny," while "lighter burdens will be approved more easily." *Fish v. Schwab*, 957 F.3d 1105, 1124, 1124 (10th Cir. 2020). But even when the burden is only "slight," to survive constitutional scrutiny, it must be justified by "relevant and legitimate interests of sufficient weight." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019). Ultimately, "a court applying *Anderson-Burdick* must not only determine the legitimacy and strength of the State's interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 305 (3d Cir. 2025) (citation modified); *accord* Order at 8.

### 2. The Student ID Ban burdens students' and young voters' right to vote.

SB 10 does not burden *all* Indiana voters; it singles out students for exclusion. *See supra* Statement of Facts §§ II–III[10]; Order at 11. Under *Anderson-Burdick*, this "[d]isparate impact matters." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216–17 (N.D. Fla. 2018); *see also Eakin*, 149 F.4th at 309 (explaining that a burden assessment turns in part on whether "the law disproportionately limit[s] political participation" by a particular group). To assess the burden that a voting restriction imposes, courts consider not only its weight but also who bears it. *See Anderson*, 460 U.S. at 793. Restrictions that "fall more heavily" on a particular "segment of the community" create a "disparity in voting power." *Id.* at 793 n.15 (quoting *Bullock v. Carter*, 405 U.S. 134, 144 (1972)). This warrants closer scrutiny—even when the burden would otherwise be small, *id.* at 793; *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 200–02 (2008); *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1215–16.

The Student ID Ban targets students on its face. By "categorically prohibiting" an ID used by "*only* [one] class" of voters, the Ban "has the effect of creating a secondary class of voters" who are uniquely barred from using the ID most accessible to them, even if it otherwise satisfies the law's requirements. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1217 (emphasis in original). "This effect alone is constitutionally untenable." *Id.*; *cf. Williams v. Salerno*, 792 F.2d 323, 327–28 (2d Cir. 1986) (holding that the Equal Protection Clause "does not, of course, permit a state to discriminate against students by denying them the right to vote or by subjecting them to more vigorous registration requirements than are generally applied").

---

[10] Unless otherwise indicated, internal citations in this Section refer to the Statement of Facts above.

The Ban's focus on students translates into concrete obstacles that make it harder for students to vote. *Supra* § III. It excludes the ID students are most likely to possess and routinely carry, *supra* § I, forcing them to rely on other forms of ID they are significantly less likely than older voters to possess. *See supra* §§ I, III. Other forms of voter ID are also uniquely difficult for students to obtain. *See supra* § III.[11] The processes for securing common forms of acceptable ID are designed around the circumstances of more settled, older adults. To procure an Indiana driver's license, for example, an applicant may submit a mortgage, utility bills, pay stubs, and medical bills. *See* Exs. 75 at 6–9; 76. But many students live in campus housing, study full time, and use their parents' insurance, leaving them without access to documents that are common features in older adults' lives. Likewise, to obtain a birth certificate—a prerequisite for most forms of voter ID—a student must present a government ID showing the address where the certificate will be sent. Ex. 77. Students who move each fall are less likely to have their current address reflected on a government ID. *Supra* at 10. And because obtaining a birth certificate can take up to 16 weeks, even a student who orders one *immediately* upon arriving on campus in August may not receive it in time to obtain an ID and vote in November. *Supra* at 11. In short, these requirements are *structurally* more difficult for students to satisfy. That unequal burden is constitutionally significant: election restrictions that "fall[] unequally" impose a weightier burden on the right to vote. *Anderson*, 460 U.S. at 793–94, 793 n.15 (quoting *Bullock*, 405 U.S. at 144).

---

[11] Even at baseline, the current obstacles to obtaining a qualifying ID exceed the burdens the Supreme Court found were "only . . . limited" in *Crawford*, 553 U.S. at 203, because the requirements for obtaining ID have become more burdensome since that case was tried, particularly for students. *Supra* § III; *see also Crawford*, 553 U.S. at 189 (emphasizing that its conclusion was fact-dependent); *Fish*, 957 F.3d at 1130 (explaining that the *Crawford* Court's conclusion about the burdens at issue were made "in light of the record then before the Court").

Because the unique burdens students face arise from common features of student life, the Student ID Ban also burdens student voters as a group, diminishing their ability to participate in the political process on equal terms. The approximately 200,000 students enrolled at Indiana public colleges and universities with qualifying student IDs are systematically less likely to have or carry other identification they can use to vote. Ex. 2 at 11 (Mayer Decl.); *see supra* §§ I, III. Election officials and voter outreach volunteers confirm this pattern: Students rely heavily on their student IDs to vote—often because they lack other options. *See* Ex. 2 at 8 (Mayer Decl.); Ex. 5 ¶¶ 11–14 (Kuhl Decl.). Monroe County's election-day check-in data tells the same story. Voters at precincts on or next to the IU-Bloomington campus were *three or four times less likely* than the electorate as a whole to present an Indiana driver's license or state ID at the polls. Ex. 2 at 15–16 (Mayer Decl.). In short, voters in student-heavy precincts rely on Indiana BMV-issued IDs at much lower rates than voters elsewhere. So, when the state takes student IDs off the table, it removes a means of bridging that disparity—and places the burden on voters least likely to possess an alternative.

By making voting harder for students, the Ban necessarily burdens Indiana's young voters as well. Students at Indiana's public colleges and universities are overwhelmingly young; nearly three quarters are between ages 18 and 24. Ex. 2 at 12–13 (Mayer Decl.). Students also make up a significant segment of Indiana's youngest voters, who are concentrated on college campuses. *Id.* at 12–14. The Ban therefore "fall[s] more heavily" on young voters. *Anderson*, 460 U.S. at 793 n.15. Burdens that are "unevenly distributed across identifiable groups 'whose members share a particular' . . . age" are "'especially difficult' for [the] state to justify." *Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp. 3d 949, 968 (S.D. Ind. 2018) (quoting *Anderson*, 460 U.S. at 793), *consent decree vacated*, 925 F.3d 928 (7th Cir. 2019); *see* Order at 9, 12.

The Ban's disproportionate impact on students and young voters distinguishes this case from *Crawford*, where the Supreme Court upheld Indiana's voter ID law against a facial challenge. 553 U.S. at 202. In *Crawford*, the Court emphasized that the record lacked any "concrete evidence" showing the law would make voting more difficult for identifiable groups of voters—and that evidentiary gap was central to its conclusion that the burden was not unconstitutional. *Id.* at 201. By contrast, Plaintiffs have presented evidence tying the Ban to obstacles students face; voter data reflecting the burden the Ban imposes; and declarations from students who will be unable to vote because of the law. *Id.* at 187 (finding the absence of such evidence decisive); *see supra* § I.

The *Crawford* Court also emphasized several "safety valves" in Indiana's law that were important to its decision, but those will not meaningfully protect students and young voters here. For example, the Court noted that Indiana offers a "free" ID card for voting. *Id.* at 198. But since *Crawford*, the Legislature has made the requirements for obtaining one much more burdensome— adding documentation requirements, such as proof of a Social Security number, that students uniquely struggle to satisfy. Exs. 73 at 5–6; 74 at 4; *see also supra* § III. And, for students, who are more likely to lack underlying documents like a birth certificate or government-issued ID, securing a "free" ID card requires spending money to obtain these prerequisites. *Supra* § III.

The Court also found in *Crawford* that the heavier burden the law imposed on some people was "mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots *that will ultimately be counted,*" 553 U.S. at 181 (emphasis added), but that is also not applicable here. A provisional ballot is counted only if the voter appears in person within 10 days of the election to present qualifying ID to the circuit clerk or county election board. Ind. Code § 3-

11.7-5-2.5(a)–(b). [12] For students who lack ID—and face the same structural barriers to obtaining one after election day as they do before—this is no safety valve at all. *See Fish*, 957 F.3d at 1128–29 (finding that the proof-of-citizenship requirement imposed a significant burden in part because voters lacked an "effective" safety valve that prevented them from being "turned away without a backup option for them to cast votes").

Finally, the *Crawford* Court found that any burden on elderly voters was mitigated because Indiana permits the elderly to vote absentee without presenting photo ID. 553 U.S. at 201. But most students cannot rely on absentee voting, which is limited to voters who meet specific statutory criteria, like illness or old age, and is not normally available to young voters outside of unique circumstances (like planned travel during the voting period). Ind. Code § 3-11-10-24; *Tully I*, 977 F.3d at 617. The absence of any realistic safeguards amplifies the burden that the Ban imposes.

In sum, the Student ID Ban targets a specific group of voters; makes voting harder for them; and leaves them without meaningful safeguards. Under *Anderson-Burdick*, this constitutes a significant or "at least a moderate burden on students' and young voters' right to vote." Order at 9; *see League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216–17 (holding that a categorical ban on placing polling places on college campuses imposed a "significant" burden on the right to vote).

### 3.    The State's interests cannot justify the Student ID Ban.

*Anderson-Burdick's* second step requires the court to weigh the burdens the challenged law imposes against the "*precise* interests identified by the State." *Acevedo*, 925 F.3d at 948 (emphasis added) (quoting *Anderson*, 460 U.S. at 789). No matter how "slight" the burden, it must be

---

[12] If a voter fails to present qualifying ID, the voter's ballot can only be counted if the voter executes an affidavit stating that the voter is indigent or has a religious objection to being photographed. Ind. Code § 3-11.7-5-2.5(c).

supported by interests "sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (citation modified). Defendants' proffered justifications fall far short of that standard.

First, Defendants try to justify the Student ID Ban by invoking a "general concern with voter fraud." Order at 12–13; *see* Exs. 49, 54; *supra* at 8. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196; Order at 13. But even an interest that is "legitimate in the abstract" cannot justify a burden on the right to vote without "concrete evidence that 'those interests make it necessary to burden the plaintiff's rights.'" *Fish*, 957 F.3d at 1132 (quoting *Burdick*, 504 U.S. at 434). Defendants have identified *no* examples—or even *allegations*—of voting misconduct involving student ID, within Indiana or elsewhere. Ex. 53 at 1–6; *see supra* at 8.[13] Defendants "cannot burden the right to vote in order to address dangers that are remote and only 'theoretically imaginable.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) (quotations omitted); *see Eakin*, 149 F.4th at 317 ("Even where the law imposes a minimal burden . . . *one* bizarre instance [of voter fraud] . . . cannot justify the burden the [challenged law] imposes."); *Fish*, 957 F.3d at 1134 (finding that the state's "incredibly slight" evidence of voter fraud was not "sufficiently weighty . . . to justify the burdens imposed on voters").

Moreover, even a legitimate state interest cannot justify a burden of *any* size when the challenged restriction does not actually serve it. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 219–22 (1986). In the Legislature, the only theory the Ban's proponents offered for how it might improve election integrity was that it was needed to ensure that only U.S. citizens and

---

[13] By contrast, in *Crawford*, although the State did not identify any examples of voter impersonation *within* Indiana, it did demonstrate "that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists." 553 U.S. at 195. In the district court, the State supported these examples with evidence, including dozens of exhibits. *See* Ex. 98 (State Defendants' exhibit list).

Indiana residents vote. Ex. 47 at 7, 45. But the Ban does not advance that interest. Other IDs that remain acceptable for voting—like an Indiana driver's license or state ID—do not confirm citizenship. Ex. 62 at 2 (Secretary of State Morales stating, "Possession of a state-issued identification does not demonstrate that a person is a citizen"). Nor does identification issued "by the United States," which remains acceptable voter ID, establish Indiana residency. Ind. Code § 3-5-2.1-84. In any event, the purpose of voter ID is to verify identity, not assess voter qualifications. S*upra* at 8–9. Absent "evidence supporting the relevance of these interests in this case," these justifications hold no water. *Fish*, 957 F.3d at 1133; *see also Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (finding an "important government interest" insufficient where the court "struggle[d] to understand how [the challenged statutes] . . . advance[d] that goal"); Order at 17.

Defendants' next theory is that the Student ID Ban is necessary to address a "lack of uniformity" among student IDs. Ex. 53 at 8. But they identify no evidence that differences among student IDs have created any problem—nor do they articulate what that problem would be. *Id.* To the extent they suggest security concerns, they have produced no evidence in discovery to substantiate them. *Id.* If the concern is poll-worker confusion, again, there is no evidence of any problem, and poll-worker training materials treat student ID as a straightforward issue. *See supra* at 9. Such hypothetical concerns carry little weight. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012) ("With no evidence that local boards of elections have struggled to cope with [the issue] . . . the State has not shown that its regulatory interest in smooth election administration is 'important,' much less 'sufficiently weighty' to justify the burden.").

Moreover, singling out student IDs does not create uniformity. Indeed, it does the opposite, creating an exception for just one form of ID. At the same time, even after the Ban, Indiana's voter ID law continues to permit a wide array of ID—including documents that deviate from the statute's

standard requirements. *See supra* at 6–7. Veterans, for example—who make up roughly seven percent of Indiana's population—may vote using ID issued by the VA, which, along with military and tribal IDs, is exempt from the law's expiration-date requirement. Ind. Code § 3-5-2.1-84(b). Plus, many government-issued IDs are not uniform, even when issued by the same agency. The Legislature, for instance, issues multiple forms of ID; among them, only legislators' IDs satisfy the voter ID law's requirements, while IDs issued to other legislative staff do not. Ex. 44 at 2. In short, the State's interest asserted in uniformity is selective. *See Foster v. Chatman*, 578 U.S. 488, 505 (2016) (explaining that justifications proffered in one circumstance, but not in another where they are equally applicable, "are difficult to credit"); *see also Tashjian*, 479 U.S. at 219–22.[14]

Ultimately, Defendants' rationales offer conjecture in place of evidence, and speculation instead of a meaningful fit between the Ban and the state's asserted interests. *Anderson-Burdick* does not permit the state to impose *any* burden on the right to vote without some actual nexus between the ends and the means. *Crawford*, 553 U.S. at 191. Where, as here, a state cannot "articulate how achieving [its] goals makes it at all necessary or desirable to" burden the right to vote, there is "nothing to weigh on the [state's] side" of "the *Anderson*[-*Burdick*] balancing analysis." *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 881 (3d Cir. 1997).

### B.    Plaintiffs are likely to prevail on their Twenty-Sixth Amendment claim.

The Twenty-Sixth Amendment "confers an individual right to be free from the denial or abridgment of the right to vote on account of age." *Tully v. Okeson*, 78 F.4th 377, 383 (7th Cir. 2023) ("*Tully II*") (citation omitted); *see also* U.S. Const. amend. XXVI. In drafting the Twenty-Sixth Amendment, drafters intentionally mirrored the language in the Fifteenth and Nineteenth

---

[14] The remaining justifications identified in Defendants' discovery responses are variations on these same themes, Ex. 53 at 7–8, and they are likewise unaccompanied by any "concrete evidence" that the Student ID Ban serves them. *Fish*, 957 F.3d at 1132.

Amendments, which prohibit race and sex discrimination in voting. *See* U.S. Const. amends. XV, XIX; 117 Cong. Rec. 7534, 7539 (1971) (statement of Reps. Richard Poff and Claude Pepper). By "transplant[ing]" language from previous amendments into the text of the Twenty-Sixth Amendment, Congress intentionally "br[ought] the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018)). Thus, like the Amendments on which it was modeled, the Twenty-Sixth Amendment not only ensures that 18-year-olds may vote, but also "guarantees that citizens who are 18 years of age or older *shall not be discriminated against on account of age*." 117 Cong. Rec. 7534 (emphasis added) (statement of Rep. Richard Poff); *accord Tully II*, 78 F.4th at 383; Order at 18. The Student ID Ban does precisely what the Twenty-Sixth Amendment prohibits: it makes voting harder for Indiana's youngest voters, and it was enacted to do just that. Plaintiffs are likely to succeed on this claim.

### 1.    The Student ID Ban abridges the right to vote on account of age.

To challenge a voting restriction under the Twenty-Sixth Amendment, a plaintiff must first show that it "deni[es]" or "abridge[s]" the right to vote. *Tully II*, 78 F.4th at 383. The Student ID Ban does both. Students like Plaintiff Josh Montagne, who have qualifying student ID, but no other acceptable voter ID, will be unable to cast their ballots at the polls at all. Ind. Code § 3-5-2.1-84(c); Ex. 7 ¶ 15 (Montagne Decl.); Ex. 93 ¶ 10 (Sand Decl.); Ex. 5 ¶ 10 (Kuhl Decl.). And while these students may cast provisional ballots, without a qualifying voter ID, those ballots will not "ultimately be counted." *Crawford*, 553 U.S. at 199; Ind. Code § 3-11.7-5-2.5(a)–(b). Absent an injunction, Plaintiff Montagne and young voters like him will be "denied" the opportunity to vote in the 2026 primaries in May, and then again in the general election in November. Ex. 82; Ex. 7 ¶¶ 7–8 (Montagne Decl.); Ex. 93 ¶¶ 10–15 (Sand Decl.).

The Student ID Ban also "abridges" the right to vote. Abridgement occurs when a law "makes voting *more difficult* for [a] person than it was before the law was enacted or enforced"—

what courts often call "retrogression." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 191 (5th Cir. 2021); *see* Order at 19. The right is also abridged when a restriction "imposes a material requirement" on certain voters, meaning that it "erects a real obstacle to voting" because of their constitutionally protected activity or status. *Harman v. Forssenius*, 380 U.S. 528, 541 (1965); *see also Tully II*, 78 F.4th at 385 (quoting *Harman* for same). Since "[f]ocusing *just* on retrogression for purposes of the Fifteenth Amendment would preclude relief to individuals who, even before the passing of the act in question, had not enjoyed fully the right to vote," such obstacles abridge the right to vote regardless of whether voting was easier before. *Tully II*, 78 F.4th at 387 (emphasis added); *see* Order at 19; *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1223 ("If a unanimous Senate, near-unanimous House of Representatives, and 38 ratifying states intended the Twenty-Sixth Amendment to have any teeth, then the Amendment must protect [against] blatant and 'unnecessary burdens and barriers' on young voters' rights." (quotation omitted)).

The Student ID Ban abridges the right to vote in both ways. The Ban plainly "makes voting *more difficult*" for Indiana students, and by extension for young Hoosiers, "than it was before the law was enacted." *Tex. Democratic Party*, 978 F.3d at 191. In the two decades before the Ban, hundreds of thousands of students—who are overwhelmingly young, Ex. 2 at 13–14 (Mayer Decl.)—could use their Student IDs to vote, so long as they satisfied the "law's neutral requirements"; after the Ban, they cannot. Order at 20; *see supra* §§ I–II. By rendering this subclass of voters "worse off," the Ban "abridge[s]" the right to vote. *Tully II*, 78 F.4th at 387.

The Ban also "erects a real obstacle to voting." *Harman*, 380 U.S. at 541; *see also Tully II*, 78 F.4th at 385 (similar). All other Hoosiers can use the form of ID they find most accessible and carry with them, so long as it satisfies the voter ID law's requirements. *See supra* §§ I–III. But students—and only students—confront a categorical ban on a *specific* form of ID they already

possess and routinely carry, whether it satisfies the law's neutral requirements or not. As a result, students must both obtain and carry to the polls an alternative qualifying ID to vote. Imposing this "material burden" on a particular set of voters abridges their exercise of the franchise. *Tully II*, 78 F.4th at 387; *see League of Women Voters of Fla.*, 314 F. Supp. 3d at 1223 (finding that officials "abridge[d] the youth vote" by instituting an "affirmative prohibition of on-campus early voting"); *see United States v. Texas*, 445 F. Supp. 1245, 1249–62 (S.D. Tex. 1978) (finding an abridgement of the right to vote where an official refused to register students who otherwise satisfied residency requirements because they lived in college dormitories).

### 2.    The Student ID Ban was enacted with a discriminatory purpose.

Like the Fifteenth Amendment whose language it mirrors, the Twenty-Sixth Amendment bars not only explicit age-based classifications, but facially neutral restrictions motivated by an intent to discriminate based on age. *See Nichol*, 186 F. Supp. 3d at 976–77, *aff'd in part, rev'd in part on other grounds*, *Luft v. Evers*, 963 F.3d 665 (7th Cir 2020). These claims are assessed under the framework in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65 (1977). *See also League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221; Order at 20–21. Under *Arlington Heights*, courts consider all "circumstantial and direct evidence" to determine whether a "discriminatory purpose" against a protected group—here, young voters— animated the challenged decision. 429 U.S. at 265–66. To show discriminatory intent, a plaintiff need not establish that discrimination was the "sole[]" motivation. *Id.* at 265. Instead, "a facially neutral law fails constitutional muster if 'there is proof that a discriminatory purpose has been *a* motivating factor' in its enactment." *United States v. Viveros-Chavez*, 114 F.4th 618, 622 (7th Cir. 2024) (emphasis added) (quoting *Arlington Heights*, 429 U.S. at 267).

To guide this analysis, *Arlington Heights* identifies factors that may indicate legislators' discriminatory intent, including discriminatory impact, the historical background, and relevant

legislative history. 429 U.S. at 266–68; Order at 21. These factors are not a checklist; the question is whether discriminatory purpose may "be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Courts err by "view[ing] each piece of evidence in isolation," rather than considering the evidence as a whole. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 729 (9th Cir. 2025), *en banc rev. denied*, 152 F.4th 1153 (9th Cir. 2025). In short, a court must not "miss[] the forest in carefully surveying the many trees." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016).

Here, the evidence all points one way. First, the Student ID Ban surgically targets students. *See supra* § II. The Ban does not change any of the voter ID law's neutral requirements or their application to any other form of ID; it simply carves out student ID, whether it meets the criteria or not. Ind. Code § 3-5-2.1-84(c); Order at 20. "Disparities" in treatment that "are so glaring and so patently without justification" can "give rise to an irresistible inference that they are the consequence of intentional discrimination." *Smith v. Boyle*, 144 F.3d 1060, 1064 (7th Cir. 1998); *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (explaining that an official acts with discriminatory motive when she "single[s] out a particular group for disparate treatment").

Because the Ban targets students, it has a significant effect on Indiana's youngest voters. Indiana's students and young voters substantially overlap. The Indiana voter file tells that story: registered voters aged 18 to 24 are heavily concentrated on Indiana's college campuses. Ex. 2 at 13–14 (Mayer Decl.). And nearly three quarters of the students at Indiana's public colleges and universities with qualifying IDs are between ages 18 and 24. *Id.* at 13. Because the Ban singles out students, it "bears more heavily" on young voters than on the rest of the electorate. *Arlington Heights*, 429 U.S. at 266. This sort of disparate impact is evidence of intent. *Id.* And, although "impact alone" is not normally dispositive, a pattern is sometimes so "stark" that it is

"unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1221 (citation omitted); Order at 22. This is such a case. The law's "unambiguous" target and "lopsided" effects evidence discriminatory intent. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222; Order at 22.

The Ban's "historical background" underscores this conclusion. *Arlington Heights*, 429 U.S. at 267; Order at 22. Three separate times, the Legislature amended the voter ID law to *expand* the forms of ID that could be used to vote, allowing voters to use ID issued by the VA, military ID, and tribal ID, even if they lack an expiration date. *Supra* at 5–6. "SB 10 thus 'stands as a shady contraction' in a context of exemptions—'the *only* contraction, in fact.'" Order at 22–23 (quoting *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1223) (emphasis in original).

Courts also find discriminatory intent when a law's disparate impact was "foreseeab[le]," particularly if it was unnecessary to serve the interests at stake. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) (first citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979); and then *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978)). Legislators here were warned about the Ban's effects. Students explained how it would burden them. *See supra* at 7–8. Even the Co-Director of the Election Division—a Defendant in this case—admonished that the Ban would "foreclose . . . many college students . . . from being able to vote." Ex. 46 at 4. The Legislature passed it anyway. Doing so with full knowledge of the Ban's consequences shows it was adopted "because of," and not "in spite of," its predictable effects. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also* Order at 22.

When laws are adopted based on "substantive departures" from normal considerations, this suggests "that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 268. Here, the adoption of the Ban was grounded in a substantive departure from the widespread consensus

31

about the purpose of Indiana's voter ID law. From its inception, the state has explained that the purpose of the voter ID law is "*identifying* individual voters," not "to verify residency" or citizenship. Ex. 61 at 56 (emphasis added); *see also* Ex. 60. Yet the Ban's supporters—including the Secretary of State—abruptly altered that conception when explaining the Ban, portraying residency and citizenship verification as an important goal of voter ID. The Legislature's abrupt departure from the consensus understanding of how voter ID functions supplies additional evidence of its discriminatory purpose. *Arlington Heights*, 429 U.S. at 267–68.

Defendants' implausible justifications—which "reek of pretext"—are also a hallmark of discriminatory intent. *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222; *see supra* at 8–9. When a legislature enacts a law with "no evidence" the law would achieve its intended purpose, and there is "scant evidence . . . that the [legislature] made an effort to find such information," this suggests a discriminatory purpose. *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003); *cf. Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

One justification is especially telling. Defendants say the Student ID Ban is about "uniformity." *See* Ex. 53 at 8. But when voter ID rules were loosened in other contexts, *no one* raised concerns about uniformity—not even the Ban's sponsor, Senator Doriot, who voted to exempt tribal IDs from the expiration-date requirement. *See* Ex. 36. That silence is especially telling as to tribal IDs. At least *seven* federally recognized tribes have members in Indiana, Ex. 43, and because each tribe issues its own IDs, those cards vary in appearance and content. *See* Ex. 99. Moreover, only IDs from federally recognized tribes can be used to vote; thus, as with student IDs, some tribal ID cards qualify while others do not. *See* Ind. Code § 3-5-2.1-84(b). And unlike colleges and universities, which do not generally shift from public to private, tribes' federal

recognition status *can* change, so a tribal ID that satisfies the voter ID law during one election may not be valid in the next. Ex. 100.[15] Justifications "are difficult to credit" when officials fail to apply them in comparable situations. *Foster*, 578 U.S. at 505. When a "proffered reason" is applied inconsistently, "that is evidence tending to prove purposeful discrimination." *Id.* at 512 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).

Finally, the sequence of events leading up to the Ban's enactment confirms the law's discriminatory purpose. The Ban was introduced in the Legislature after college students had increased their voting power and amidst a nationwide pattern of voting restrictions that targets student voting, including by banning the use of student ID cards as voter ID—and only months after a prominent advocate *expressly* advocated for laws like this one. *See supra* at 5–6. While the Student ID Ban is not consistent with any of the justifications Defendants offer, it falls in lockstep with these efforts to restrict the franchise for student voters. *See Mi Familia Vota*, 129 F.4th at 726 ("The political climate . . . leading to [the] enactment of [the action] provides circumstantial evidence of discriminatory intent."); *see also McCrory*, 831 F.3d at 226 (finding that evidence of discriminatory intent existed where voting restrictions were enacted "in the immediate aftermath of unprecedented African American voter participation").

When the evidence is viewed cumulatively, "its direction is too powerful to conclude anything but discrimination." *Dretke*, 545 U.S. at 265. The Student ID Ban is an unprecedented measure that singles out student ID, adopted with full awareness of its disproportionate effects on young voters and without any plausible, nondiscriminatory rationale. This precision targeting of Indiana's youngest voters is precisely what the Twenty-Sixth Amendment forbids.

---

[15] As with student IDs, there is no indication that tribal IDs have resulted in any fraud. *See, e.g.*, *Election Fraud Map*, *supra* note 4 (showing zero election fraud cases involving tribal ID).

III.        **The Student ID Ban imposes imminent irreparable harm on Plaintiffs.**

Irreparable harm is established when "the district court cannot remedy [the injury] following a final determination on the merits." *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). That is the case here. The Student ID Ban discriminates against young Hoosiers and disproportionately burdens their right to vote. *Supra* §§ II–III. Plaintiffs therefore face imminent, irreparable harm—particularly as the 2026 elections approach. *Supra* §§ II–III. Absent an injunction, Plaintiff Montagne will be unable to vote in the primary or general elections. *See supra* at 15. Plaintiff Women4Change's members at Indiana public colleges and universities will lose the ability to use a form of ID they already possess and carry to satisfy the voter ID law, burdening their right to vote and for some, depriving them of it entirely. *See supra* at 16–17. These harms cannot be remedied later; "once the election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247. Courts have repeatedly held that "a violation of the right to vote is presumptively an irreparable harm." *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944; *see also Am. Council of the Blind of Ind. v. Ind. Election Comm'n*, No. 1:20-CV-03118-JMS-MJD, 2022 WL 702257, at *9 (S.D. Ind. Mar. 9, 2022); *Husted*, 697 F.3d at 436 ("A restriction on the fundamental right to vote . . . constitutes irreparable injury.").

The Ban will also cause—and is already causing—irreparable injury to the organizational Plaintiffs, Count US IN and Women4Change. A core part of their missions and work is helping students successfully vote, educating them about the process, and encouraging broad turnout among younger voters. *See supra* at 16. By erecting barriers to student voting, the Ban makes this work significantly harder, reducing the number of voters Plaintiffs can reach and diminishing their effectiveness. *See id.* That "constitutes an irreparable injury." *Ind. State Conf. of the NAACP*, 326 F. Supp. 3d at 663 (finding that irreparable harm existed where a restriction "limit[ed] [plaintiff]

organization[s'] ability to" assist voters and carry out their missions) (quotations omitted); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

## IV.        The public interest and the balance of the equities favor preliminary relief.

The remaining factors also support an injunction. When a plaintiff is likely to succeed on a constitutional claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012). This principle carries particular force in the voting context, where "the public interest is served by helping to ensure that eligible citizens are able to exercise their right to vote." *Carey v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1034 (W.D. Wis. 2022); *see also Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1156 (S.D. Ind. 2018).

Defendants, by contrast, face no cognizable harm; they would simply be enjoined from enforcing an unconstitutional statute. Because no statewide elections have yet occurred under the Ban, an injunction here would merely "preserv[e] the status quo," *ACLU of Ill.*, 679 F.3d at 590 n.1, by requiring Indiana to conduct elections as it has for the last twenty-one years: accepting all IDs, including eligible student ID cards, that meet the voter ID law's neutral criteria.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin the Student ID Ban.

Dated: February 6, 2026

Respectfully submitted,

/s/ *Aria C. Branch*
Aria C. Branch*
Katie Chamblee-Ryan*
Derek Zeigler*
Max Accardi*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
abranch@elias.law
kchambleeryan@elias.law
dzeigler@elias.law
maccardi@elias.law
Tel: (202) 968-4490

Jeffrey Macey
**Macey Swanson LLP**
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN 46204
jmacey@maceylaw.com

*Attorneys for Plaintiffs*
*Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system, and parties may access this filing through the Court's system.


/s/ *Aria C. Branch*
Aria C. Branch