# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

COUNT US IN, WOMEN4CHANGE                )
INDIANA, and JOSH MONTAGNE,              )
                                         )
     Plaintiffs,                        )
                                         )     Case No. 1:25-CV-00864-RLY-MKK
  v.                                     )
                                         )
DIEGO MORALES, in his official capac-    )
ity as Indiana Secretary of State, et al., )
                                         )
     Defendants.                        )
                                         )

## STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ANDREW NUSSBAUM
CHRISTOPHER O. MURRAY

First & Fourteenth PLLC
2 N. Cascade Avenue, Suite 1430
Colorado Springs, CO 80903
(719) 286-2475
andrew@first-fourteenth.com
chris@first-fourteenth.com

JAMES COMPTON

First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 998-1978
james@first-fourteenth.com

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

JEFFERSON S. GARN
BRADLEY S. DAVIS
KYLE HUNTER
Deputy Attorneys General

Office of Attorney General Todd Rokita
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
(317) 232-5933
James.Barta@atg.in.gov

*Counsel for State Defendants*

## TABLE OF CONTENTS

STATEMENT OF ISSUES ........................................................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 3

   I.     General Requirements to Vote in Indiana. ................................................... 3

   II.    Indiana's Voter ID Requirements. ............................................................... 4

       A.   Indiana's original voter ID requirements. ............................................ 4

       B.   SB 10 and other amendments to Indiana's voter ID requirements. ................. 5

   III.   This Lawsuit. ................................................................................................ 7

ARGUMENT ............................................................................................................... 7

   I.     A Preliminary Injunction Would Be Inappropriate Under *Purcell*. .............. 8

   II.    The Court Lacks Subject Matter Jurisdiction. ........................................... 9

       A.   The organizations lack standing in their own right. ........................... 10

       B.   Women4Change does not have associational standing. ...................... 13

       C.   The State Defendants are not proper defendants. .............................. 14

   III.   Plaintiffs Are Unlikely to Succeed on Their First and Fourteenth Amendment Claims. ....................................................................................................... 15

       A.   SB 10 does not burden the right to vote. ............................................ 17

       B.   SB 10 serves numerous state interests. ............................................. 23

       C.   SB 10 does not violate the Twenty-Sixth Amendment. ...................... 25

       D.   Plaintiffs do not satisfy the requirements for a facial challenge. ......... 29

   IV.   The Remaining Factors Decisively Cut Against an Injunction. ................. 31

       A.   Plaintiffs' delay bars relief. ............................................................... 31

       B.   Plaintiffs have not shown any irreparable harm. ............................... 32

       C.   The balance of equities and the public interest weigh against an injunction. .......... 33

   V.    Plaintiffs' Request for Relief Is Overbroad. ............................................. 35

CONCLUSION .......................................................................................................... 35

## STATEMENT OF ISSUES

1.      Whether a preliminary injunction is appropriate under *Purcell v. Gonzalez*, 549 U.S. 1 (2006), where voting for the primary election begins on April 7, 2026, and Plaintiffs waited ten months after the challenged law's enactment to seek a preliminary injunction.

2.      Whether Plaintiffs Count Us IN and Women4Change have Article III standing to challenge Indiana's SB 10 where SB 10 does not regulate their conduct, their alleged injuries consist solely of updating voter education materials and training volunteers, and Women4Change has failed to identify a single member who will be unable to vote due to SB 10 or for whom voting will be made more costly.

3.      Whether sovereign immunity bars suit against the State Defendants.

4.      Whether Indiana's SB 10 violates the First, Fourteenth, or Twenty-Sixth Amendments by clarifying that Indiana voters cannot vote using IDs issued by state educational institutions but must use the same forms of ID (*e.g.*, driver's licenses, free state ID cards, and passports) available to all other Indiana voters.

5.      Whether the equities, public interest, and binding precedent preclude entry of a preliminary injunction barring SB 10's enforcement, including against strangers to this litigation.

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. League of United Latin Am. Citizens*,
  146 S. Ct. 418 (2025).................................................................................. 9, 29

*Abbott v. Perez*,
  585 U.S. 579 (2018) ................................................................................... 28, 34

*Alexander v. S.C. State Conf. of the NAACP*,
  602 U.S. 1 (2024) ............................................................................................. 28

*American Council of Blind of Indiana v. Indiana Election Comm'n*,
  No. 1:20-CV-03118-JMS-MJD, 2022 WL 702257 (S.D. Ind. Mar. 9, 2022) ......................... 9

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................................................ 16

*Ardoin v. Robinson*,
  142 S. Ct. 2892 (2022).................................................................................... 9

*Asian Americans Advancing Just.-Chicago v. White*,
  No. 1:20-CV-01478, 2021 WL 12318991 (N.D. Ill. Mar. 25, 2021) ....................... 15

*BABE VOTE v. McGrane*,
  546 P.3d 694 (Idaho 2024) ............................................................................ 18

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ........................................................................................ 33

*Bowes v. Indiana Sec'y of State*,
  837 F.3d 813 (7th Cir. 2016) .......................................................................... 31

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ........................................................................................ 23

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .................................................................................... 16, 18

*Common Cause Indiana v. Lawson*,
  327 F. Supp. 3d 1139 (S.D. Ind. 2018)........................................................... 15

*Common Cause Indiana v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) ...................................................................... 11, 13

*Common Cause Indiana v. Lawson*,
  977 F.3d 663 (7th Cir. 2020) ........................................................................... 9

*Common Cause Indiana v. Lawson*,
  978 F.3d 1036 (7th Cir. 2020) ......................................................................... 9

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) .................................................................................. *passim*

*Crawford v. Marion County Election Bd.*,
  472 F.3d 949 (7th Cir. 2007) ............................................................. 18

*Deep S. Ctr. for Env't Just. v. EPA*,
  138 F.4th 310 (5th Cir. 2025) ............................................................ 12

*Democratic Nat'l Comm. v. Bostelmann*,
  451 F. Supp. 3d 952 (W.D. Wis. 2020) ............................................. 33

*Democratic Nat'l Comm. v. Bostelmann*,
  488 F. Supp. 3d 776 (W.D. Wis. 2020) ............................................. 17

*Democratic Nat'l Comm. v. Bostelmann*,
  977 F.3d 639 (7th Cir. 2020) ............................................................... 9

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
  141 S. Ct. 28 (2020) .......................................................................... 34

*S.C. State Conf. of the NAACP v. Dep't of Juv. Just.*,
  No. 25-1032, 2026 WL 233528 (4th Cir. Jan. 29, 2026) ................... 12

*Diaz v. Cobb*,
  541 F. Supp. 2d 1319 (S.D. Fla. 2008) .............................................. 33

*DM Trans, LLC v. Scott*,
  38 F.4th 608 (7th Cir. 2022) ............................................................. 32

*Doe v. Holcomb*,
  883 F.3d 971 (7th Cir. 2018) ...................................................... 14, 15

*Doe v. Rokita*,
  54 F.4th 518 (7th Cir. 2022) ............................................................. 35

*Ex parte Young*,
  209 U.S. 123 (1908) .......................................................................... 14

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) .................................................................. *passim*

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ............................................................. 24

*Fulani v. Hogsett*,
  917 F.2d 1028 (7th Cir. 1990) ........................................................... 31

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ......................................................... 23

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) .......................................................................... 15

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .......................................................................... 11

*Ind. Democratic Party v. Rokita*,
  458 F. Supp. 2d 775 (S.D. Ind. 2006) .......................................... *passim*

*Jones v. Markiewicz-Qualkinbush,*
    842 F.3d 1053 (7th Cir. 2016) ................................................................. 31

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006) ................................................................................. 29

*Lee v. Virginia State Bd. of Elections,*
    188 F. Supp. 3d 577 (E.D. Va.) ............................................................... 29

*Luft v. Evers,*
    963 F.3d 665 (7th Cir. 2020) ........................................... 16, 17, 20, 28

*Manhart v. WESPAC Found., Inc.,*
    No. 24-CV-08209, 2025 WL 2257408 (N.D. Ill. Aug. 7, 2025) ............. 14

*March for Our Lives Idaho v. McGrane,*
    749 F. Supp. 3d 1128 (D. Idaho 2024) ........................................... 18, 27

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................... 34

*McDonald v. Board of Election of Commissioners of Chicago,*
    394 U.S. 802 (1969) ................................................................................. 26

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ............................................................................. 8, 9

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ................................................................................. 30

*N.C. State Conference of the NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020) ................................................................... 28

*Nashville Student Org. Comm. v. Hargett,*
    155 F. Supp. 3d 749 (M.D. Tenn. 2015) ......................................... 18, 27

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 33

*Orr v. Shicker,*
    953 F.3d 490 (7th Cir. 2020) ................................................................... 32

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ................................................................................. 28

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC,*
    2 F.4th 1002 (7th Cir. 2021) ........................................................... 13, 14

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ........................................................................... 1, 6, 8, 9

*Republican Nat'l Comm. v. Democratic Nat'l Comm.,*
    589 U.S. 423 (2020) ................................................................................... 8

*Satanic Temple, Inc. v. Rokita,*
    163 F.4th 1061 (7th Cir. 2026) ....................................................... 13, 14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................... 14

*Tenn. Conf. of the NAACP v. Lee*,
    105 F.4th 888 (6th Cir. 2024) ................................................................ 12

*Texas Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ................................................................. 27

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................... 35

*Trump v. Wisconsin Elections Comm'n*,
    983 F.3d 919 (7th Cir. 2020) ................................................................. 31

*Tully v. Okeson*,
    78 F.4th 377 (7th Cir. 2023) ............................................................. 26, 27

*Tully v. Okeson*,
    977 F.3d 608 (7th Cir. 2020) ............................................................ 23, 34

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ............................................................................... 27

*Walgren v. Bd. of Selectmen of Town of Amherst*,
    373 F. Supp. 624 (D. Mass. 1974) .................................................... 27, 28

*Washington State Grange v. Washington Republican Party*,
    552 U.S. 442 (2008) ............................................................................... 30

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................................ 7, 8

*Wisconsin Voter All. v. Millis*,
    --- F.4th ---, No. 25-1279, 2026 WL 370269 (7th Cir. Feb. 10, 2026) .......................... 11, 12, 13

## Constitutional Provisions and Statutes

2005 Ind. Legis. Serv. P.L. 109-2005 ........................................................ 4

Ind. Code § 3-7-13-1 ................................................................................ 3

Ind. Code § 3-5-2.1-84(a) ......................................................................... 5

Ind. Code § 3-5-2.1-84(c) ............................................................... 6, 20, 27

Ind. Code § 9-13-2-78 .............................................................................. 33

Ind. Code § 9-24-16-10(b)–(c) ............................................................... 3, 5

Ind. Code § 9-24-1-1(a) ........................................................................... 33

Ind. Code § 9-24-1-7(a) ........................................................................... 33

Ind. Code § 3-10-1-7.2(b)–(c) .................................................................. 15

Ind. Code § 3-11.7-2-1(b)(1) .................................................................... 20

Ind. Code § 3-11-4-1 .................................................................................... 3

Ind. Code § 3-11-8-2 .................................................................................... 3

Ind. Code § 3-11-8-25.1(b)–(c) ................................................................. 15

Ind. Code § 3-11.7-5-2.5(c) ....................................................................... 20

Mo. Rev. Stat. § 115.427 ............................................................................ 25

Ohio Rev. Code § 3505.18 .......................................................................... 25

Pub. L. No. 76-2014, 2014 Ind. Acts 828 .................................................... 6

Pub. L. No. 118-2011, 2011 Ind. Acts 1206 ................................................. 6

Pub. L. No. 2021-209, 2021 Ind. Acts 3161 ................................................. 6

S.C. Code § 7-13-710 ................................................................................. 25

Tenn. Code § 2-7-112 ................................................................................. 25

Tex. Elec. Code § 63.0101 .......................................................................... 25

U.S. Const. amend. XXVI ........................................................................... 26

## INTRODUCTION

More than twenty years ago, Indiana began requiring Hoosiers to present photographic identification to vote—something Hoosiers already had to do to board planes, enter federal buildings, and buy tobacco. Although challengers argued that *some* voters may experience difficulties with obtaining Indiana driver's licenses or stated-issued identification cards, the Supreme Court held that Indiana's commonsense identification requirement did not burden the right to vote. *See Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).

Indiana Senate Bill 10 (SB 10) makes one adjustment to Indiana's election regime: it clarifies that identification documents issued by Indiana's public universities cannot be used to vote. This change places the small population who could have used university IDs to vote—students, faculty, staff, and affiliates at select universities—on the same footing as all other Indiana voters, including students at private universities and young people who are not college bound. Anyone affected by SB 10 can still vote by presenting an Indiana driver's license or free state ID card, which the overwhelming majority of students and faculty with university IDs already have.

Although Indiana enacted SB 10 in early 2025 and Indiana's 2026 primary is just weeks away, a single student voter and two advocacy organizations ask this Court to preliminarily enjoin SB 10. The motion should be denied for at least five reasons.

***First***, the motion is barred by *Purcell v. Gonzalez*, 549 U.S. 1 (2006). Early voting begins April 7, 2026, and primary election day is May 5, 2026. The Supreme Court and Seventh Circuit have repeatedly held that federal courts should not alter election rules on the eve of an election.

***Second***, this Court lacks jurisdiction. Neither organizational plaintiff has suffered the kind of concrete, mission-critical injury that confers organizational standing after *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). An organization cannot manufacture standing by

claiming it must update materials or retrain volunteers in response to a law regulating someone else's conduct. Women4Change fares no better on associational standing, as it cannot identify a single member who will be unable to vote. And in any event, the State Defendants cannot properly be enjoined because enforcement of Indiana's voter ID laws rests with local election officials.

**Third,** Plaintiffs are unlikely to succeed on their First and Fourteenth Amendment claims. Under *Anderson-Burdick*, SB 10 imposes no cognizable burden: it simply requires university-ID holders to use the same forms of identification every other Hoosier has always used. *Crawford* already rejected the argument that obtaining a driver's license or free state ID constitutes a substantial burden. Even if one focuses on those affected by SB 10, the vast majority of students, faculty, and staff already have other IDs they can use to vote. Plaintiffs have not produced a single person lacking another form of ID or unable to obtain one. And as Indiana's largest universities transition to digital IDs that could not be used for voting even before SB 10, the population affected by SB 10 will steadily shrink. Against this minimal burden, SB 10 advances compelling state interests in deterring fraud, promoting public confidence, and simplifying election administration.

**Fourth**, SB 10 does not violate the Twenty-Sixth Amendment. The law does not abridge the right to vote and draws no age-based distinctions. It applies identically to younger students, older students, faculty, staff, and contractors, and, at some institutions, nearly half of those who hold university IDs are not students at all.

**Fifth**, the equitable injunction factors independently foreclose relief. Plaintiffs' ten-month delay in seeking an injunction is fatal. No Plaintiff can show irreparable harm: the organizational Plaintiffs face only self-inflicted economic costs, and Montagne could readily obtain a free ID. The balance of equities and public interest strongly favor denial given the imminent election, overwhelming public support for voter ID, and the absence of any evidence of real-world harm.

# BACKGROUND

## I.   General Requirements to Vote in Indiana.

Indiana permits all citizens who are (or, by election day, will be) "at least eighteen (18) years of age" and have "reside[d] in a precinct continuously . . . for at least thirty (30) days" to register as voters. Ind. Code § 3-7-13-1. A person resides in their "residence," which is the place of the person's "true, fixed, and permanent home and principal establishment" and where the person "has, whenever absent, the intention of returning." § 3-5-2.1-90. Temporarily working or attending school in a place does not establish residency. § 3-5-5-7(a). Under Indiana law, college and university students must reside either at their school-year address or at their pre-college home; they cannot reside at both. § 3-5-5-7(b).

To vote, all registered voters may cast ballots in-person at their precinct on election day or at various locations up to 28 days before election day. Ind. Code §§ 3-11-8-2, 3-11-4-1, 3-11-10-26. Since 2005, casting a ballot in person has required a voter to present proof of identification. §§ 3-10-1-7.2(a), 3-11-8-25.1(a). Should a voter present at the polls without a valid form of identification, however, the voter is not turned away but permitted to cast a provisional ballot. *See* § 3-11.7-2-1(b)(1). Voters who cast provisional ballots must then either appear before the circuit court clerk or county election board within ten days of the election and show valid photo ID, § 3-11.7-5-2.5(b)(1), or appear within ten days of the election and execute an affidavit stating that they are indigent and unable to obtain photo ID without payment of a fee, § 3-11.7-5-2.5(c).

If an eligible voter needs an ID but does not have one, the Indiana Bureau of Motor Vehicles (BMV) will issue the voter a free ID. Ind. Code § 9-24-16-10(b)–(c). Obtaining a card requires an applicant to present proof of identity, lawful status, Social Security number, and residency. 140 IAC 7-1.1-3(a). A wide variety of documents can be used to establish each requirement. *See id.* Indiana residents who apply for these cards are given temporary IDs and receive their permanent

3

ID within ten business days. *See* Ex. 1 (Indiana Secretary of State, Voter Information: Photo ID Law: Obtaining a Photo ID). The average appointment to obtain ID takes less than 18 minutes and most IDs are in the mail within 3 to 5 days of the appointment. *See* Ex. 21 (Washabaugh Decl.) at ¶ 12. Most Hoosiers do not require a free ID: 87.7% of adults in the State possess a driver's license, including, by Plaintiffs' own estimate, 498,377 of the State's 679,203 people between the ages of 18 and 24. *See* Pls. Ex. 2 (Mayer Decl.) at 13.

## II.  Indiana's Voter ID Requirements.

### A.  Indiana's original voter ID requirements.

When Indiana first enacted its voter ID law in 2005, valid identification "document[s]" had to be issued by the United States or State of Indiana, show the voter's name, have a picture of the voter, and include an expiration date. 2005 Ind. Legis. Serv. P.L. 109-2005. In theory, IDs issued by state colleges and universities could satisfy the requirements. *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 789 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). But a number of state colleges and universities did not issue qualifying IDs. *See, e.g.*, Ex. 7 (Hettinger Decl.) at ¶ 15. So the "most likely source of acceptable identification [wa]s either drivers' licenses or identification cards issued by the Indiana Bureau of Motor Vehicles." *Ind. Democratic Party*, 458 F. Supp. 2d at 789. United States passports also qualified.

Although anyone without a driver's license could get a state ID for free from the BMV, legal challenges to Indiana's voter ID law quickly ensued. *See Crawford*, 553 U.S. at 186 & n.6 (opinion of Stevens, J.). Challengers argued that requiring voters to present Indiana driver's licenses or other IDs for voting was "neither a necessary nor appropriate method of avoiding election fraud," that Indiana's law "arbitrarily disfranchise[d] qualified voters who [did] not possess the required identification," and that it placed an "unjustified burden on those who cannot readily

4

obtain such identification." *Id.* at 187. They also argued that many eligible voters might face financial or other burdens in obtaining birth certificates or traveling to the BMV. *See id.* at 202 n.20; *Ind. Democratic Party*, 458 F. Supp. 2d at 829–30.

The Supreme Court rejected those challenges. "For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (op. of Stevens, J.); *see id.* at 204, 209 (Scalia, J., concurring) (same). The Court also rejected the argument that Indiana's law did not serve any valid state interests. *See id.* at 196–97 (op. of Stevens, J.); *id.* at 204, 209 (Scalia, J., concurring). "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* at 196 (op. of Stevens, J.). "Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.* And the State has a valid interest in "safeguarding voter confidence." *Id.* at 197.

## B. SB 10 and other amendments to Indiana's voter ID requirements.

Relatively few aspects of Indiana's voter ID requirements have changed since *Crawford*—a period during which Indiana has seen higher voter turnout than before it required ID. *See* Ex. 3 (Gimpel Decl.) Table 1. Today, as in 2005, Indiana generally requires voters to present a "document" that was issued by the United States or State of Indiana, shows the voter's name, includes the voter's photograph, and includes an expiration date. Ind. Code § 3-5-2.1-84(a); *see* §§ 3-10-1-7.2(a), 3-11-8-25.1(a). It also continues to offer free IDs. *See* § 9-24-16-10(b)–(c). Indiana has, however, clarified what counts as an ID issued by the United States or the State of Indiana.

In 2011, Indiana authorized use of IDs issued by the U.S. military, U.S. Department of Defense, Merchant Marine, or the Indiana National Guard. Pub. L. No. 118-2011, 2011 Ind. Acts

1206. In 2014, Indiana authorized use of IDs issued by the U.S. Department of Veterans Affairs. Pub. L. No. 76-2014, 2014 Ind. Acts 828. And in 2021, Indiana authorized use of IDs issued by federally recognized Native American tribes and bands. Pub. L. No. 2021-209, 2021 Ind. Acts 3161.

In April 2025, Indiana enacted SB 10 to clarify the status of university-issued IDs. SB 10 provides that IDs issued by state educational institutions (state colleges and universities) cannot be used for voting, ending a privilege previously afforded to faculty, staff, students, contractors, and visiting scholars at select public educational institutions. Ind. Code § 3-5-2.1-84(c). This change clarified the extent to which university IDs can be used for voting. Private university IDs have never qualified under Indiana statute and some public university IDs qualified while others did not. *See* Ex. 15 (Mayer Depo.) at 23:20-24:4; Ex. 7 (Hettinger Decl.) at ¶ 15 (stating that Purdue IDs did not contain expiration dates until 2019); Ex. 8 (Michalak Decl.) at ¶ (stating that some Ivy Tech campuses issue IDs without expiration dates); Ex. 4 (Gaines Decl.) at ¶ 58. Additionally, public university IDs varied greatly in appearance and contents. *See* Ex. 5 (Crane Decl.) at ¶ 33; Ex. 4 (Gaines Decl.) at ¶ 58. This made poll-worker training more complex and slowed processing of voters at the polls while increasing the likelihood of error. *See* Ex. 5 (Crane Decl.) at ¶¶ 32, 56.

More recently still, some of Indiana's largest public institutions, such as Purdue University and Indiana University, have begun phasing out physical IDs for students. In 2019, Purdue decided to issue students only digital IDs without expiration dates. Indiana University followed suit in 2025. *See* Ex. 7 (Hettinger Decl.) at ¶ 15; Ex. 6 (Warnsman Decl.) at ¶ 14. Those changes introduced yet more variation in university-issued IDs and threatened to spawn confusion as to whether the digital IDs could be used for voting. Ex. 5 (Crane Decl.) at ¶¶ 32, 56.

### III. This Lawsuit.

In May 2025, Plaintiffs Count US IN, Women4Change Indiana, and Josh Montagne brought this challenge to SB 10. Count US IN, a non-profit organization based in Indiana, asserts that SB 10 impedes its ability to conduct get-out-the-vote efforts and forces it to "turn its efforts to mitigating the Student ID Ban's effect." Complaint, ECF No. 1 at ¶ 16; *see* Ex. 19 (Count Us IN's Objections and Responses to Discovery) at 23–24. But Count Us IN's representative testified in her deposition that the organization's get-out-the-vote efforts are not dependent on the type of ID a voter has, and it has not changed its voter registration or outreach activities since SB 10 was enacted. Ex. 13 (Vargas Depo.) at 61:19–24, 62:9–24. Women4Change, another Indiana nonprofit, asserts that SB 10 harms its members and makes its work at educating voters "more challenging, burdensome, and ultimately less effective." Complaint at ¶¶ 19–20. But it, too, was not able to identify a member who will be unable to vote because of SB 10. Ex. 14 (Klitzch Depo.) at 32:2–5. Plaintiff Josh Montagne is a student at Indiana University Bloomington. Montagne does not possess any valid voter ID after the passage of SB 10 and alleges that SB 10 makes it harder for him to vote. *See* Complaint at ¶ 21.

Plaintiffs' complaint asserts two facial challenges to SB 10. First, it alleges that SB 10 violates the First Amendment and the Fourteenth Amendment's Equal Protection Clause by un-constitutionally burdening the right to vote of "young voters." Complaint at ¶¶ 81–85. Second, the complaint alleges that SB 10 violates the Twenty-Sixth Amendment by intentionally "targeting student IDs for exclusion as a valid form of photo ID." *Id.* ¶¶ 86–93.

### ARGUMENT

"A preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking [one] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. None of those criteria are met here.

## I.   A Preliminary Injunction Would Be Inappropriate Under *Purcell*.

As explained below, Plaintiffs' requested injunction is a solution looking for a problem: there is no evidence that the relatively small population who could previously have used public university-issued IDs for voting lack other qualifying IDs or will be unable to obtain a free state ID. But the injunction—which was not requested until ten months after Indiana enacted SB 10— is also a proposal that would *cause* a problem. Granting an injunction would disrupt a soon-to-be-held election by injecting last-minute rule changes into a complex, time-sensitive process.

Since *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020). This is because federal injunctions can wreak havoc on the very process they are trying to improve. As Justice Kavanaugh aptly summarized, "state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring, in grant of applications for stays). Consequently, "[w]hen an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters." *Id.* at 880–81.

So important is the *Purcell* principle that the Supreme Court and Seventh Circuit have routinely held that it is improper to issue injunctions in the weeks or months leading up to an election. *See, e.g.*, *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025)

(staying injunction issued eleven months before election day); *Merrill*, 142 S. Ct. at 879 (staying injunction issued seven weeks before primary elections); *Ardoin v. Robinson*, 142 S. Ct. 2892, 2892–93 (2022) (staying injunction where primary elections were still five months away); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 642 (7th Cir. 2020) (staying injunction granted six weeks before election); *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020) (staying injunction granted five weeks before election); *Common Cause Indiana v. Lawson*, 977 F.3d 663, 664 (7th Cir. 2020) (staying injunction granted five weeks before election). And in *American Council of Blind of Indiana v. Indiana Election Comm'n*, No. 1:20-CV-03118-JMS-MJD, 2022 WL 702257 (S.D. Ind. Mar. 9, 2022), this Court ruled it was too close to an election to issue an injunction where the election was "less than eight weeks away." *Id.* at *6.

Early voting for Indiana's primary election is slated to begin on April 7, 2026—just 18 days after briefing on Plaintiffs' motion for a preliminary injunction is set to conclude. *See* Ex. 2 (Indiana Election Division Calendar). And primary election day itself is May 4, only six weeks after briefing closes. *See id.* That places Plaintiffs' motion squarely in *Purcell* territory. If the Court were to issue an injunction, any state and local election officials covered by it would have days, or at most a few weeks, to implement changes, educate officials, and retrain poll workers. That would be no small task. Training of local officials occurred four months ago in December 2025. *See* Ex. 10 (Bonnet Decl.) at ¶ 6. Preparing and printing materials can take weeks, making it "difficult and expensive, if not impossible" at this late date. *See id.* Public university IDs vary widely in appearance and introduce substantial complexity to the verification process. Ex. 5 (Crane Decl.) at ¶ 49. An injunction would therefore be exactly the kind of late judicial tinkering with election laws that can lead to disruption and to unanticipated and unfair consequences.

## II. The Court Lacks Subject Matter Jurisdiction.

Independent of *Purcell*, the Court lacks jurisdiction because the Plaintiffs lack standing

and the State Defendants are immune from suit. Women4Change and Count US IN have not proven the kind of concrete injury-in-fact that gives organizations standing to bring a constitutional suit. And they cannot manufacture standing by claiming they must spend more money on education or advocacy; the Supreme Court has foreclosed that route to jurisdiction. Further, Women4Change cannot meet the requirements for associational standing because it has not identified a single injured member. Finally, as the State Defendants do not enforce the laws against Plaintiffs, they have sovereign immunity and Plaintiffs' harms are not redressable by them in any event.

### A.        The organizations lack standing in their own right.

To have standing, Plaintiffs must show "(i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380, 393–94 (2024). Satisfying those requirements becomes "substantially more difficult" where a plaintiff chooses to "challenge[] the government's regulation of . . . '*someone else*.'" *Id.* at 382 (emphasis in original) (citations omitted).

Both Women4Change and Count US IN chose the more difficult route. Neither organization argues that SB 10 directly commands the organizations "to do anything or to refrain from doing anything." *All. for Hippocratic Med.*, 602 U.S. at 385. Instead, they argue that SB 10 has made their advocacy more difficult, causing them to spend money or divert resources away from other efforts. *See* Brief in Support of Plaintiffs' Motion for a Preliminary Injunction, ECF No. 86 ("Br.") at 15–17. Specifically, Women4Change alleges that it will need to update educational and training materials to address the changed identification requirements, Pls. Ex. 14 ¶ 12, while Count US IN alleges that it will "take more time" to explain Indiana's voting requirements to voters and to train volunteers who undertake those efforts, Pls. Ex. 6 ¶¶ 12–13. The organizations argue that those impacts suffice under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Common*

*Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). Br. 15–16.

Recently, however, the Supreme Court "revised the [standing] test from *Havens*," repudiating *Common Cause*'s reading of it. *Wisconsin Voter All. v. Millis*, --- F.4th ---, No. 25-1279, 2026 WL 370269, at *9 (7th Cir. Feb. 10, 2026) (Brennan, J., concurring). In *Alliance for Hippocratic Medicine*, the Court rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. Rather, an organization must show the challenged action "directly affect[s] and inter-fere[s]" with the organization's "core business activities." *Id.* at 395.

This means that Women4Change and Count US IN cannot establish standing by alleging that it is now harder to educate and assist potential voters. In *Alliance for Hippocratic Medicine*, medical associations argued that FDA actions on mifepristone "caused" them injury, arguing they had to expend more resources conducting studies, communicating with members, conducting ad-vocacy, and educating the public to combat the FDA's actions—injuries indistinguishable from the injuries Women4Change and Count US IN assert. *Id.* at 385, 394. Yet the Court held that the associations lacked standing despite the new difficulties they faced. *Id.* at 394–95.

The Seventh Circuit held the same in another case concerning voter-ID regimes. In *Wisconsin Voter Alliance*, an organization alleged that Wisconsin had frustrated its "core organizational and advocacy activities" by failing to address complaints used to educate the public and to obtain information. 2026 WL 370269, at *2. That was insufficient for standing. *Id.* at *7. "Organizations must point to more evidence of concrete disruptions to mission-critical business operations." *Id.* And even if the filing of complaints was a "core" business activity, the court explained,

Wisconsin did not directly interfere with the organization's mission because the organization had "alternative channels" by which it could "educat[e] voters" and "rais[e] public concerns." *Id.*

This case is no different. Nothing in SB 10 compels Women4Change and Count US IN to do anything, bars them from educating potential voters about Indiana election law, or prevents them from assisting students. The organizations may have to provide potential voters with different information than they did before SB 10 or even believe that potential voters who feel "discouraged." Br. 16. But organizations cannot "manufacture standing" by saying that the government's regulation of someone else means they must expend more time, resources, or money on education, training, and advocacy. *All. for Hippocratic Med.*, 602 U.S. at 395; *see also S.C. State Conf. of the NAACP v. S.C. Dep't of Juv. Just.*, No. 25-1032, 2026 WL 233528, at *6 (4th Cir. Jan. 29, 2026); *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 318 (5th Cir. 2025); *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 902–07 (6th Cir. 2024). Indeed, that is precisely why organizations lacked standing to challenge Indiana's original voter ID law. *See Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 815–19 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

Moreover, even if one assumes that organizations can sometimes establish interference with core business operations by pointing to impacts on education, training, and advocacy, Women4Change and Count US IN have not provided "evidence of concrete disruptions." *Wisconsin Voter All.*, 2026 WL 370269, at *7. Women4Change and Count US IN say they must provide different information about IDs. Br. 16. But Women4Change *already* includes information about qualifying forms of ID in its informational materials, Ex. 14 (Klitzch Depo.) at Exs. 2 & 3, and *already* updates them every year. *Id.* at 38:19–39:7. Count Us IN also already provides potential voters information about qualifying ID and updates that information "cycle to cycle" with any

12

changes to the law. Ex. 13 (Vargas Depo.) at 95:5–14; 40:1–9.

The organizational Plaintiffs make no attempt to estimate how much additional time it will allegedly take to update materials or educate potential voters and do not venture to provide specifics about how many people will allegedly require assistance in obtaining IDs solely due to SB 10. *See* Ex. 13 (Vargas Depo.) at 129:15–130:25. Nor do the organizations provide details about the alleged diversion of resources. *See, e.g., id.* at 102:13–103:1. In fact, Count Us IN has made no operational changes in response to SB 10 over the last year. *Id.* at 53:13–19.

That distinguishes this case from *Common Cause* in which the plaintiffs provided evidence that the law had "already inflicted costs" on them and would inflict "further concrete and specific adverse consequences," including by deregistering voters plaintiffs had helped register to vote. 937 F.3d at 951–52. Embracing Plaintiffs' theory on this record would create the very outcome that Article III does not tolerate: a world in which "all the organizations in America . . . have standing to challenge almost every" law "they dislike." *All. for Hippocratic Med.*, 602 U.S. at 395.

### B. Women4Change does not have associational standing.

Women4Change also lacks associational standing. *Contra* Br. 17. To have associational standing, an association must establish, among other things, that "at least one of its members would 'have standing to sue in their own right.'" *Satanic Temple, Inc. v. Rokita*, 163 F.4th 1061, 1067 (7th Cir. 2026) (quoting *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021)). To satisfy that requirement, an organization must "identify a member who has standing to present in her own right the injury caused by" SB 10. *Id.* at 1068. This requires more than evidence of "generalized harm to a group of individual members." *Prairie Rivers Network*, 2 F.4th at 1010. Rather, an organization must submit an "affidavit nam[ing] the individuals who were harmed" and showing the named individuals would have standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009).

13

Women4Change has not identified any individual member with standing to sue. In neither its declaration nor deposition did Women4Change identify a single member who will be unable to vote because of SB 10. Ex. 14 (Klitzch Depo.) at 32:12–33:2. The only identified Women4Change member who claims harm, Sajida Qaddoura, has both an Indiana driver's license and a U.S. passport and could vote using those. *See* Ex. 16 (Qaddoura Depo.) at 14:21–24. Her claimed "injury" reduces to a preference to use a university ID. *See* Ex. 16 (Qaddoura Depo.) at 16:21–17:2. But that does not convey standing. *See Manhart v. WESPAC Found., Inc.*, No. 24-CV-08209, 2025 WL 2257408, at *12 (N.D. Ill. Aug. 7, 2025) ("[A]nnoyance, inconvenience, lost time, and stress—are not concrete for Article III purposes.").

## C. The State Defendants are not proper defendants.

### i.     The State Defendants are immune from suit.

The Eleventh Amendment "generally immunizes" states and state officials from suit in federal court. *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018). Absent exceptions not relevant here, a plaintiff may evade sovereign immunity only by showing that a state official "has 'some connection with the enforcement' of an allegedly unconstitutional state statute for the purpose of enjoining that enforcement." *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

But the Secretary of State and Election Division have "no direct role in enforcing election laws," including SB 10 and associated voter ID laws. *Ind. Democratic Party*, 458 F. Supp. 2d at 785. By statute, responsibility for enforcement rests with "precinct election officer[s]" and "precinct election board[s]." Ind. Code §§ 3-10-1-7.2(b)–(c), 3-11-8-25.1(b)–(c). The Secretary of State and Election Division have not enforced and are not threatening to enforce SB 10 against Plaintiffs themselves; the Eleventh Amendment thus bars suit. *Doe*, 883 F.3d at 977.

*Common Cause Indiana v. Lawson*, 327 F. Supp. 3d 1139 (S.D. Ind. 2018), *aff'd*, 937 F.3d 944 (7th Cir. 2019), is not to the contrary. In that case, the court held that the Election Division

was a proper defendant in a claim asserted under the Voter Registration Act because its directors "are the NVRA officials in the state," "ultimately responsible for the state's compliance with the NVRA," and "establish the policies and procedures" for implementing it. *Id.* at 1152. "That is not so here." *Asian Americans Advancing Just.-Chicago v. White*, No. 1:20-CV-01478, 2021 WL 12318991, at *2 (N.D. Ill. Mar. 25, 2021). Plaintiffs do not identify how the Secretary of State or Election Division enforce SB 10. Sovereign immunity thus bars their suit. *See id.*

### ii.     Plaintiffs' injury is not redressable via an order against the State Defendants.

Standing requires any harm be fairly traceable to the defendant and redressable by a judgment against the defendant. *See All. for Hippocratic Med.*, 602 U.S. at 380. None of the State Defendants are involved in enforcing SB 10 against the Plaintiffs or any Indiana voter. Thus, any alleged injury is not traceable to the State Defendants or redressable by relief against them. *See Haaland v. Brackeen*, 599 U.S. 255, 292–94 (2023). As this Court has recognized in a prior suit, "[t]he Election Division's manuals and training, however, are advisory only, as the administration of any election and its oversight is the responsibility of the County Election Board." *Ind. Democratic Party*, 458 F. Supp. 2d at 785–86. County boards, who enforce the law, "can take, and have taken, positions about election laws and procedures contrary to the position advanced by the State Election Division." *Id.* at 786. To obtain relief, Plaintiffs need an order against county officials, not the State Defendants. Plaintiffs therefore lack standing to sue the State Defendants.

### III. Plaintiffs Are Unlikely to Succeed on Their First and Fourteenth Amendment Claims.

Plaintiffs do not have a strong likelihood of success on the merits. Plaintiffs bring a facial challenge to SB 10 under the First and Fourteenth Amendments, alleging that the statute unconstitutionally burdens the right to vote under the *Anderson-Burdick* framework. Br. 18–19.

*Anderson-Burdick* entails a two-step analysis. At step one, a court examines the "character and magnitude" of the alleged burden on the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 434

(1992). Ordinary and "generally applicable" burdens are not considered severe. *Anderson v. Cele-brezze*, 460 U.S. 780, 788 n.9 (1983). At step two, the court must weigh the burden against the state's interests. *Burdick*, 504 U.S. at 434. Under this inquiry, "[o]nly when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules." *Luft v. Evers*, 963 F.3d 665, 672 (7th Cir. 2020). All other regulations will be upheld if they are "reason-able" and "nondiscriminatory." *Anderson*, 460 U.S. at 788.

Critically, *Anderson-Burdick* is not an invitation to consider whether a voting regulation is "beneficial, on balance." *Luft*, 963 F.3d at 671. "[T]he judiciary" may not "decide whether any given election law is necessary." *Id.* Such an inquiry would improperly substitute "judicial judg-ment for legislative judgment." *Id.* (cleaned up). Further, any alleged burdens created by a partic-ular voting regulation must be considered alongside "the interaction of individual provisions with the election system as a whole." *Id.* So, for example, "[a] state with liberal access to absentee ballots may well offset this with more stringent verification of eligibility." *Id.*

Finally, under *Anderson-Burdick*, the Court does not consider the burden of a voting regu-lation on a particular group in isolation. *Contra* Br. 19. To the contrary, the Seventh Circuit has cautioned that "the burden of a specifically challenged election provision must be considered against 'the state's election code as a whole'—that is, by 'looking at the whole electoral system,' rather than 'evaluat[ing] each clause' and its effects on individual voters 'in isolation.'" *Demo-cratic Nat'l Comm. v. Bostelmann*, 488 F. Supp. 3d 776, 800 (W.D. Wis. 2020) (quoting *Luft*, 963 F.3d at 669, 671, 674); *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring) (explaining burdens must be evaluated "categorically"). The threshold question is thus whether SB 10 imposes an unconstitutional burden on the right to vote, considered *across Indiana's voting population*.

**A. SB 10 does not burden the right to vote.**

SB 10 does not burden the right to vote. First, any putative burden is minimal and indistinguishable from the burden upheld in *Crawford*. Second, very few voters who could have used university IDs before SB 10 will experience even this alleged minimal burden.

**i.    Obtaining valid voter ID is not a severe burden on the right to vote.**

The putative burden from SB 10—that a voter will have to obtain a driver's license or free state ID—does not rise to the level of violating the right to vote. This "burden" is identical to the burden associated with every voter ID law in the country and one that courts across the country, including the Supreme Court, have held does not implicate the right to vote. Indeed, when Indiana first passed its voter ID regime, plaintiffs brought a suit alleging that obtaining a voter ID burdened their right to vote. *See Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Indiana's law required every person to present an ID to vote. Even the poor, elderly, and homeless had to make a trip to the BMV or passport office to obtain a valid ID. Importantly, that included every university student in the state, even those attending private universities who could not use their university ID. The Plaintiffs alleged that this burdened Hoosiers' right to vote.

This Court, the Seventh Circuit, and the Supreme Court all rejected the idea that voters were burdened by obtaining a valid voter ID. *See Indiana Democratic Party*, 458 F. Supp. 2d at 824; *Crawford*, 472 F.3d at 954; *Crawford*, 553 U.S. at 200. As the Supreme Court explained in *Crawford*, "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198; *see also Crawford*, 553 U.S. at 209 (Scalia, J., concurring) ("The burden of acquiring, possessing,

17

and showing a free photo identification is simply not severe"). The burden rejected in *Crawford* is *exactly* the same burden alleged by Plaintiffs here—even down to the specifics like cost of obtaining a birth certificate for in- and out-state-voters. *See* Ex. 20 (*Indiana Democratic Party v. Rokita* Memorandum in Support of Motion for Summary Judgment) at 15–20 (arguing that the cost of obtaining a birth certificate violates the right to vote). If anything, the alleged burden is *less* than the burden rejected in *Crawford*, because the effect of SB 10 is felt by fewer voters—university-ID holders as opposed to all Hoosier voters.

"When . . . the statute's broad application to all Indiana voters [is considered,] . . . it imposes only a limited burden on voters' rights." *Crawford*, 553 U.S. at 202–03 (op. of Stevens, J.) (internal quotation marks omitted) (quoting *Burdick,* 504 U.S., at 439); *see id.* at 205 (Scalia, J., concurring) (explaining a burden must be evaluated based on total effects, not "different *impacts* of the single burden" on different groups of voters). Every court to have considered laws similar to SB 10 has ruled that *Crawford* compels the conclusion that eliminating university IDs does not impose an undue burden on the right to vote. *See BABE VOTE v. McGrane*, 546 P.3d 694, 713 (Idaho 2024) (upholding Idaho's elimination of university ID); *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1142 (D. Idaho 2024) (upholding Idaho's elimination of university ID under *Crawford*); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749 (M.D. Tenn. 2015) (upholding Tennessee's elimination of university ID under *Crawford*).

Plaintiffs argue that the burden of obtaining ID is somehow meaningfully greater for students than it was for the Plaintiffs in *Crawford*. Br. 20, n. 11. That is incorrect. This Court's opinion in *Crawford* addressed students living in Indiana and the briefing in the case addressed university IDs. *See Indiana Democratic Party*, 458 F. Supp. 2d at 807 n.43; Ex. 20 (*Indiana Democratic Party v. Rokita* MSJ Brief) at 10. Moreover, this Court considered the homeless, the low-income,

and the disabled, three groups who face more difficulty than students in obtaining ID. *See Indiana Democratic Party*, 458 F. Supp. 2d at 829 ("[T]he groups that Plaintiffs claim would be disproportionately impacted, such as the elderly, disabled, and homeless, can all avail themselves of permissible alternatives to the photo identification requirements.").[1] Nor do the data bear out the argument that public university students face any greater burden than the general population. Public university students face similar travel times and distances to Indiana BMVs as all other voters, including voters in their same age bracket who attend private universities or do not attend university at all. Ex. 3 (Gimpel Decl.) at ¶ 11, 29. And Plaintiffs do not allege that the cost of obtaining an ID is uniquely burdensome for students. *See* Complaint at ¶¶ 48–49; Br. 12–13.

Plaintiffs' arguments also ignore the numerous avenues open to voters to obtain an ID and vote with or without one. Indiana residents without a driver's license are entitled to obtain a state ID free of charge. *Supra*, pp. 3–4. Passports, Indiana driver's licenses and state IDs, and military IDs are all valid forms of identification for purposes of voting. *Supra*, p. 4. And if a voter presents to vote without a compliant ID, he can cast a provisional ballot and either later present a valid ID or request a determination of indigency to overcome the ID requirement. *Supra*, p. 3 (citing Ind. Code §§ 3-11.7-2-1(b)(1), § 3-11.7-5-2.5(c)). These other provisions further undermine any claim that SB 10 burdens the right to vote. *See Luft*, 963 F.3d at 671 (explaining that the alleged burden on the right to vote of a particular voting regulation must be considered along "with the election

---

[1] Plaintiffs assert that "the requirements for obtaining ID have become more burdensome since" *Crawford*. Br. 20 n.11. This argument fails for two reasons. First, the requirements that Plaintiffs' cite—obtaining a birth certificate and traveling to the BMV—have always been in effect since before *Crawford* was decided. *See* Br. 10 n.8. Second, the additional requirements Plaintiffs point to are minimal: additional proof of residency and proof of a social security number. These documents are available to every U.S. citizen and anyone with a credit card, bank account, lease, or mortgage. Montagne already possesses every document necessary to obtain an Indiana driver's license. *See* Ex. 12 (Montagne Depo.) 22:16–19; 47:13–48:20

system as a whole").

It is voter motivation, not the need to obtain a photo ID, that is the decisive factor in voter participation. Decades of research evaluating convenience-based electoral reforms, including the Motor Voter Act of 1993, no-excuse absentee balloting, early voting, expanded polling hours, and vote-by-mail, have consistently found negligible effects on turnout, leading scholars to conclude that administrative costs are simply not the binding constraint on participation. Ex. 3 (Gimpel Decl.) at ¶¶ 20–21. This can be seen from the depositions of Montagne and Taylor Sands. Both possess the documents required to obtain a driver's license or state ID but choose not to. For both students, the obstacle is not time, money, or lack of access to documents. In fact, neither has even investigated what they would need to do to obtain a driver's license. *See* Ex. 12 (Montagne Depo.) at 58:3–7; Ex. 17 (Sand Depo.) at 8:22–9:8. They simply don't want to be responsible for keeping their identifying documents secure. *See* Ex. 12 (Montagne Depo.) at 40:24–41:19, 72:23–73:8; Ex. 17 (Sand Depo.) at 27:2–12.

ii.    **SB 10 does not increase the burden on the right to vote, nor does it target students or young people.**

Plaintiffs' claim that SB 10 targets students and young people, but the statute itself is generally applicable, providing that no documents "issued by an educational institution," can be used. Ind. Code § 3-5-2.1-84(c). And a substantial portion of public university IDs are issued to faculty, staff, contractors, visiting scholars, and older students. *See, e.g.,* Ex. 6 (Warnsman Decl.) at ¶ 8; Ex. 7 (Hettinger Decl.) at ¶ 8. Indiana University, for example, has 89,000 students and 62,500 faculty, staff, and affiliates. *See* Ex. 6 (Warnsman Decl.) at ¶ 3. In other words, almost half of people with an ID from IU are not students. Purdue has 57,310 students and 19,213 faculty and staff, meaning a quarter of those eligible for its IDs are not students. *See* Ex. 7 (Hettinger Decl.) at

¶ 4. The population affected by SB is not the "young" or "students," it is voters of any age who hold a public-university-issued ID. This is not a law "surgically targeted" at the young. Br. 5.

Yet even those gross population numbers overstate the effect. Anyone who already holds a valid Indiana driver's license, state ID card, a passport, a tribal ID, or a military ID will still be able to vote without doing anything more. Mayer Depo. at 40:5–23. SB 10 also will have no effect on public-university students, staff, and contractors issued digital IDs, which could not serve as a valid voter ID even before SB 10. *Id*. As of 2026, that category includes every incoming student at Indiana University and Purdue University. *See,* Ex. 6 (Warnsman Decl.) at ¶ 14; Ex. 7 (Hettinger Decl.) at ¶ 12. Nor does SB 10 affect those with public university IDs that never qualified as voter ID. For example, Ivy Tech, the largest public school in Indiana with 200,000 students, currently issues some IDs without expirations dates and, by July 2, 2026, will not issue any IDs with expiration dates. *See* Ex. 8 (Michalak Decl.) at ¶¶ 5–6. And SB 10 will have no effect on public university students who are not domiciled in Indiana, who vote in other States' elections, or who would not have otherwise voted. Accordingly, the *actual* populations that will be required to do anything in response to SB 10 are the ever-diminishing population who 1) hold a *physical* public-university ID *with an expiration date*, 2) lack an alternative form of ID like an Indiana driver's license or passport, and 3) are domiciled and vote in Indiana rather than their prior state.

Plaintiffs' own estimates (which, again, ignore the faculty, staff, and affiliates who possess university IDs) put relevant population at 45,000 students, or 23% of four-year university students, which amounts to only 6.6% of the state's population under the age of 25. *See* Pls. Ex. 2 (Mayer Decl.) at Table 1, Table 3, p. 18. But even that estimate is far too high because it fails to account for 1) students who have lived in Indiana but vote elsewhere; 2) students who attend universities that do not issue qualifying IDs (including the State's largest public universities); or 3) students

who possess qualifying ID other than a driver's license or passport. *See id.* Plaintiffs' estimates further inflate the percentage of university ID holders without alternate ID because they exclude the faculty, staff, and affiliates who do not fit their age-discrimination narrative. Those populations are even more likely to possess alternate forms of ID. *See id.* at Table 3. Tellingly, Plaintiffs do not put numbers on what the actual population affected is.

Finally, Plaintiffs themselves do not claim that everyone in the very small population who must get a new ID to vote will experience significant burdens. Rather, they argue there are some students who may face transportation difficulties, be indigent, have trouble getting documents, or have inflexible class schedules. Br. 10–13. But they do not say what percentage of students at public universities who must get a new form of ID to vote faces any one of those difficulties— which are the difficulties put forward in *Crawford*—much less several. The lack of a meaningful burden on the student vote can be seen in the fact that Plaintiffs have not identified a single person who lacks another form of ID or will be unable to obtain another form of ID as a result of SB 10. *See* Ex. 14, (Klitzch Depo.) at 32:2-5. Ex. 13, (Vargas Depo.) at 105:23-106:3; Ex. 12, (Montagne Depo.) at 56–64.[2] Plaintiffs' failure to identify any voters actually affected fatally undermines their claim of burden. *Crawford*, 553 U.S. at 200 (criticizing the lack of evidence of the scope of the population affected). Surely, if SB 10 posed the burden claimed, identifying droves of voters who will be unable to vote would be easy. This is *Crawford* all over again.

---

[2] Indeed, Montagne is unaware of any friend or acquaintance at Indiana University Bloomington who will be unable to vote as a result of SB 10 or will need to obtain a new ID because of SB 10. Ex. 12 (Montagne Depo.) at 58:1–63:23. Taylor Sand claimed to know of one person who would be unable to vote, but that person was unable to vote before SB 10's passage. *See* Ex. 17 (Sand Depo.) at 20:20–22:9, 23:19–22. Sajida Qaddoura also claimed to know of students who could not vote, but couldn't provide any estimate of how many and was instructed by counsel not to identify any individuals. *See* Ex. 16 (Qaddoura Depo.) at 17:19–21:19.

**B.  SB 10 serves numerous state interests.**

Indiana's voter identification requirements, including SB 10's clarification that university-issued identification cards do not qualify as government-issued identification, serve the State's well-established interest in bolstering public confidence in the integrity of elections. The Supreme Court has recognized that, "[c]losely related" to deterring actual wrongdoing is each State's equally important interest in "protecting public confidence in the integrity and legitimacy of representative government." *Crawford*, 553 U.S. at 197. Critically, a State need not await documented fraud before acting to protect this interest. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021) ("[A] State may take action to prevent election fraud without waiting for it to occur."); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021) (same).

"There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196. And "[b]alancing the interests of discouraging fraud and mitigating elections-related issues with encouraging voter turnout is a judgment reserved to the legislature." *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020). Indiana driver's licenses and Indiana state identification cards are issued pursuant to rigorous, uniform, and statutorily mandated standards, including proof of identity, lawful presence, Social Security verification, and Indiana residency, which are verified through state and federal databases. Ex. 5 (Crane Decl.) at ¶ 46. Reliance on such forms of identification at all stages of voting supports public confidence in election outcomes, Ex. 5 (Crane Decl.) at ¶ 26, a governmental interest expressly recognized by the Supreme Court in *Crawford*. 553 U.S. at 197. The Seventh Circuit itself has specifically recognized that, as a general rule, photo ID laws "promote confidence" in the integrity of elections *See Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014).

The record here strongly supports Indiana's judgment. Regression analysis of the 2024

SPAE data demonstrates that stricter identification laws correlate with lower levels of public belief in fraud prevalence, even after controlling for partisanship. Ex. 4 (Gaines Decl.) at ¶¶ 41–42. This finding is corroborated by experimental evidence: a randomized field study found that registered voters who received postcards describing their state's photo ID law reported significantly lower perceptions of fraud following the election than matched voters who received no such information, leading the authors to conclude that photo ID restrictions can reduce fraud perceptions "when the public learns about these restrictions." *Id.* ¶ 43 (discussing Endres & Panagopoulos (2021)). Laws requiring photo ID are also widely popular, enjoying supermajority support in Indiana, even among democrats. *See* Ex. 4 (Gaines Decl.) at ¶¶ 14–17, 28. Studies further show that there is meaningful room for confidence-building measures and underscoring the practical value of clear, well-publicized identification rules in Indiana. *Id.* ¶¶ 36, 39. SB 10's removal of a form of ID that tended to cause confusion, and would do so even more as universities transition to digital IDs, is precisely the kind of transparent, easily communicated rule that will strengthen public trust.

In addition to advancing the state's interest in preventing fraudulent voting and thereby increasing confidence in election outcomes, SB 10 also supports the related governmental interest in "orderly administration and accurate recordkeeping" in elections. *Crawford*, 553 U.S. at 196. This interest "provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.* SB 10 promotes the orderly administration of elections and accurate recordkeeping by streamlining Indiana's photo identification requirement to make the acceptable forms of identification more uniform, objective, and verifiable. Ex. 5 (Crane Decl.) at ¶ 49. This makes confirming voter identity at the polls a simpler task, reducing discretionary decision-making by poll workers. Ex. 5 (Crane Decl.) at ¶ 35. Such a change is best practice under any circumstance but especially makes sense in light of widespread transition to digital university IDs. These IDs

24

are not valid voter ID, but could be a source of confusion among voters and poll workers alike. Indiana has a valid interest in clarifying its laws so that treatment of voters is uniform and voters don't show up to the polls thinking a digital ID could qualify only to realize it does not.

By narrowing the field of acceptable IDs, SB 10 streamlines election administration and sensibly limits the documents that may be used at the polls. Student identification cards are not issued under any statewide election or motor vehicle legal standard, do not require proof of citizenship, lawful presence, or Indiana residency, and vary significantly by institution in format, security features, and issuance procedures. Ex. 5 (Crane Decl.) at ¶ 28–29. Indiana's policy choice to eliminate public-university IDs as acceptable forms of identification for voting will therefore improve election administration by decreasing waiting time at polling places, improving the homogeneity of valid IDs, improving the security of valid IDs, and decreasing the knowledge burden on both poll workers and voters. Ex. 5 (Crane Decl.) at ¶¶ 24, 55, 64.[3]

### C.  SB 10 does not violate the Twenty-Sixth Amendment.

SB 10 does not violate the Twenty-Sixth Amendment because it does not burden the right to vote, does not draw any age-based distinctions, and was not enacted with any discriminatory intent. The Twenty-Sixth Amendment provides that the "right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. "[T]he Twenty-Sixth Amendment confers an individual right to be free from the denial or abridgment of the right to vote on account of age." *Tully v. Okeson*, 78 F.4th 377, 383 (7th Cir. 2023) (*Tully II*).

Determining whether the Twenty-Sixth Amendment has been violated entails a two-part

---

[3] Indiana is not alone in clarifying that public university IDs cannot be used for voting. *See* Idaho Code §§ 34-1113, 34-411; Mo. Rev. Stat. § 115.427; Ohio Rev. Code § 3505.18; S.C. Code § 7-13-710; Tenn. Code § 2-7-112; Tex. Elec. Code § 63.0101.

inquiry. First, a court must examine the voting regulation against the historical understanding of what the franchise "ought to be." *Tully II*, 78 F.4th at 386. Does the regulation preclude or effectively impair "the right to register, the right to cast a ballot, and the right to have that ballot counted"? *Id.* at 384. Second, a court must decide if the regulation "abridge[s]" the right by imposing a "material requirement" on the right to vote solely on account of age. *Id.* at 385–86.

Notably, the Twenty-Sixth Amendment does not guarantee particular methods of voting. *Tully II*, 78 F.4th at 383 (citing *McDonald v. Board of Election of Commissioners of Chicago*, 394 U.S. 802, 807 (1969)). Rather, a voting regulation violates the Twenty-Sixth Amendment only if it effectively precludes young voters from registering to vote or casting a ballot. *Id.* at 384. Nor does "abridge" mean "retrogression." *Id.* at 386–87. The question is not whether a law leaves young voters "worse off," but whether they are effectively precluded from voting. *Id.* at 387.

### i. SB 10 does not abridge the right to vote on account of age.

SB 10 does not abridge the right to vote because it imposes no new material requirement on any voter. SB 10 does not prevent any voter, young or old, from voting. It simply rescinds a special privilege that was unavailable to the vast majority of Indiana voters: private-university students, the unemployed, tradespeople, anyone else who did not work or study at a public university, and public university staff and students who lacked physical IDs with expiration dates. It cannot be that equalizing the treatment of voters abridges the right to vote. And any argument that the costs associated with obtaining a birth certificate and traveling to a BMV branch constitute a material condition on the franchise proves far too much: every Indiana voter faces the same requirements, and the Supreme Court has already held that obtaining an ID is not a material burden. *See Crawford*, 553 U.S. at 198 (op. of Stevens, J.); *id.* at 209 (Scalia, J., concurring).

SB 10 does not violate the Twenty-Sixth Amendment for the independent reason that it draws no age-based distinctions whatsoever. The law applies uniformly to all Indiana voters

26

regardless of age: It provides that a "document issued by an educational institution" cannot be used to vote. Ind. Code § 3-5-2.1-84(c). Nothing about that provision turns on age. Students at public universities are of all ages, *see* Pls. Ex. 2 (Mayer Decl.) at Table 2, and as described above, a substantial portion of those with IDs from public universities are faculty, staff, and affiliates. *See supra* p. 20–21. Meanwhile, many young people—including private-university students, students at public institutions whose IDs are now digital or do not include expiration dates, and the almost 50% of young Hoosiers who do not attend any university—would not be able to use university-issued IDs to vote even absent SB 10. *See* Ex. 11 (Indiana Commission for Higher Education, College Going Scorecard). There is no Twenty-Sixth Amendment violation.

### ii. *Arlington Heights* does not control and, even if it did, SB 10 passes muster.

Plaintiffs argue that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65 (1977), provides the standard for analyzing their Twenty-Sixth Amendment claim. Br. 29. But the Seventh Circuit and other courts have not adopted that approach. *See Tully II*, 78 F.4th at 383 (analyzing Twenty-Sixth Amendment claim pursuant to original meaning of the text, not *Arlington Heights*); *Texas Democratic Party v. Abbott*, 978 F.3d 168, 184 (5th Cir. 2020); *Mar. for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1140 (D. Idaho 2024); *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015). This is because the Thirteenth, Fourteenth, and Fifteenth Amendments address a "fundamentally different" concern—racial discrimination. *Walgren v. Bd. of Selectmen of Town of Amherst*, 373 F. Supp. 624, 634 (D. Mass. 1974). There is no similar history regarding age. *See id.*

But even assuming it is proper to look behind SB 10's facially neutral text, it does not change the outcome. To start, even if Plaintiffs could establish that SB 10 has some disproportionate impact on younger voters, that would not establish a Twenty-Sixth Amendment violation. Discriminatory impact alone is insufficient; Plaintiffs must demonstrate that the legislature acted with

discriminatory *intent*. *See Abbott v. Perez*, 585 U.S. 579, 607 (2018). When evaluating SB 10, the Court must apply a "presumption of legislative good faith." *Id*. at 610; *see also N.C. State Conference of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) ("*Abbott* could not be more clear in allocating the burden of proof and applying the presumption of good faith."). "This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024).

At most, Plaintiffs' evidence supports the inference that the legislature was aware that eliminating public-university-issued IDs as a permissible form of voter identification could have an effect on some younger voters. But, as discussed above, an examination of the relevant data shows that the affected population spans voter ages and voters who lack another form of ID is tiny in all events. Even still, awareness of consequences of law is not evidence of discriminatory purpose. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences.); *Luft*, 963 F.3d at 670 ("[G]overnment often does things that have disparate impact but can be said to intend that effect only when it acts because of . . . the disparate effect.").

Plaintiffs have adduced no direct evidence of age discrimination. Every quote or statement in their brief is from individuals not associated with the Indiana legislature. *See e.g.* Br. 6 (quoting non-Indiana legislator Cleta Mitchell). Stray activist or legislator comments cannot be imputed to the legislature as a whole. *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 605 (E.D. Va.), *aff'd*, 843 F.3d 592 (4th Cir. 2016); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006).

Plaintiffs instead rely exclusively on circumstantial evidence, primarily previous

amendments to Indiana's voter ID law that permitted the use of military and tribal IDs. Br. 6–7, 26. The presumption of legislative good faith requires that the Court construe this circumstantial evidence in the legislature's favor. *See Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025). Further, these amendments are not evidence of age discrimination for at least three reasons. First, those amendments were enacted by different General Assemblies years ago. Second, there are rationales that support both actions. Both military and tribal IDs, like passports and IDs issued by Indiana, are issued by central government authorities that impose top-down standards for ID issuance. Meanwhile, fewer and fewer state universities are issuing IDs that can be used for voting, increasing the likelihood of confusion. Third, according to the Plaintiffs' own experts, the addition of military IDs promotes the youth vote because active duty servicemembers are disproportionately young. Ex. 15 (Mayer Depo.) at 51:7–14.

Without direct, or even circumstantial, evidence that the reason for SB 10 was the age of voters, Plaintiffs cannot overcome the strong presumption of legislative good faith. In this case, the presumption of legislative good faith is well supported by the actual legislative record, which is replete with direct evidence of the legislature's valid reasons for changing the law, including improved election administration. *See, e.g.,* Pls. Ex. 47 (Transcript of IN Senate Elections Committee SB 10 Hearing) at 6–7; Pls. Ex. 49 (Transcript of IN Senate SB 10 Hearing) at 12–13, 22–24. Contrary to Plaintiffs' assertions, these justifications are not "implausible," Br. 32, but are well supported by expert literature and analysis, and best practices in election administration. *See e.g.,* Ex. 5 (Crane Decl.) at ¶¶ 28–68; Ex. 4 (Gaines Decl.) at ¶¶ 53–71; *see also supra* III.B.

### D. Plaintiffs do not satisfy the requirements for a facial challenge.

In *Crawford* itself, the Supreme Court made clear that a "facial challenge must fail where the statute has a 'plainly legitimate sweep." 553 U.S. at 202 (quoting *Washington State Grange v. Washington Republican Party*, 552 U.S. 442, 449 (2008)). That means a plaintiff cannot win a

facial challenge, without assessing the challenge law's "full scope," identifying both its constitutional and unconstitutional applications, and demonstrating that the unconstitutional applications are "substantial" compared to the law's plainly legitimate sweep. *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024); *see id.* at 723–25.

Here, Plaintiffs' facial challenge fails for at least four reasons. First, Plaintiffs do not undertake the required analysis for a facial challenge and have failed to carry their burden as a result.

Second, when considering the "broad application to all Indiana voters," the statute poses only a negligible burden. *Crawford*, 553 U.S. at 202. SB 10 has a plainly legitimate sweep: Plaintiffs do not establish that large swaths of the individuals allegedly affected by SB 10 face any cognizable burden. *See supra*, pp. 20–22. And SB 10 serves compelling state interests of promoting public confidence in elections, in discouraging fraud and in promoting the orderly administration of elections and recordkeeping related to them. *See supra*, III.B.

Third, the Plaintiffs' claim for facial invalidation of SB 10 suffers from exactly the problem identified in *Washington State Grange*: it asks for premature adjudication of a constitutional claim. Plaintiffs' "evidence" of harm largely consists of speculation. And Plaintiffs ignore that most public universities are transitioning to digital ID, which means that many students would be unable to use their IDs for voting even absent SB 10. *See* Ex. 5 (Crane Decl.) at ¶¶ 37, 53.

Fourth, facial invalidation is not warranted by the harm claimed by the organizational Plaintiffs. The organizational Plaintiffs claim that SB 10 will increase the costs of their advocacy and reduce the effectiveness of their advocacy with respect to the students they do reach. These relatively small-scale harms do not justify facially enjoining SB 10. The organizational Plaintiffs' harm is largely unrelated to the right to vote; they should not be able to walk into court and strike down an entire law based on decreased efficiency in voter education.

## IV. The Remaining Factors Decisively Cut Against an Injunction.

### A. Plaintiffs' delay bars relief.

Plaintiffs' delay in requesting an injunction is fatal to their request for preliminary relief. The Seventh Circuit has held that delay in seeking a preliminary injunction against an election law is fatal. In the context of an election, "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). "[T]his means that any claim against a state electoral procedure must be expressed expeditiously" or it will be barred by laches. *Id.* "[B]elated election litigation risks giving voters incentive to remain away from the polls." *Trump v. Wisconsin Elections Comm'n*, 983 F.3d 919, 925 (7th Cir. 2020).

When the Seventh Circuit says "expeditiously," it really means it—election claims have been barred for delays as short as eleven weeks. *See Fulani*, 917 F.2d at 1031. The court has also upheld the denial of a preliminary injunction motion based on a three-month delay. *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016). It has even held that a delay as short as two months weighs against a request for injunctive relief related to an election. *See Bowes v. Indiana Sec'y of State*, 837 F.3d 813, 818 (7th Cir. 2016).

The delay here is substantially longer. Plaintiffs waited ten months after SB 10 was signed into law before they filed for a preliminary injunction. Plaintiffs filed their complaint in May 2025 but allowed the case to proceed for nine months before seeking preliminary relief. There is no explanation for this delay. Plaintiffs' choice to sleep on their rights will greatly prejudice defendants if the Court enters an injunction. If this preliminary injunction motion had been adjudicated last spring, there would be no need to retrain poll workers because the training hadn't happened yet. But now, months have passed since trainings on SB 10 have occurred, and Indiana sits on the doorstep of the 2026 election. Changing course at this late hour will be extremely difficult for the

31

state, if not outright impossible. *See* Ex. 10 (Bonnet Decl.) at ¶ 6.

### B.        Plaintiffs have not shown any irreparable harm.

Plaintiffs will not suffer irreparable harm absent an injunction. The organizational Plaintiffs will suffer only self-inflicted monetary injury, and the only inconvenience SB 10 works on Montagne is the need to retrieve his birth certificate from his parents' home or have it brought to him during his parents' regular visits. *See* Ex. 12 (Montagne Depo.) at 42:21–44:16. Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020). In other words, a movant must show that "legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022).

Even assuming the organizational Plaintiffs have shown a cognizable harm, that harm is only economic. They claim that they will have to spend more, spend differently, and spend less efficiently. *See* Complaint at ¶¶ 16, 19–20. But both organizations already produce all the materials they need to address SB 10. Vargas Depo. at 41:8-16. Any new expenditures will be on education and advocacy around the law, which is not an injury sufficient for standing, let alone an injunction. *See All. for Hippocratic Med.*, 602 U.S. at 395

While Montagne claims that SB 10 will prevent him from voting, he already has everything he needs to obtain a valid voter ID *See* Ex. 12 (Montagne Depo.) 22:16–19; 47:13–48:20. The *only* obstacle between Montagne and an Indiana ID is obtaining his birth certificate, which he stores at his parents' house. He does not want to obtain his birth certificate but can express no reason for that beyond personal preference. *See id.* at 40:24– 47:6. Moreover, Montagne was legally required to possess an Indiana driver's license before SB 10 because he is a resident and has operated a car in the state. *See* Ind. Code § 9-24-1-1(a) (requiring the operators of motor vehicles to possess a driver's license); Ind. Code § 9-24-1-7(a) (exempting nonresidents from § 9-24-1-1(a)); Ind. Code

§ 9-13-2-78 (providing multiple definitions of resident, including "an individual who is living in Indiana if the individual has no other legal residence" and "[a]n individual who is registered to vote in Indiana."); Montagne Depo. at 25:8–27:15, 55:3–12. To the extent he suffers an injury in having to obtain his birth certificate or visit the BMV, that injury is not attributable to SB 10.

## C. The balance of equities and the public interest weigh against an injunction.

The balance of equities and public interest merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the public interest and equities strongly disfavor entering an injunction altering Indiana's photo ID requirement weeks before the election. "The public interest in the maintenance of order in the election process is not only important, it is compelling." *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 971 (W.D. Wis. 2020) (quoting *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1335 (S.D. Fla. 2008)); *see Benisek v. Lamone*, 585 U.S. 155, 160 (2018). An injunction would sow confusion among voters, undermine orderly election administration, and override a legitimate, democratically adopted measure supported by a robust public consensus.

First, an injunction would cause confusion among voters. Early voting in the primary election starts in just a few weeks. Voters across Indiana have been told that university IDs are no longer valid IDs. Issuing an injunction now would require election officials to issue new, contradictory voter education materials, issue new guidance to all 92 counties, and retrain poll workers. All of this would result in widespread confusion. *See* Ex. 10 (Bonnet Decl.) ¶ 9; *see also Tully v. Okeson*, 977 F.3d 608, 618 (7th Cir. 2020) ("[g]iven the imminence of the election, our intervention now would only risk exacerbating voter confusion, and we should therefore allow the election to proceed without an injunction.") (internal quotation marks omitted).

Second, an injunction would re-introduce inefficiencies, confusing standards, and discrepancies SB 10 corrected. The Indiana legislature has determined that removing the use of university

IDs is the best way to balance election administration, voter confidence, and the ability of voters to obtain ID. That is a decision this Court should not countermand because "balancing the interests of discouraging fraud and mitigating elections-related issues with encouraging voter turnout is a judgment reserved to the legislature." *Tully*, 977 F.3d at 611. "This court is ill equipped to second guess, let alone override, the rational policy judgments of Indiana's elected officials 'on the eve of an election.'" *Id.* at 618 (quotations omitted).

Third, an injunction would "clearly inflict[] irreparable harm on the State" by overriding democratically adopted laws. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Under the Constitution, "state legislatures . . . bear primary responsibility for setting election rules." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (citations omitted)). Not only is SB 10 the result of a democratic process, it is a widely popular result. Voter ID laws like SB 10 enjoy overwhelming bipartisan support. *See* Ex. 4 (Gaines Decl.) at ¶¶ 14, 22, 27.

In contrast, Plaintiffs cannot muster a single instance of a person who lacks another form of ID or will be unable to obtain another form of ID as a result of SB 10. Montagne is not aware of a single other student burdened by the law, despite his position on the executive board of the College Democrats at IU Bloomington. *See* Ex. 12 (Montagne Depo.) 58:1–63:23. Women4Change could not find a single member burdened by the law, *see* Ex. 14 (Klitzch Depo.) at 69:23-7:5, and Count Us IN is not aware of any person who will be burdened by the law, *see* Ex. 13 (Vargas Depo) at 110:18–111:9. Enjoining a democratically adopted law to address nonexistent harms would not be equitable or serve the public interest.

## V.  Plaintiffs' Request for Relief Is Overbroad.

Finally, Plaintiffs' requested injunction—a statewide prohibition on enforcing SB 10—is improper. As noted above, Plaintiffs "have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute." *Crawford*, 553 U.S. at 203. And regardless federal courts lack authority to "grant relief to nonparties." *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025). So granting relief that covers anyone but the parties to this suit would be improper. *See id.*; *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022).

Any argument that universal relief is necessary to grant complete relief to Women4Change and Count US IN is unavailing. Those organizations have not identified anyone they will serve who will be unable to vote because of SB 10. And it would be an impermissible end-run around *CASA* to issue a universal injunction simply because organizations whose rights are not directly impacted by SB 10 claim that they would have to spend more money to educate the public.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

ANDREW NUSSBAUM
CHRISTOPHER O. MURRAY

First & Fourteenth PLLC
2 N. Cascade Avenue, Suite 1430
Colorado Springs, CO 80903
(719) 286-2475
andrew@first-fourteenth.com
chris@first-fourteenth.com

JAMES COMPTON

First & Fourteenth PLLC
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
(202) 998-1978
james@first-fourteenth.com

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ Andrew Nussbaum*
JAMES A. BARTA
Solicitor General

JEFFERSON S. GARN
BRADLEY DAVIS
KYLE HUNTER
Deputy Attorneys General

Office of Attorney General Todd Rokita
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
(317) 232-5933
James.Barta@atg.in.gov

*Counsel for State Defendants*