UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| COUNT US IN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-00864-RLY-MKK |
| | ) | |
| DIEGO MORALES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLANTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

In *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), the Supreme

Court rejected a constitutional challenge to Indiana's law requiring citizens voting in

person on election day to present photo identification.  To qualify as proof of

identification, an ID must be issued by the government of the United States or Indiana

and include the voter's name, a photograph of the voter, and an expiration date.  For

nearly two decades, Indiana accepted student ID cards issued by Indiana public

universities so long as they satisfied these four requirements.  But in 2025, Indiana

enacted Senate Bill 10 ("SB 10").  This law—without otherwise changing the original

law's requirements—eliminated student IDs as an acceptable form of identification at the

polls.  Students who relied on their student IDs to vote and lack an alternative form of

identification claim that the law will prevent them from voting in the upcoming 2026

elections.

Plaintiffs therefore move for a preliminary injunction to prevent Defendants from

enforcing SB 10, arguing that the law (1) unconstitutionally burdens the right to vote in

1

violation of the First and Fourteenth Amendments and (2) intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment.  Having determined that, based on this record, Plaintiffs have demonstrated a reasonable likelihood of success on the merits of their claim under the First and Fourteenth Amendments, the court **GRANTS** their motion for preliminary injunction.

## I.    Background

### A.    General Requirements to Vote in Indiana

Indiana permits all citizens who are (or, by election day, will be) "at least eighteen (18) years of age" and have "reside[d] in a precinct continuously . . . for at least thirty (30) days" to register as voters.  Ind. Code § 3-7-13-1.  A person resides in their "residence," which is the place of the person's "true, fixed, and permanent home and principal establishment" and where the person "has, whenever absent, the intention of returning." *Id.* § 3-5-2.1-90.

To vote, all registered voters may cast ballots in person at their precinct on election day or at various locations up to 28 days before election day. *Id.* §§ 3-11-8-2, 3-11-4-1, 3-11-10-26.  Since 2005, voters have had to present proof of identification to cast a ballot in person. *Id.* §§ 3-10-1-7.2(a), 3-11-8-25.1(a).  As originally enacted, Indiana's voter ID law required eligible proof of identification to: (1) display the voter's name; (2) include the voter's photograph; (3) display an expiration date; and (4) have been issued by the government of the United States or Indiana. *Id.* § 3-5-2.1-84(a).  Although "the most likely source of acceptable identification is either drivers' licenses or identification cards issued by the Indiana Bureau of Motor Vehicles ("BMV")," *Indiana Democratic Party v.*

*Rokita*, 458 F. Supp. 2d 775, 789 (S.D. Ind. 2006), a wide range of IDs satisfied these requirements, (Dkt. 86-2 at 2–12), including student IDs issued by many Indiana public universities, (*id.* at 7).[1]

If an eligible voter needs an ID but does not have one, the BMV will issue them a free ID. *Id.* § 9-24-16-10(b)–(c). Still, obtaining a card requires an applicant to present proof of identity, lawful status, Social Security number, and residency. 140 IAC 7-1.1-3(a).

Should a voter present at the polls without a valid form of identification, the voter is not turned away but permitted to cast a provisional ballot. *See* Ind. Code § 3-11.7-2-1(b)(1). Voters who cast provisional ballots must then either appear before the circuit court clerk or county election board within ten days of the election and show a valid photo ID, *id.* § 3-11.7-5-2.5(b)(1), or appear within ten days of the election and execute an affidavit stating that they are indigent and unable to obtain a photo ID without payment of a fee, *id.* § 3-11.7-5-2.5(c). Photo identification is unnecessary for voters who vote absentee-by-mail. *See id.* § 3-11-4-2(h). But Indiana limits absentee voting to voters who meet specific statutory criteria. *Id.* § 3-11-10-24.[2]

### B.    Student ID Usage Pre-SB 10

For nearly two decades, hundreds of thousands of students at Indiana public universities used their student ID cards to vote. (*See* Dkt. 86-2 at 83–84 ¶¶ 8–12, 89–92

---

[1] Of the approximately 250,000 students enrolled in Indiana's public universities, (Dkt. 86-2 at 71), nearly 200,000 attend schools with IDs that qualified before SB 10, (*id.* at 31).

[2] Most students cannot rely on absentee voting, which is not normally available to young voters outside of unique circumstances.

¶¶ 11–18, 95 ¶¶ 6–8).  For example, the election supervisor for Monroe County, which includes Indiana University-Bloomington, estimated that in the November 2024 general election about two-thirds of voters at the on-campus polling place used student IDs to vote.  (*Id.* at 102).

Over the years, several universities took steps to ensure their student IDs conformed to the voter ID requirements.  After Indiana passed its voter ID law, public colleges and universities contacted state and local officials to confirm that their student IDs satisfied it.  (Dkt. 86-3 at 21–22).  In 2016, Indiana University at South Bend updated its student IDs to comply with the voter ID law.  (*Id.* at 24–25).  And in 2019, Purdue University did the same.  (*Id.* at 27–30).  Purdue's bursar explained, "[I]f we can help make voting more convenient for students, we want to do so."  (*Id.* at 28).  Even after Purdue shifted to mobile ID cards in 2023, it continued to provide physical, "vote-ready" ID cards that could be printed on site at polling locations.  (*Id.* at 41).

For many students who relied on it, student IDs made the difference in whether they could vote.  (*See, e.g.*, Dkt. 86-2 at 95 ¶¶ 6–8).  Students are far less likely than other voters to possess the most common alternative forms of ID, like an Indiana driver's license or ID card.  While 87.7% of Indiana residents have a driver's license, that rate drops to 73.4% for Hoosiers between the ages of 18 and 24—the predominant age group among Indiana college students.  (*See id.* at 32–34).  Out-of-state students, who constitute more than one-third of students at Indiana schools with qualifying IDs, are even less likely to have an Indiana driver's license or state ID, particularly since Indiana law does not require students to secure an in-state license.  (*Id.* at 31; *see, e.g.*, *id.* at 83–84 ¶ 9, 96

4

¶¶ 10–11; Ind. Code § 9-13-2-78(1)(A) (exempting students "[a]ttending a postsecondary educational institution" from being required to obtain an Indiana driver's license)).

Monroe County's election-day check-in data illustrates the point. Although the County does not record the specific type of voter ID each person presents, voters who present Indiana driver's licenses or state IDs check in at the polls by scanning them, making the scans a reliable proxy. (Dkt. 86-3 at 53; Dkt. 86-4 at 14; *see* Dkt. 86-2 at 35–36). In the 2022 and 2024 general elections, all but 5.1% of Monroe County voters scanned an Indiana driver's license or state ID at the polls on election day. (Dkt. 86-2 at 35). But at precincts on or adjacent to Indiana University's Bloomington campus, that number roughly triples. (*Id.* at 35–36). In 2022, 20% of voters at one precinct on the IU's Bloomington campus did not present an Indiana driver's license or state ID at the polls. (*Id.*). And in both years, nine of the ten precincts with the highest proportion of voters who did not scan an Indiana driver's license or state ID at the polls were located on or next to IU's Bloomington campus. (*Id.* at 36).

Because most students are young, restrictions that disproportionately burden students necessarily fall hardest on Indiana's youngest voters. At Indiana's public colleges and universities, 74.1% of voting-age students are between the ages of 18 and 24. (*Id.* at 32). Moreover, Indiana's young voters are not spread evenly throughout the electorate—they are highly geographically concentrated on college campuses. (*Id.* at 33). Across Indiana's thousands of precincts, (Dkt. 86-5 at 28), only 20 have populations where more than 30% of voters are between the ages of 18 and 24; all but one sit on or adjacent to a college campus. (Dkt. 86-2 at 33–34).

5

**C.    SB 10**

In April 2025, Indiana enacted SB 10, which amended its voter ID law to exclude student ID cards.  Ind. Code § 3-5-2.1-84(c).  SB 10 did not change the law's four long-standing criteria for acceptable photo ID.  Instead, it clarified that "proof of identification" for voting purposes "does not include a document issued by an educational institution."  *Id.*

Before SB 10, every other amendment that Indiana made to its voter ID law moved in the opposite direction, easing the requirements for certain types of ID.  In 2011, Indiana amended the law to exempt military documents from the expiration date requirement.  H.B. 1109, 117th Gen. Assemb., 1st Reg. Sess. (Ind. 2011), *enacted as* Pub. L. No. 118-2011, 2011 Ind. Acts 1206.  Three years later, it did the same for identification issue by the U.S. Department of Veterans Affairs ("VA").  H.B. 1318, 118th Gen. Assemb., 2d Reg. Sess. (Ind. 2014), *enacted as* Pub. L. No. 76-2014, 2014 Ind. Acts 828.  And in 2021, Indiana exempted tribal identification cards from the expiration date requirement too.  H.B. 1485, 122d Gen. Assemb., 1st Reg. Sess. (Ind. 2021), *enacted as* Pub. L. No. 2021-209, 2021 Ind. Acts 3161.  All these amendments created exceptions for IDs that otherwise do not meet the statute's criteria.  In contrast, SB 10 marked the first time that Indiana singled out a previously acceptable form of ID and barred its use at the polls.  Students are the only group that are told that their widely held, government-issued ID cannot be used to vote.

Although supporters of SB 10 described it largely as an election-integrity measure, (*see, e.g.*, Dkt. 86-6 at 35–36, 205–06, 365), there is no evidence that student IDs have

been used to engage in voter fraud or any other voting-related misconduct. Proponents also suggested that poll workers might struggle to determine which student IDs were valid for voting. (*Id.* at 212–13). But poll worker training materials demonstrate that guidance for election workers addressed student IDs only briefly, noting the basic voter ID requirements and sometimes listing the schools whose identification qualified. (*See, e.g.*, Dkt. 86-7 at 438–605).

### D.    This Lawsuit

In May 2025, shortly after SB 10 was enacted, Plaintiffs Count US IN, Women4Change Indiana, and Josh Montagne brought this constitutional challenge. Count US IN is an Indiana-based non-profit organization. (Dkt. 1 ¶ 14). The organization's mission is "to elevate citizens' voices and foster inclusive, equitable political participation by encouraging diverse voter turnout, educating citizens on voting rights and protections, combating voter suppression, and cultivating partnerships to create political equity." (Dkt. 86-2 at 88–89 ¶ 7). Women4Change Indiana is an Indiana-based non-profit corporation. (Dkt. 86-3 at 15 ¶ 3). Its mission is "to promote civic education and encourage democratic participation to achieve better outcomes for women in Indiana." (*Id.* ¶ 4). Montagne is a 21-year-old student at Indiana University Bloomington. (Dkt. 86-2 at 94 ¶¶ 3–4). He is originally from Missouri but has lived in Indiana since 2023. (*Id.* at 94, 96 ¶¶ 4, 10). He is also registered to vote in Indiana and has voted in the state three times. (*Id.* at 94–95 ¶¶ 4, 6). Each time, he used his student ID card issued by Indiana University Bloomington to satisfy Indiana's photo ID requirement. (*Id.* at 95 ¶ 6). But he lacks an Indiana driver's license, an Indiana ID card,

7

or any other form of identification that satisfies Indiana's voter ID requirements after the passage of SB 10.  (*Id.* ¶ 7).

Plaintiffs sued a host of Defendants in their official capacities.  They include: Diego Morales, the Indiana Secretary of State; Paul Okeson, the Chair of the Indiana Election Commission; Suzannah Overholt, the Vice-Chair of the Indiana Election Commission; Karen Celestino-Horseman and Litany Pyle, who are both members of the Indiana Election Commission; Bradley King and Angela Nussmeyer, who are Co-Directors of the Indiana Election Division; and the Monroe County Board of Elections.

The Plaintiffs challenge SB 10 on two grounds.  First, they argue that it unconstitutionally burdens the right to vote of students and young voters in violation of the First and Fourteenth Amendments.  Second, they argue that it intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment.

Defendants moved to dismiss this lawsuit in July 2025.  (Dkt. 30).  In October, this court denied that motion.  (Dkt. 57).  In February 2026, Plaintiffs filed a motion for preliminary injunction.  (Dkt. 85).  They ask this court to enjoin Defendants from enforcing SB 10 during the upcoming elections to the extent that it eliminates student ID as an acceptable form of photo identification under Indiana's voter ID law.

All other facts necessary to resolve this motion are addressed as necessary in the Discussion section.

## II.    Legal Standard

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3)

irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). In evaluating the merits element, the court "approach[es] the record from a neutral and objective viewpoint, assessing the merits as . . . they are likely to be decided after more complete discovery and litigation." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022).

If the moving party fails to demonstrate any one of the three threshold requirements, the injunctive relief must be denied. *Girls Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). But if those threshold conditions are met, the court must then assess the balance of the harms—the harm to Plaintiffs if the injunction is not issued against the harm to Defendants if it is issued—and determine the effect of an injunction on the public interest. *Id.* "The more likely the [moving party] is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

## III.    Discussion

### A.    Standing

Standing "is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)). Here, Defendants argue that neither Count US IN nor Women4Change Indiana have standing. But "[o]nly injunctive relief is sought, and for that only one

9

plaintiff with standing is required." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007). Defendants do not dispute that Montagne has standing, so whether these organizations have standing need not be addressed at this juncture.

**B.      Sovereign Immunity**

The Secretary of State and the Election Division ("State Defendants") claim that they are immune from suit and that an injunction against them would not redress Plaintiffs' injuries because neither has a direct role in enforcing election laws. The Eleventh Amendment "generally immunizes" suits brought against states and state officials acting in their official capacities. *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018). But there are several exceptions to this general rule. Relevant here is the exception that allows private parties to sue state officials in their official capacities to enjoin ongoing violations of federal law. *See Ex parte Young*, 209 U.S. 123, 157 (1908). To avoid the Eleventh Amendment, a plaintiff must name "a state official who has 'some connection with the enforcement' of an allegedly unconstitutional state statute." *Holcomb*, 883 F.3d at 975 (quoting *Ex parte Young*, 209 U.S. at 157). A plaintiff must "also establish that his injury is causally connected to that enforcement and that enjoining the enforcement is likely to redress his injury." *Id.* at 975–76.

The State Defendants maintain that responsibility for enforcement rests with "precinct election officer[s]" and "precinct election board[s]." *See* Ind. Code §§ 3-10-1-7.2(b)–(c), 3-11-8-25.1(b)–(c). As such, they argue that Plaintiffs need an order against county officials. The court disagrees.

The Secretary of State and the Election Division need only have "some connection" with the enforcement" of SB 10. *Ex parte Young*, 209 U.S. at 157. Under Indiana law, the Secretary of State is the "chief state election official," Ind. Code § 3-6-3.7-2(5), who must "perform *all* ministerial duties related to the administration of elections," *id.* § 3-6-4.2-2(a) (emphasis added). And the Election Division must "assist the [Election Commission] and the [Secretary]" in those tasks and instruct local election officials on their duties under state and federal law. *Id.* §§ 3-6-4.2-2(b), 3-6-4.2-14. Given these responsibilities, both state and federal courts in Indiana have concluded that the Secretary of State and the Election Division are proper defendants in challenges to Indiana election laws. *See Common Cause Ind. v. Ind. Sec'y of State*, No. 1:12-cv-1603, 2013 WL 12284648, at *1, *3 (S.D. Ind. Sep. 6, 2013); *League of Women Voters of Ind., Inc. v. Rokita*, 915 N.E.2d 151, 157 (Ind. Ct. App. 2009). In any event, Defendants do not dispute that either the Indiana Election Commission or the Monroe County Board of Elections are immune from suit. At a minimum, the court has the power to enjoin these two entities.

## C.    The *Purcell* Principle

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). This is because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. Because

11

the risk of confusion increases as election dates draw nearer, courts considering an application for an injunction shortly before an election must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and [their] own institutional procedures." *Id.* at 4. At the same time, the Supreme Court has "not forbidden all change close to an election." *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 642 (7th Cir. 2020). Rather, "[h]ow close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects. Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring).

Indiana's primary election day is set for May 4, 2026—a little less than three weeks from the day of this order. Accordingly, the court must consider whether the relief sought by Plaintiffs would be so disruptive as to be barred by the *Purcell* principle. *See, e.g.*, *Republican Nat'l Comm.*, 589 U.S. at 423–25 (district court violated *Purcell* principle by issuing injunction five days before scheduled election and providing relief for which the plaintiffs did not specifically ask); *Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020) (staying injunction issued five weeks before an election); *Am. Council of Blind of Ind. v. Ind. Election Comm'n*, No. 1:20-cv-3118, 2022 WL 702257, at *6–7 (S.D. Ind. Mar. 9, 2022) (denying relief that would be "too disruptive" but granting relief that "would not constitute the kind of significant change or result in confusion that the *Purcell* principle seeks to avoid").

Although an injunction would leave Defendants with little time to implement changes, the primary concerns underlying the *Purcell* principle—confusion and disruption—are largely absent here.  In more cases than not, "merely requir[ing] the revival of previous practices" will not prove so disruptive that the *Purcell* principle bars relief.  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014).  Such is the case here.  The requested relief only requires Defendants to accept student IDs as a form of voter identification—something Indiana has already done for nearly two decades.

Defendants protest that they will need to update the election materials they have already printed.  But a comparison of Indiana's materials before and after SB 10 shows how little those materials will need to change.  The only relevant change that Indiana made to its Election Administrator's Manual is the addition of a single sentence that states "document[s] issued by an educational institution" can no longer "serve as photo ID for purposes of voting."  (*Compare* Dkt. 96-2 at 1100 (updated manual), *with* Dkt. 86-7 at 241 (2024 manual without sentence)).  Other training materials similarly address SB 10 in little more than a sentence.  (*See* Dkt. 96-2 at 1223, 1260, 1286).  Any necessary changes would therefore not introduce the sort of complexity that *Purcell* seeks to avoid, especially when one considers that student IDs otherwise meet the criteria for photo identification established by Indiana's voter ID law.[3]  Allowing voters to use their student

---

[3] In his declaration, the Director of Elections for the Marion County Election Board ("MCEB")—Indiana's most populous county—confirmed that "[i]f student IDs were once again allowed to be used in Indiana, MCEB could and would reincorporate the portions of those

IDs to vote "would not require a significant expenditure of resources by Defendants or election officials, would be a feasible change to implement in advance of the upcoming election, and is unlikely to cause voter confusion that would cause voters to be discouraged from voting." *Am. Council of Blind of Ind.*, 2022 WL 702257, at \*7.

Defendants also claim that Plaintiffs' delay in requesting an injunction is fatal to their request for preliminary relief. But Plaintiffs filed this suit weeks after SB 10 was enacted—they did "not unduly delay[] bringing the complaint to court." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Nor did they delay filing this motion for preliminary injunction. "Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). "Whether the defendant has been 'lulled into a false sense of security or had acted in reliance on the plaintiff's delay' influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not." *Id.* (quoting *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979)). Neither circumstance is present here. The court will not penalize Plaintiffs for the time it took them to gather the evidence necessary to support their motion for preliminary injunction. *See Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (mem.) (vacating stay).

*Purcell* does not present a bar to Plaintiffs' request for relief. As such, the court will consider whether Plaintiffs have satisfied the requirements for injunctive relief.

---

materials that discussed student IDs into its training and Election Day operations for forthcoming elections. (Dkt. 96-2 at 803).

14

### D.     Likelihood of Success on the Merits

Plaintiffs make two arguments challenging the constitutionality of SB 10.  First, the law imposes unconstitutional burdens on students and young voters in violation of the First and Fourteenth Amendments.  Second, the law violates the Twenty-Sixth Amendment's ban on intentional age-based discrimination in voting.  For the reasons explained below, the court finds that Plaintiffs are reasonably likely to succeed on their claim under the First and Fourteenth Amendments.  Therefore, the court need not address Plaintiffs' claim under the Twenty-Sixth Amendment.  *See Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 184 (1999) ("It is . . . an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground.").

### 1.     First and Fourteenth Amendment

"Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964).  "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.* at 562.  Still, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974).  To balance these potentially conflicting constitutional principles, the "flexible *Anderson-Burdick* standard" governs challenges to

15

state election laws.  *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019).

> Under this standard, a court:

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  The level of scrutiny the court applies when weighing these interests depends on "the extent of [the law's] imposition" on the right to vote.  *Acevedo*, 925 F.3d at 948.  When First and Fourteenth Amendment rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"  *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  In contrast, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions."  *Anderson*, 460 U.S. at 788.  But even "slight" burdens "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"  *Crawford*, 553 U.S. at 191 (op. of Stevens, J.) (quoting *Norman*, 502 U.S. at 288–89); *see id.* at 210–11 (Souter, J., dissenting).

Before evaluating SB 10 under the *Anderson-Burdick* framework, however, the court first considers to what extent *Crawford* controls the outcome of this case.  In *Crawford*, a fractured Supreme Court rejected a constitutional challenge to Indiana's

16

original voter ID law because "[t]he application of the statute to the vast majority of Indiana voters [was] amply justified by the valid interest in protecting 'the integrity and reliability of the electoral process.'" *Id.* at 204 (op. of Stevens, J.) (quoting *Anderson*, 460 U.S. at 788 n.9).  Defendants therefore claim that "[t]his is *Crawford* all over again." (Dkt. 91 at 30).  But there are a few reasons why that is not true, the most important of which concerns the burdened population.

In *Crawford*, the plurality opinion considered the extent to which Indiana's voter ID law burdened "all Indiana voters."  553 U.S. at 202–03 (op. of Stevens, J.). Defendants claim that just as in *Crawford*, the court must consider the burden SB 10 imposes on all Indiana voters.  (Dkt. 91 at 24).  And if that were true, this indeed would be *Crawford* all over again.  But *Crawford* does not preclude the court from considering how SB 10 burdens a particular class of voters.  In fact, the plurality opinion recognized that under Indiana's voter ID law, "a somewhat heavier burden may be placed on a limited number of persons," such as the elderly, indigent, and homeless.  *Crawford*, 553 U.S. at 199 (op. of Stevens, J.).  Although the Court ultimately evaluated the burden as applied to all Indiana voters, this was only because "on the basis of the evidence in the record," the Court could not "quantify . . . the magnitude of the burden on this narrow class of voters."  *Id.* at 200.  Accordingly, the court will consider the extent to which SB 10 burdens all Indiana voters only if, "on the basis of the evidence in the record," the magnitude of the burden on students and young voters is unquantifiable.  Otherwise, the fact that an identifiable "class of voters" bears the effects of SB 10 likely warrants a more

rigorous inquiry into the state's justifications. *See Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523–24 (7th Cir. 2017).

Moreover, the *Anderson-Burdick* balancing test requires courts "to conduct fact-intensive analyses when evaluating state electoral regulations." *Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020). The district court in *Gill*, by relying too heavily on an analogous case, "neglected to perform the fact-intensive analysis required for the *Anderson-Burdick* balancing test." *Id.* So although *Crawford* will no doubt prove instructive to the proper resolution of this motion, SB 10 imposes different burdens on a different group of voters and is justified by different state interests than the broader voter ID law at issue in *Crawford*. To hold that *Crawford* forecloses relief without giving due weight to the particular facts of this case would be to commit legal error. With these lessons in mind, the court turns to the particular facts of this case.

### i.    Severity of the Burden

To understand the extent to which SB 10 burdens the right to vote, the court looks first to the relevant text. On its face, SB 10 is nondiscriminatory; under Indiana law, the term "proof of identification" for voting purposes no longer "include[s] a document issued by an educational institution." Ind. Code § 3-5-2.1-84(c). This regulation applies to voters of any age who hold a public-university-issued ID; it does not apply exclusively to young voters and students. University faculty and staff, for example, are among those who possess a university-issued ID. (Dkt. 92-6 ¶ 8; Dkt. 92-7 ¶ 8). But its general applicability notwithstanding, the effects of SB 10 clearly "fall more heavily" on young voters and students, *Anderson*, 460 U.S. at 793 n.15 (quoting *Bullock v. Carter*, 405 U.S.

134, 144 (1972)), given they possess a sizable majority of public-university-issued IDs, (*see* Dkt. 92-6 ¶ 3; Dkt. Dkt. 92-7 ¶ 4).

Students also rely more heavily on their student IDs to vote because they often lack other options, unlike "faculty, staff, and affiliates" who are "more likely to possess alternate forms of ID." (Dkt. 91 at 30). Plaintiffs' evidence suggests as much. In Monroe County, three voter precincts are on Indiana University's Bloomington campus. (Dkt. 86-3 at 35–36). Almost 70% of the registered voters at those precincts are 18-24-year-olds. (*See id.* at 34). This makes sense—almost 75% of students who attend an Indiana public college or university are 18-24-year-olds. (*See id.* at 32). In 2022, 18.5% of voters at these three precincts used a form of photo identification other than an Indiana driver's license or state ID (a student ID, passport, military ID, etc.). (*See id.* at 36). In 2024, 15.3% used another form of ID. (*See id.* at 35). Across these two elections, only 5.1% of all Monroe County voters used a form of identification other than an Indiana driver's license or state ID. (*Id.*). So voters at precincts on IU's Bloomington campus were at least three times less likely than the general electorate to present an Indiana driver's license or state ID at the polls. Similar rates occurred at precincts adjacent to IU's Bloomington campus. (*See id.* at 35–36). These numbers likely understate the number of IU students who used something other than an Indiana driver's license to vote because they do not include early in-person or absentee voters (which constituted 60% of voters in 2024 and 34% of voters in 2022). (*Id.* at 37). The Monroe County Election Supervisor agrees; she estimated that, at on-campus polling locations at IU, two-thirds of 2024 voters used a student ID to vote. (Dkt. 86-2 at 102). The evidence therefore supports what

19

common sense suggests: college students, the majority of whom are between the ages of 18 and 24, are the class of voters most likely to use an ID issued by a public university to vote, and the most likely to be burdened by SB 10.

This does not mean that SB 10 burdens every Indiana public university student between the ages of 18 and 24. For those who possess an Indiana driver's license or a passport, the burden is no more than minimal, for they already have an acceptable alternative. Rather, the burdened population is limited to those who possess a student ID (that would have satisfied Indiana's voter ID requirements before SB 10) but lack an acceptable alternative and are otherwise eligible to vote in Indiana. According to *Crawford*, that such voters exist in the abstract matters little. To demonstrate that a restriction imposes a special burden on a class of voters, one must at least provide the numbers of voters affected and "concrete evidence of the burden imposed on voters who currently lack" a permissible form of photo identification. *Crawford*, 553 U.S. at 200–01 (op. of Stevens, J.). Defendants insist that Plaintiffs have provided neither.

First, Defendants claim that Plaintiffs "do not put numbers on what the actual population affected is." (Dkt. 91 at 30). But Plaintiffs' expert estimated the impacted population to be approximately 90,000 students. (Dkt. 86-2 at 38). He also provided a more conservative estimate of approximately 60,000 students to account for potential passport ownership by U.S.-citizen students who pay out-of-state tuition. (*Id.*). Based on the evidence provided, however, the court estimates that the actual population affected is

20

likely closer to 40,000 students.[4]  And contrary to Defendants' claims, the estimates

provided by Plaintiffs' expert exclude faculty, staff, and affiliates who possess university

IDs, as well as students enrolled at Ivy Tech or Vincennes University.[5]  At any rate, courts

applying *Anderson-Burdick* have found that laws burdening comparable numbers of

voters triggered heightened scrutiny.  *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1133 (10th

Cir. 2020) ("[T]he evidence of the approximately 30,000 disenfranchised voters means

that heighted scrutiny is appropriate.").

      Defendants also claim that the burden of obtaining an Indiana ID is no greater for

students than it was for the plaintiffs in *Crawford*.  But "[t]hose who find it difficult to

---

[4] A "brief" discussion on how the court arrived at this number.  Plaintiffs' expert begins his analysis by calculating the total number of 18-24-year-old students that are U.S. citizens and enrolled at Indiana public universities.  (Dkt. 86-2 at 32).  Of these 154,464 students, 100,109 students are classified as "resident" because they are eligible for in-state tuition, which typically requires living in the state for 12 months before the beginning of the student's first semester.  (*Id.*).  The remaining 52,355 students are classified as "nonresident."  (*Id.*).  From there, the expert applied the driver's license possession rate for 18-24-year-olds in Indiana to the "resident" group to achieve an estimate of approximately 27,000 students who lack an acceptable alternative ID.  (*Id.* at 33, 38).  The expert makes no changes to the "nonresident" group, although he does provide a more conservative estimate that halves the population to account for possible passport possession.  Neither the Defendants nor the court objects to the expert's methodology.  But the court thinks a more accurate estimate should account for (1) the national passport possession rate in the United States (excluding Indiana) within the "nonresident" group and (2) possible passport possession within the "resident" group.  Since the national passport possession rate in the United States (excluding Indiana) is about 53.5%, (*see* Dkt. 86-8 at 110–11), the court estimates the "nonresident" population that lacks an acceptable alternative ID to be closer to 24,345 students.  As for the "resident" population, the court uses Indiana's driver's license possession rate among 18-24-year-olds, Indiana's passport possession rate, and the inclusion-exclusion principle, assuming independence, to reach an estimate of 17,219 students.  (*Id.* at 33; Dkt. 86-8 at 110).  This puts the total population at approximately 41,564 students but does not account for students who possess qualifying ID other than an Indiana driver's license or passport.

[5] The expert excluded Ivy Tech because its IDs lack an expiration date and therefore did not qualify as voter ID before SB 10.  (Dkt. 86-3 at 31 n.30).  He also excluded Vincennes University because he was unable to determine if its student IDs qualified as voter ID before SB 10.  (*Id.*).

assemble the required documentation face 'somewhat heavier' burdens." *Luft v. Evers*, 963 F.3d 665, 679 (7th Cir. 2020) (quoting *Crawford*, 553 U.S. at 199 (op. of Stevens, J.)).  To avoid the same fate as the plaintiffs in *Crawford*, Plaintiffs must nonetheless provide "concrete evidence of the burden imposed" on students and younger voters that currently lack accepted photo identification.  *Crawford*, 553 U.S. at 201 (op. of Stevens, J.).

Since Defendants claim that Montagne has the documents necessary to obtain an Indiana driver's license or state ID, the court begins by examining the documents an applicant for one of these forms of identification must supply.  They include (1) a document proving identity, like a U.S. birth certificate or an unexpired passport; (2) a document proving lawful status in the United States; (3) a document proving the applicant's Social Security number; and (4) two documents proving Indiana residency, like a bank statement or utility bill.  (Dkt. 86-8 at 68–74, 89); *see* Ind. Admin. Code § 9-24-16-10.  As Plaintiffs explain, there are several reasons why students are less likely to possess these documents.

Start first with the document proving identity.  For one, many students—especially out-of-state students—do not have ready access to their birth certificates while at school.  (*See* Dkt. 86-2 at 84).  Montagne, for example, keeps his birth certificate at his parents' house in O'Fallon, Missouri.  (*Id.* at 96).  He prefers to keep his birth certificate and other sensitive documents at his parents' house to reduce the risk that they are lost or stolen.  (*Id.*).  And while he could always order a copy of his birth certificate, doing so raises a new set of problems.  In Indiana, as in many other states, obtaining a birth certificate

22

requires a form of identification that lists an address matching the mailing address for the certificate. (Dkt. 86-8 at 91). But students often lack a form of identification that reflects their current address, for some students start their college experiencing living on campus, *id.* at 94—and therefore cannot obtain an identification card that reflects their current address in time to vote[6]—and others frequently relocate (which requires frequent re-registration), (*see* Dkt. 86-2 at 28). And although a birth certificate is unnecessary for students who have a passport, those who lack a passport face the same challenge, for obtaining a passport also requires a birth certificate, (Dkt 86-8 at 89)—not to mention the attendant time (several weeks) and cost ($165),[7] (*see id.* at 121, 124).

As for the second document, aside from a birth certificate, the only documents accepted to prove lawful status in the United States are a passport or various immigration documents. (*Id.* at 89). So this requirement raises the same problems as the first.

Proof-of-residency documents present a new set of hurdles, especially for students who live on campus. Those students often lack a mortgage, rental contract, homeowner's insurance, or utility bills in their own names. (*See, e.g.*, *id.* at 126–27, 129). They often remain on their parents' health insurance and are therefore unlikely to receive medical bills at their campus address. (*See id.* at 134–35). And they are less likely to be employed, which means they are also less likely to have pay stubs or tax forms tied to

---

[6] Since an Indiana birth certificate can take up to 16 weeks to obtain, (Dkt. 86-8 at 105), a student who orders a birth certificate after arriving on campus when school starts in August may not receive it in time to obtain an ID and vote in November.

[7] Only 35.5% of Hoosiers own a passport. (Dkt. 86-8 at 110). This rate falls well below the national average of 53.1%. (*Id.* at 111).

their residence.  (*Compare id.* at 137–38, *with id.* at 140).  These circumstances make it less likely that students have one—no less two—documents proving Indiana residency.

Indiana does offer a free Indiana "Identification Card" that can be used to vote. (*See id.* at 196–99).  But the requirements for obtaining one have increased and now mirror those needed to obtain a driver's license.  In 2007, Indiana amended its law to require applications to present "valid documentary evidence" of the applicant's lawful status in the United States and Social Security number—neither of which had been required before.  (*See id.*; *see also id.* at 39–40, 45).  Moreover, anyone applying for an Indiana ID—whether a driver's license or the free ID card—must surrender any existing out-of-state driver's license or ID they possess.  *See* Ind. Code § 9-24-11-4; (*see also* Dkt. 86-2 at 39).  Obtaining the free ID for voting therefore requires an applicant to surrender their driving privileges everywhere—a burden that weighs heaviest on out-of-state students wanting to vote in Indiana.

In addition to "find[ing] it difficult to assemble the required documentation," *Luft*, 963 F.3d at 679, other constraints, like inflexible class schedules, limited access to transportation, and limited funds, make it more challenging to obtain an alternative form of identification.  (*See, e.g.*, Dkt. 86-2 at 97 ¶ 16; Dkt. 86-8 at 184 ¶ 14).  Montagne's experience is illustrative.  He lacks an unexpired passport.  (Dkt. 92-12 at 22–23, 40).  So under SB 10, he must obtain an Indiana driver's license or ID card to vote.  Because he does not have access to a car, he has no need for an Indiana driver's license.  (*Id.* at 22; Dkt. 86-2 at 95–96 ¶¶ 9, 11).  And although it is not impossible for Montagne to obtain an acceptable form of identification, it is burdensome.  (*See* Dkt. 92-12 at 73–74).  Even if

24

he retrieved his birth certificate from his parents' home in Missouri, (Dkt. 86-2 at 96 ¶ 10), he would still need to obtain several other documents.  Although he could use his lease to prove his residence, his lease incorporates other attendant living expenses, and he pays his roommate for their utility bills, which are registered in his roommate's name. (Dkt. 92-12 at 51).  On top of that, the nearest BMV office to Montagne is "about four miles away." (*Id.* at 52).  Getting there by bus would require multiple bus lines and several hours, which might require Montagne to miss class.  (*See id.* at 52, 73–74).  On the one hand, these burdens—"the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph"—are nothing more than the "usual burdens of voting."  *Crawford*, 553 U.S. at 198 (op. of Stevens, J.).  On the other hand, Plaintiffs have provided evidence that suggests those burdens have at least a slightly greater impact on students and young voters than they do on all Indiana voters.

Beyond these time and cost constraints, the court also finds relevant Defendants' selective treatment of student ID cards.  As discussed earlier, the law does not discriminate against students or young voters on its face.  But by eliminating student IDs as an acceptable form of identification, Defendants selectively excluded a form of identification that otherwise complies with the neutral criteria established by Indiana's voter ID law and that has been accepted as a form of voter identification for nearly two decades.  Defendants maintain that both Montagne and another IU student "possess the documents required to obtain a driver's license or state ID but choose not to" and that "Plaintiffs have not identified a single person who lacks another form of ID or will be unable to obtain another form of ID as a result of SB 10." (Dkt. 91 at 28, 30).  But if the

25

mere theoretical availability of alternative ID is sufficient to render any burden minimal, Indiana could continue to eliminate previously accepted forms of identification—and continue to point to available alternatives to insulate itself from challenge—even if tens of thousands of Hoosiers had relied on the previously accepted form. Surely this selective treatment of student ID plays some role in the *Anderson-Burdick* analysis.

Moreover, unlike the groups in *Crawford*, students cannot rely on the safety valves designed for voters who lack identification. *See Luft*, 963 F.3d at 675 ("[E]lectoral provisions cannot be assessed in isolation."). The district court in *Crawford* explained that none of the allegedly disproportionately burdened groups even needed to obtain photo identification to vote because both the elderly and the disabled were entitled to vote absentee (which does not require photo identification) and the homeless would likely qualify for the law's indigency exception (which also does not require photo identification). *Ind. Democratic Party*, 458 F. Supp. 2d at 823 n.70. Neither avenue is available for the disproportionately burdened group here. Absentee voting is limited to voters who meet specific statutory criteria, like illness or old age, and is not normally available to younger voters outside of unique circumstances. Ind. Code § 3-11-10-24. Another safety valve, that "voters without photo identification may cast provisional ballots that will ultimately be counted," is similarly unavailing. *Crawford*, 553 U.S. at 199 (op. of Stevens, J.). A provisional ballot is counted only if the voter appears in person within ten days of the election to present qualifying ID to the circuit clerk or county election board. Ind. Code § 3-11.7-5-2.5(a)–(b). But for students who lack ID— and face the same structural barriers to obtaining one after election day as they do

26

before—this is no safety valve at all. *See Fish*, 957 F.3d at 1128–29 (finding that the proof-of-citizenship requirement imposed a significant burden in part because voters lacked an "effective" safety valve that prevented them from being "turned away without a backup option for them to cast votes").

For most voters, the burdens Plaintiffs describe do not "even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (op. of Stevens, J.). But *Crawford* makes clear that voting restrictions may impose "a somewhat heavier burden" on "a limited number of persons." *Id.* at 199. On this record, Plaintiffs have demonstrated a reasonable likelihood that SB 10 imposes "a somewhat heavier burden" on students and young voters. Therefore, under the flexible *Anderson-Burdick* framework, the court finds that SB 10 likely imposes a moderate burden on this class of voters.

### ii.     Indiana's Interests

Having determined that SB 10 likely imposes a moderate burden on the rights of students and young voters, the court now "'identif[ies] and evaluate[s] the precise interests put forward by the State as justifications for the burden imposed by its rule' and weigh[s] these interests against the burdened rights." *Acevedo*, 925 F.3d at 948 (quoting *Anderson*, 460 U.S. at 789). "In doing so, we look to the 'legitimacy and strength' of the proffered interests, as well as 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* (quoting *Anderson*, 460 U.S. at 789). Defendants offer two primary justifications for SB 10: that it (1) increases public confidence in the

27

integrity of elections and (2) supports the related interest in "orderly administration and accurate recordkeeping" in elections. *Crawford*, 553 U.S. at 196 (op. of Stevens, J.).

### a.      Protecting Public Confidence

In *Crawford*, Indiana largely relied on its interest "in deterring and detecting voter fraud" to justify its voter ID law. *Id.* at 191, 194–97. But Defendants do not invoke this interest to justify SB 10. Instead, they rely on the "closely related" interest in "protecting public confidence" in the integrity of elections. *Id.* at 197. This interest "has independent significance, because it encourages citizen participation in the democratic process." *Id.* Although protecting public confidence is undoubtedly a strong interest in the abstract, Defendants offer little evidence demonstrating why the burdens SB 10 imposes are necessary to further that interest.

Defendants note that unlike student IDs, Indiana driver's licenses and state ID cards are issued "pursuant to rigorous, uniform, and statutorily mandated standards." (Dkt. 91 at 31). They claim that "[r]eliance on such forms of identification at all stages of voting supports public confidence in election outcomes." (*Id.*). But even after SB 10, voters may use photo identification issued by the government of the United States to vote. And Defendants do not argue that the issuing standards of those forms of photo identification mirror the standards employed by Indiana. So even if Indiana prefers its own standards, it still accepts photo identification issued under other standards, which undermines its purported interest in uniformity.

Defendants also rely on the declarations of two experts: Dr. Brian Gaines, a political scientist, and Matthew Crane, a Colorado election administrator. (*See* Dkt. 92-4;

28

Dkt. 92-5). But neither expert pointed to any data showing a connection between voter confidence and the use of student IDs at the polls. (*See* Dkt. 96-2 at 231, 659). Dr. Gaines relied on a study of Virginia residents to establish a connection between stricter voter ID laws and increased voter confidence. That study found that Virginia residents reported lower perceptions of voter fraud after receiving a postcard describing Virginia's voter ID law. (*Id.* at 794). But that study is of little relevance here because the postcard listed student ID as an acceptable form of photo ID. (*Id.* at 796). Virginia's voter ID law therefore resembled Indiana's voter ID law as it existed before SB 10 was enacted, not after.

Generally, photo ID laws "promote confidence" in the integrity of elections. *See Frank v. Walker*, 768 F.3d 744, 751 (7th Cir. 2014). But because SB 10 likely imposes a moderate burden on the right to vote, the court must evaluate the extent to which Defendants' interest in protecting public confidence makes it *necessary* to eliminate student IDs as a valid form of photo identification. Without more evidence, the court cannot conclude that SB 10 is *necessary* to protect public confidence in Indiana's elections.

### b.    Orderly Election Administration

The same is true of Defendants' interest in "orderly administration and accurate recordkeeping" in elections. *Crawford*, 553 U.S. at 196 (op. of Stevens, J.). Defendants claim that SB 10 promotes this interest by streamlining Indiana's photo ID requirement to make the acceptable forms of identification more uniform, objective, and verifiable. And

yet, if anything, SB 10 does the opposite, for it creates an exception for a single form of voter ID that otherwise meets the law's neutral requirements.

Besides, Defendants provide no evidence that student IDs have ever caused confusion or otherwise complicated election administration. In fact, before SB 10, student IDs merited only brief mention in poll-worker trainings. (*See* Dkt. 86-7 at 438–605). And the characteristics of student IDs that Defendants warn may cause confusion are equally applicable to other forms of ID that the law still permits, including Veteran's Administration, military, and tribal ID cards, many of which are less uniform than student IDs. (*See, e.g.*, Dkt. 86 at 33–34). Of course, eliminating these forms of identification would also streamline election administration by narrowing the field of acceptable IDs. But Defendants do not explain why student IDs alone need to go. As with Defendants' interest in protecting public confidence, this inconsistency convinces the court that eliminating student IDs is unnecessary to further Indiana's interest in orderly election administration.

There is no question about the legitimacy or importance of Indiana's interest in "protecting 'the integrity and reliability of the electoral process." *Crawford*, 553 U.S. at 204 (op. of Stevens, J.) (quoting *Anderson*, 460 U.S. at 788 n.9). But student IDs have qualified as proof of identification under Indiana's voter ID law for nearly two decades. To eliminate the ID that students and young voters are far more likely to rely on, Defendants must better document the unique problems student IDs raise. On this record, SB 10 looks more like a solution in search of a problem. Having determined that Indiana's legitimate interests in protecting public confidence and orderly election

administration are not strong enough to justify the moderate burden that SB 10 imposes on students and young voters, the court concludes that Plaintiffs have a reasonable likelihood of success to prevail on their First and Fourteenth Amendment claim.

### E.    Irreparable Harm

Irreparable harm exists where "legal remedies such as monetary damages are inadequate" to address the harm. *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 842 (7th Cir. 2005). "The moving party must demonstrate that he will likely suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). Although this requires "more than a mere possibility of harm," it does not "require that the harm actually occur before injunctive relief is warranted." *Id.* at 1045. "Nor does it require that the harm be certain to occur before a court may grant relief on the merits." *Id.* "Rather, harm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Id.* (quoting *Girls Scouts of Manitou Council*, 549 F.3d at 1089).

"[V]oting is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). As such, courts routinely find that restrictions on the right to vote constitute irreparable harm. *See Am. Council of Blind of Ind.*, 2022 WL 702257, at *9; *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ("As has been held by numerous other courts, a violation of the right to vote is presumptively an irreparable

31

harm. Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law." (citation omitted)); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury.").

To the extent that SB 10 burdens Plaintiffs' right to vote, they have shown the potential for irreparable harm. Absent an injunction, Montagne, specifically, will be unable to vote in the upcoming primary or general elections. And even if Defendants are right that SB 10 does not make it impossible for him to vote, the moderate burden that it imposes on his right to vote still constitutes irreparable harm as a matter of law. *See Ind. State Conf. of the NAACP*, 326 F. Supp. 3d at 663. Plaintiffs therefore satisfy this requirement for injunctive relief.

F. **Balance of Harms and the Public Interest**

Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must consider "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992)). Under the Seventh Circuit's "sliding scale" approach, the "more likely the plaintiff is to win, the less heavily need the balance of harms weigh

in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018)).

When a plaintiff is likely to succeed on a constitutional claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012). And as discussed above, absent injunctive relief, Montagne will either be unable to vote in the upcoming elections or face a moderate burden on his right to vote.

Defendants argue that an injunction "would sow confusion among voters, undermine orderly election administration, and override a legitimate, democratically adopted measure." (Dkt. 91 at 41). The court has already addressed why the *Purcell* principle does not bar relief here. As for the concern with election administration, no statewide elections have occurred since SB 10 was enacted. Thus, an injunction would only require Indiana to conduct elections as it has since it enacted its voter ID law: accepting student ID cards that meet its voter ID law's neutral criteria. And while its true that an injunction would override a democratically adopted law, Indiana has no valid interest in enforcing "a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 589–90.

The balance of harms therefore weighs in favor of the Plaintiffs. Moreover, the public interest weighs in favor of granting an injunction because the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell*, 549 U.S. at 4 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).

## IV.    Bond

Defendants will not incur any damages from the preliminary injunction. Therefore, the court waives the security requirement of Rule 65(c) of the Federal Rules of Civil Procedure. *See Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (district court can waive bond requirement when there is no danger the opposing party will incur any damages from the injunction).

## V.    Conclusion

Plaintiffs have shown that they are likely to succeed on their claim that SB 10 imposes unconstitutional burdens on students and young voters in violation of the First and Fourteenth Amendments. They have also established irreparable harm and satisfied the remaining requirements for a preliminary injunction. Plaintiffs' motion for preliminary injunction (Dkt. 85) is therefore **GRANTED**. The injunction will issue by separate order.

**IT IS SO ORDERED** this 14th day of April 2026.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distribute Electronically to Registered Counsel of Record.