**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| COUNT US IN, WOMEN4CHANGE INDIANA, and JOSH MONTAGNE, <br><br>       Plaintiffs, <br><br> v. <br><br> DIEGO MORALES, in his official capacity as Indiana Secretary of State, *et al.*, <br><br>       Defendants. | Case No.: 1:25-CV-00864-RLY-MKK |

**<u>BRIEF IN SUPPORT OF</u>**
**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................... 2

    I.    For twenty years, Indiana students used their student ID cards to vote. ............................ 2

    II.    Indiana legislators targeted student IDs for exclusion. ....................................................... 5

    III.    Students face unique barriers to obtaining voter ID. ......................................................... 13

    IV.    Plaintiffs are injured by SB 10, leading to this lawsuit. ...................................................... 17

    V.    This Court issued a preliminary injunction, which the Seventh Circuit stayed. ................ 19

LEGAL STANDARD ............................................................................................................. 20

ARGUMENT ......................................................................................................................... 21

    I.    Plaintiffs have standing. ...................................................................................................... 21

    II.    The Student ID Ban violates the First and Fourteenth Amendments of the U.S. Constitution as an undue burden on the right to vote. ...................................................... 23

        A.    The Student ID Ban burdens students' and young voters' right to vote. ...................... 23

        B.    The State's interests cannot justify the Student ID Ban. ............................................. 26

    III.    The Student ID Ban violates the Twenty-Sixth Amendment of the U.S. Constitution because it discriminates on the basis of age. ................................................................... 28

        A.    The Student ID Ban abridges the right to vote on account of age. .............................. 29

        B.    The Student ID Ban was enacted with a discriminatory purpose. ............................... 30

    IV.    The Court should grant this motion and enter a permanent injunction as soon as possible after the May 5 primary election concludes. ...................................................... 33

CONCLUSION ...................................................................................................................... 33

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Acevedo v. Cook Cnty. Officers Electoral Bd.*,
  925 F.3d 944 (7th Cir. 2019)...................................................................... 23, 26

*Advent Elecs., Inc. v. Buckman*,
  No. 95 C 305, 1997 WL 83297 (N.D. Ill. Feb. 19, 1997) .................................. 33

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) .................................................................................. 23–26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................................... 20

*Bullock v. Carter*,
  405 U.S. 134 (1972) ...................................................................................... 24

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ...................................................................................... 23

*Burgess v. Ryan*,
  996 F.2d 180 (7th Cir. 1993)......................................................................... 33

*C.W. ex rel. Wood v. Textron, Inc.*,
  807 F.3d 827 (7th Cir. 2015)......................................................................... 27

*Coal. for Open Democracy v. Scanlan*,
  794 F. Supp. 3d 28 (D.N.H. 2025) ................................................................. 22

*Columbus Bd. of Educ. v. Penick*,
  443 U.S. 449 (1979) ...................................................................................... 32

*Common Cause Ind. v. Marion Cnty. Election Bd.*,
  311 F. Supp. 3d 949 (S.D. Ind. 2018) ............................................................. 25

*Count US IN v. Morales*,
  No. 1:25-cv-864, 2026 WL 1009067 (S.D. Ind. Apr. 14, 2026) .................................*passim*

*Count US IN v. Morales*,
  No. 26-1783, 2026 WL 1067135 (7th Cir. Apr. 20, 2026)................................. 2, 20, 21, 33

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ...................................................................................... 24–26

*Eakin v. Adams Cnty. Bd. of Elections*,
    149 F.4th 291 (3d Cir. 2025) ................................................................... 24

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................ 22

*Fish v. Schwab*,
    957 F.3d 1105 (10th Cir. 2020) ............................................................... 25

*Gray v. Sanders*,
    372 U.S. 368 (1963) ................................................................................ 21

*Harman v. Forssenius*,
    380 U.S. 528 (1965) .......................................................................... 29, 30

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ................................................................................ 22

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ............................................................... 32

*Jud. Watch, Inc. v. Ill. State Bd. of Elections*,
    No. 24 C 1867, 2025 WL 2712209 (N.D. Ill. Sep. 23, 2025) .............................. 23

*Jud. Watch, Inc. v. King*,
    993 F. Supp. 2d 919 (S.D. Ind. 2012) ...................................................... 21

*Kampmier v. Emeritus Corp.*,
    472 F.3d 930 (7th Cir. 2007) ................................................................... 20

*League of United Latin Am. Citizens v. Exec. Off. of the,*
    *Pres.*, 808 F. Supp. 3d 29 (D.D.C. 2025) ................................................ 23

*League of Women Voters of Fla., Inc., v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ........................................... 23–26, 31

*Luft v. Evers*,
    963 F.3d 665 (7th Cir. 2020) ................................................................... 30

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ................................................................. 32

*Miller-El v. Dretke*,
    545 U.S. 231 (2005) ................................................................................ 32

*Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*,
    708 F.3d 921 (7th Cir. 2013) ................................................................... 21

*N.C. State Conf. of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) .................................................................................. 32

*Nairne v. Landry*,
   151 F.4th 666 (5th Cir. 2025) ................................................................................ 23

*Nalco Chem. Co. v. Hydro Techs., Inc.*,
   809 F. Supp. 672 (E.D. Wis. 1992) ....................................................................... 33

*One Wis. Inst., Inc. v. Nichol*,
   186 F. Supp. 3d 958 ................................................................................................ 30

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ............................................................................................... 32

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ................................................................................................... 33

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) ............................................................................... 23

*Shango v. Jurich*,
   681 F.2d 1091 (7th Cir. 1982) .............................................................................. 31

*Smith v. Boyle*,
   144 F.3d 1060 (7th Cir. 1998) .............................................................................. 31

*Staffa v. Pollard*,
   597 Fed. App'x 893 (7th Cir. 2015) ..................................................................... 33

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ............................................................................................... 27

*Tex. Democratic Party v. Abbott*,
   978 F.3d 168 (5th Cir. 2021) ................................................................................ 29

*Tully v. Okeson*,
   78 F.4th 377 (7th Cir. 2023) ........................................................................... 28–30

*Tully v. Okeson*,
   977 F.3d 608 (7th Cir. 2020) ................................................................................ 23

*UAW v. Brock*,
   477 U.S. 274 (1986) ............................................................................................... 21

*United Food & Com. Workers v. Brown Grp., Inc.*,
   517 U.S. 544 (1996) ............................................................................................... 21

*United States v. Bd. of Sch. Comm'rs of City of Indianapolis*,
 573 F.2d 400 (7th Cir. 1978) ................................................................. 32

*United States v. Viveros-Chavez*,
 114 F.4th 618 (7th Cir. 2024) ................................................................ 30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*,
 429 U.S. 252 (1977) ....................................................................... 30, 31

*Voto Latino v. Hirsch*,
 712 F. Supp. 3d 637 (M.D.N.C. 2024) ................................................. 23

*Washington v. Davis*,
 426 U.S. 229 (1976) ....................................................................... 30, 31

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................... 17, 23

U.S. Const. amend. XIV ..................................................................... 17, 23

U.S. Const. amend. XXVI.............................................................. 17, 23, 28

## STATUTES

Ind. Code § 3-11-10-24 ............................................................................ 16

Ind. Code § 3-11.7-5-2.5........................................................................ 16, 25

Ind. Code § 3-7-13-1 ................................................................................ 13

Ind. Code § 9-13-2-78 ................................................................................ 4

Ind. Code § 9-24-16-10 ............................................................................ 13

Ind. Code. § 3-5-2.1-84 ..................................................................... *passim*

## RULES

Fed. R. Civ. P. 56(a) ................................................................................ 20

Fed. R. Evid. 702 .................................................................................... 27

## OTHER AUTHORITIES

117 Cong. Rec. 7534 (1971)...................................................................... 28

Election Fraud Map, Heritage Found., https://electionfraud.heritage.org/
 [https://perma.cc/DR7K-JUPV] (last visited Apr. 30, 2026) ...................... 5

H.B. 1109, 117th Gen. Assemb., 1st Reg. Sess. (Ind. 2011), *enacted as* Pub. L. No. 118-2011, 2011 Ind. Acts 1206 ...................................................................................................8

H.B. 1318, 118th Gen. Assemb., 2d Reg. Sess. (Ind. 2014), *enacted as* Pub. L. No. 76-2014, 2014 Ind. Acts 828 .....................................................................................................8

H.B. 1485, 122d Gen. Assemb., 1st Reg. Sess. (Ind. 2021), *enacted as* Pub. L. No. 2021-209, 2021 Ind. Acts 3161 ...................................................................................................8

**INTRODUCTION**

Indiana's Senate Bill 10 singled out one form of voter identification—student ID—and barred its use at the polls, even when it satisfies the neutral requirements that apply to every other form of ID. *See* Ind. Code. § 3-5-2.1-84 (eff. July 1, 2025) (formerly codified at Ind. Code § 3-5-2- 40.5(c)) (the "Student ID Ban"). As a result, tens of thousands of students who rely on student ID to vote have no other way to cast their ballots, and overcoming this barrier will require them to secure a different form of identification that is systematically more difficult for students to obtain. Plaintiffs—a sophomore at Indiana University-Bloomington and two organizations that help students register and vote—sued less than three weeks after SB 10 was enacted, alleging that the Student ID Ban imposes an unconstitutional burden on the right to vote and intentionally discriminates against Indiana's youngest voters.

The uncontested evidence confirms that the Student ID Ban does both. With fact discovery now complete, there are no material disputes about the Ban's impact on students and youth—or the weaknesses of the State's justifications for it. No one disagrees that the Ban falls more heavily on students and, by extension, on Indiana's youngest voters, nor is there any dispute about the heightened barriers students face to obtaining alternative forms of ID. Meanwhile, Defendants' own experts agree that there is no evidence that student ID causes voter fraud or even contributes to a perception that such fraud exists. Nor is there any evidence that student ID has ever caused confusion or any administrative burden at any point over the decades in which it was accepted as voter ID in Indiana without incident. Under the legal principles this Court has already articulated in its orders denying Defendants' motion to dismiss and granting Plaintiffs' motion for a preliminary injunction, the Ban violates the First, Fourteenth, and Twenty-Sixth Amendments, and summary judgement should be granted. *See* Dkt. Nos. 57, 99.

Plaintiffs respectfully request expedited consideration to ensure that relief is in place for the upcoming November 3, 2026 general election, with early voting beginning on October 6. The Seventh Circuit stayed this Court's preliminary injunction because it was issued "seven days after voting in the [primary] election ha[d] already begun." *Count US IN v. Morales*, No. 26-1783, 2026 WL 1067135, at *2 (7th Cir. Apr. 20, 2026) (per curiam). To avoid any similar concerns, Plaintiffs respectfully request that this Court grant relief as soon as possible after this motion is fully briefed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.      For twenty years, Indiana students used their student ID cards to vote.**

1.      In 2005, the State of Indiana enacted a voter ID law that required voters to present photo ID to cast ballots at the polls so long as it satisfied four criteria: it had to (1) display the voter's name; (2) include the voter's photograph; (3) display an expiration date; and (4) have been issued by the government of the United States or Indiana. Ind. Code § 3-5-2.1-84(a).

2.      A wide range of IDs satisfied the voter ID law, including student IDs issued by many Indiana public universities. Ex. 1; Ex. 2 at 18 (Mayer Decl.).

3.      Nearly 250,000 students are enrolled in Indiana's public universities. Ex. 3.

4.      Nearly 200,000 Indiana public college and university students currently attend schools with IDs that meet the voter ID law's neutral criteria. Ex. 2 at 11.

5.      Since 2005, students at eligible universities have regularly used their student IDs to vote. Ex. 4 ¶¶ 8–12 (Kuhl Decl.); Ex. 5 ¶¶ 11–18 (Vargas Decl.); Ex. 6 ¶¶ 6–8 (Montagne Decl.).

6.      According to the Monroe County election supervisor, approximately two-thirds of voters at the on-campus polling place used student IDs to vote in 2024. Ex. 7 at 2.

7.      Governmental and educational organizations have encouraged students to use their student IDs to vote. Exs. 1, 8–12.

2

8.     When helping students register to vote, civic organizations, including Plaintiffs, have emphasized that students could use their student IDs to vote as a routine part of their practice. Ex. 5 ¶¶ 12–13; Ex. 13 ¶¶ 10, 12 (Klitzsch Decl.); Ex. 4 ¶¶ 8–12.

9.     After Indiana passed its voter-ID law, public colleges and universities contacted state and local officials to confirm their student IDs satisfied the law, and state officials confirmed that IDs that otherwise met the law's neutral criteria could be used to vote. Ex. 14 at 1–2.

10.     In 2016, Indiana University South Bend updated its student ID to comply with the voter ID law. Ex. 15.

11.     In 2019, Purdue University updated its student ID to comply with the law. Exs. 16; 3 at 2.

12.     In explaining the 2019 updates to its student ID, Purdue University's bursar said, "[I]f we can . . . make voting more convenient for students, we want to do so." Ex. 16 at 2.

13.     Although some Indiana universities have begun to make digital student IDs available, students at those institutions can still obtain physical ID cards, and students who attend those schools testified that they continue to rely on and carry their physical ID cards. Exs. 17 ¶ 15 (Warnsman Decl.); 18 (Sand Dep.) at 28:15–29:22; 1919 ¶ 13 (Hettinger Decl.); 1820 (Kuhl Dep.) at 13:15–24; 21 (Montagne Dep.) at 21:6–23 ("I think there is [a digital ID] on my phone, but yeah, you can't even use that to get on the bus."); 22 (Qaddoura Dep.) at 15:19–16:14 (describing attendance trackers that "only scan physical IDs").

14.     When Purdue University made mobile student IDs available in 2023, it provided physical, "Vote-Ready" ID cards that could be printed on-site at polling locations. Ex. 23 at 9.

15.     For many students, student ID is the only form of ID that they possessed that allowed them to vote. *E.g.*, Ex. 6 ¶¶ 6–8; Ex. 4 ¶¶ 8–12 .

3

16.    The predominant age group among Indiana college students is 18 to 24. Ex. 2 at 12–14.

17.    Statewide, almost 90 percent of Indiana voters used an Indiana driver's license or state ID card to register to vote. Ex. 2 at 13; Ex. 24.

18.    Only 73.4 percent of Hoosiers between the ages of 18 and 24 have a driver's license. Ex. 2 at 12–14.

19.    Out-of-state students constitute more than one-third of students at Indiana public colleges and universities with qualifying IDs. *Id.* at 11.

20.    Out-of-state students are less likely than in-state students to have an Indiana driver's license or state ID. *See id.* at 8, 11; Ex. 6 ¶¶ 10–11; Ex. 4 ¶ 9.

21.    Indiana does not require students from other states to secure an Indiana driver's license. Ind. Code § 9-13-2-78(1)(A).

22.    In several Indiana counties, including Monroe County, voters who have driver's licenses or state IDs must scan them when they check in to vote on election day. Exs. 25 at 3; 26 at 12; 27 at 12.

23.    Thus, in these counties, the electronic pollbook's record of ID scans is a reliable proxy for the portion of voters who possess an Indiana driver's license or state ID. Ex. 2 at 15–16.

24.    In the 2022 and 2024 general elections, all but 5.1 percent of Monroe County voters scanned an Indiana driver's license or state ID at the polls on election day. *Id.* at 15.

25.    However, in precincts on or adjacent to Indiana University-Bloomington's campus, the number of voters who did not scan an Indiana driver's license or state ID was substantially higher, sometimes triple or quadruple the percentage for the county as a whole. *Id.* at 15–16.

4

26.     In 2022, 20 percent of voters at one precinct on the IU-Bloomington campus did not present an Indiana license or state ID at the polls. *Id.* at 16.

27.     In both 2022 and 2024, nine of the ten precincts with the highest proportion of voters who did not scan an Indiana driver's license or state ID at the polls were located on or next to the IU-Bloomington campus. *Id.*

28.     At Indiana's public colleges and universities, 74.1 percent of voting-age students are aged between 18 and 24. *Id.* at 12.

29.     Statewide, only 9.5 percent of residents fall within the 18 to 24 age range. *Id.* at 13.

30.     Indiana's young voters are highly geographically concentrated on college campuses. *Id.* at 14.

31.     Indiana has thousands of electoral precincts. Ex. 28.

32.     Only 20 of Indiana's thousands of electoral precincts have populations where more than 30 percent of voters are aged 18 to 24. Ex. 2 at 13–14.

33.     All but one of the 20 electoral precincts where voters aged 18 to 24 constitute greater than 30 percent of the voting population sit on or adjacent to a college campus. *Id.*

**II.     Indiana legislators targeted student IDs for exclusion.**

34.     More than half of states with voter ID requirements accept student ID for voting. *See* Ex. 34.

35.     No Defendant has produced an example of voter fraud or other misconduct derived from the use of student IDs in voting in Indiana or in any other state. Exs. 29–33.

36.     No evidence exists that allowing student IDs for use in voting has resulted in any voter fraud in Indiana.[1]

---

[1]     *Election Fraud Map*, Heritage Found., https://electionfraud.heritage.org/ [https://perma.cc/DR7K-JUPV] (last visited Apr. 30, 2026).

37.     No evidence exists that allowing student IDs for use in voting has resulted in any voter fraud in any state that permits their use as voter ID.

38.     In the past two presidential elections, students turned out to vote at historically high rates. Ex. 35.

39.     Since 2024, political activism and legislation nationwide have pushed for restrictions that would make voting more difficult for students.

40.     In 2025, multiple states considered or enacted measures that restrict the use of student IDs at the polls. Exs. 36–38.

41.     In 2025, multiple states considered or adopted laws that tighten residency rules for student voters or limit on-campus polling locations. Exs. 36–40.

42.     In February 2026, the U.S. Department of Education issued a warning to colleges and universities nationwide not to share data with the National Study of Learning, Voting, and Engagement ("NSLVE"), which aims to promote civic engagement through analysis of student voting behavior, warning that violations could compromise access to federal funding. Ex. 41.

43.     In a statement accompanying the warning, Education Secretary Linda McMahon said, "American colleges and universities should be focused on teaching, learning, and research—not influencing elections." *Id.* at 3.

44.     The Department of Education's warning and investigation has led to a freeze on the release of student-voter data by NSLVE, which, according to public reporting, has made it harder for colleges and universities to determine how to increase student-voter turnout. Ex. 42.

45.     At an April 2023 retreat for donors to the RNC, political activist Cleta Mitchell called for states to ban student IDs for use as voter identification. Exs. 39–40.

6

46.    Cleta Mitchell has contended that student voters' participation in elections "manipulat[es] . . . election outcomes." Ex. 43 at 10–12.

47.    At a July 2024 meeting of the American Legislative Exchange Council ("ALEC"), Cleta Mitchell urged state lawmakers to "introduce a bill to get rid of the student ID" as voter ID. Ex. 44 at 2.

48.    In 2021, 2023, and 2025, ALEC provided financial support to Indiana Senator Doriot's campaign. Ex. 45 at 3, 11, 14.

49.    Senator Doriot, SB 10's sponsor, began drafting SB 10 in late 2024, and had incorporated the Ban into the draft by no later than November 2024. Ex. 46 at 8–10. SB 10 excludes student ID cards as eligible voter ID under Indiana's voter ID law by redefining "proof of identification" to specify that it "does not include a document issued by an educational institution." Ind. Code § 3-5-2.1-84(c).

51.    After SB 10, any form of identification other than student ID can be used at the polls so long as it satisfies the law's four neutral criteria. *Id.*

52.    Indiana continues to accept at the polls many forms of ID from a broad range of government entities, each with their own separate criteria for issuing ID, including IDs issued by the United States government, IDs issued to Indiana legislators, and tribal IDs, which are issued by their individual tribes. Exs. 47 at 91:21–95:8; 48 at 1–9.

53.    Indiana continues to accept at the polls many forms of ID that vary in format, including Indiana driver's licenses, IDs issued by the U.S. government, IDs issued by the Indiana Legislature, and tribal IDs. *Id.*

54.    The enactment of SB 10 was the first time the Legislature singled out a previously acceptable form of ID and barred its use at the polls.

7

55. Prior to SB 10, every amendment Indiana made to its voter ID law eased the criteria for certain types of ID.

56. In 2011, the General Assembly amended the voter ID law to exempt military documents from the expiration-date requirement. H.B. 1109, 117th Gen. Assemb., 1st Reg. Sess. (Ind. 2011), *enacted as* Pub. L. No. 118-2011, 2011 Ind. Acts 1206.

57. Following SB 10, active-duty and retired service members and National Guard members can still use their military IDs to vote. Exs. 48 at 5, 49.

58. In 2014, the General Assembly amended the voter ID law to exempt IDs used by the U.S. Department of Veterans Affairs from the expiration-date requirement. H.B. 1318, 118th Gen. Assemb., 2d Reg. Sess. (Ind. 2014), *enacted as* Pub. L. No. 76-2014, 2014 Ind. Acts 828.

59. Following SB 10, the roughly 7 percent of Indiana's adult population who are veterans can use retired military ID or VA-issued IDs to vote. Exs. 49 at 1–2; 50 at 3.

60. In 2021, the General Assembly amended the voter ID law to exempt tribal identification cards from the expiration-date requirement. H.B. 1485, 122d Gen. Assemb., 1st Reg. Sess. (Ind. 2021), *enacted as* Pub. L. No. 2021-209, 2021 Ind. Acts 3161.

61. Many of the same legislators who supported SB 10—including its sponsors, Senators Doriot, Garten, and Gaskill—voted in favor of this change. *See* Ex. 51.

62. Following SB 10, the approximately 25,000 members of federally recognized tribes in Indiana can use tribal ID cards to vote. Ex. 52.

63. The changes for military, veteran, and tribal IDs passed with overwhelming or unanimous bipartisan support. Exs. 51, 53–57.

64. No legislator raised substantive concerns about the exemptions made for military, veteran, or tribal IDs. Exs. 58–60.

65.     Indiana legislators have official IDs that satisfy the voter ID law's criteria. Ex. 61 at 2.

66.     During legislative hearings on SB 10, civic groups testified that many students rely on their student IDs to vote and would struggle to obtain another voter ID. Ex. 62 at 36–46, 66–78.

67.     During legislative hearings on SB 10, students, including Plaintiff Josh Montagne, also expressed concerns about their ability to vote following SB 10. *Id.* at 46–66.

68.     One student explained during these debates that: "For many students, a university-issued ID is the most accessible form of identification they have. Many of my peers, especially from low-income backgrounds, do not own driver's license[s] or passports. If this bill passes, students who rely on their school IDs to vote would face unnecessary and unfair barriers that serve no purpose other than to suppress voter turnout amongst young people." *Id.* at 117–18.

69.     In a written review of SB 10, Defendant Angie Nussmeyer, Co-Director of the Indiana Election Division, warned that it would "severely limit public state college and university students" and "foreclose . . . many college students . . . from being able to vote," and explained that, for some students, "their student ID may be the only form of identification to vote in person on or before Election Day." Ex. 63 at 1, 4.

70.     During the legislative hearings, SB 10 supporters described the Ban primarily as an election-integrity measure. Exs. 62 at 32–33; 64 at 6–7; 29 at 9; 30 at 29.

71.     No legislative proponent of SB 10 presented evidence that the use of student IDs to vote has caused any election-integrity problem in any past election. Exs. 62, 64–30.

72.     In the course of this litigation, Defendants have not produced any evidence of fraud related to the use of student ID for voting, in Indiana or elsewhere. Ex. 65 at 6–9.

9

73.     No county that has responded to Plaintiffs' subpoenas has produced any evidence of fraud related to the use of student IDs in voting. Exs. 66–78.

SB 10 proponents and Senator Doriot framed the Ban as a way to ensure only Indiana residents and U.S. citizens vote in Indiana elections. Ex. 64 at 7.

75.     In Indiana, voters' citizenship and residency are established during voter registration, not during voter identification at the polls. *Id.* at 42; Ex. 31 at 77.

76.     The purpose of Indiana's voter ID law is to confirm that the person appearing at the polls is the same person who is registered. Ex. 79 at 56.

77.     Other acceptable forms of voter ID, such as VA cards, do not establish residency in Indiana, and others, such as Indiana driver's licenses, do not establish citizenship. Ex. 80.

78.     During the legislative debates, SB 10's proponents also suggested that poll workers might struggle to determine which student IDs were valid for voting. Ex. 64 at 14.

79.     Poll-worker training materials address student IDs, note voter-ID requirements, and sometimes list schools that offer qualifying forms of student IDs. Exs. 80–84.

SB 10's proponents offered nothing to substantiate their poll-worker-confusion concern. Exs. 62, 64, 30, 85–86.

81.     Defendants have not presented any evidence that the use of student IDs to vote caused confusion or election workers or anyone else. Ex. 65 at 6–8.

82.     To the contrary, the evidence shows that the Ban itself causes confusion. Ex. 2 at 8–11; Ex. 4 ¶ 12; Ex. 87 ¶¶ 13–15 (Sand Decl.); 88 at 114:10–115:10 (Vargas Dep.).

83.     Colorado election administrator Matt Crane, whose testimony Defendants rely upon to argue that the use of student ID to vote could cause poll-worker confusion, admitted during

his deposition that each of the issues he identified that he alleged could make student ID confusing applied to other forms of ID still accepted as voter ID after the Ban. Ex. 47 at 110:12–113:25.

84.    In this litigation, Defendants represented that election-related materials had been updated to reflect the Ban and identified the specific materials that the State updated. Ex. 89.

85.    Those documents included the Election Administrator's Manual, which is a multi-hundred-page manual that contained a single sentence change to account for SB 10, stating that: "document[s] issued by an educational institution" can no longer "serve as photo ID for purposes of voting." *Compare* Ex. 90 at 253 (2026 manual), *with* Ex. 31 at 227 (2024 manual).

86.    The other relevant materials consist of two presentations and a handout that summarize 2025 legislative changes to the voting process and describe the Ban in a single sentence. Exs. 91 at -194; 92 at -238; 93 at -408.

87.    Approximately three weeks before the start of early voting in the 2026 primary election, which began on April 7, 2026, the Marion County Director of Elections, Patrick Becker, stated that the Marion County Election Board "could and would reincorporate the portions of [its poll-worker training guides and other resources] that discussed student IDs into its training and Election Day operations for forthcoming [primary] elections" if SB 10 was no longer in effect. Ex. 94 ¶¶ 2–6 (Becker Decl.).

88.    In this litigation, Defendants have stated that the Ban is justified by the State's interest in improving voters' confidence in the integrity of Indiana elections.

89.    During the legislative hearings on SB 10, no one presented any evidence that the Student ID Ban would improve voter confidence in Indiana elections.

90.     Defendants' evidence that SB 10 improves voter confidence in Indiana elections consists of testimony by Dr. Brian Gaines, a political scientist, and Matthew Crane, a Colorado election administrator. Exs. 95, 96.

91.     Dr. Gaines's opinion relied on a Virginia study finding that Virginia residents reported lower perceptions of fraud after receiving a postcard describing Virginia's voter ID law. The postcard in that study specifically named student ID as a form of qualifying voter ID in Virginia. Ex. 97 at 4.

92.     Dr. Gaines admitted in his deposition that the Virginia study did not demonstrate any connection between banning student ID as voter ID and improving voter confidence in the integrity of elections. Ex. 98 at 73:15–74:14.

93.     Dr. Gaines admitted in his deposition that he was not aware of any study demonstrating a connection between banning student ID as voter ID and improving voter confidence in the integrity of elections. *Id.*

94.     Mr. Crane admitted in his deposition that he was not aware of any study demonstrating a connection between banning student ID as voter ID and improving voter confidence in the integrity of elections. Ex. 47 at 93:11–94:20.

95.     During the legislative hearings on SB 10, legislators questioned whether out-of-state students have sufficient ties to participate in Indiana elections. Exs. 62 at 7–8, 10–13, 15, 49–50, 62; 30 at 18; 86 at 12, 45.

96.     In response to a student's testimony about SB 10's effects, a legislator asked him to estimate how many of his friends who attended Indiana University "later move[d] here and bec[a]me permanent residents." Ex. 62 at 49:12–50:3.

12

97.     A representative of the Secretary of State's office also suggested that students whose permanent residences were elsewhere should be "voting at their home address and not the university address." *Id.* at 22:14–19.

98.     Indiana law provides that students may register and vote in Indiana once they have resided in the state for 30 days. Ind. Code § 3-7-13-1(3); Ex. 99.

**III.     Students face unique barriers to obtaining voter ID.**

99.     Indiana public universities, such as Indiana University and Purdue University, issue student IDs for free and make them obtainable by presenting any government-issued ID along with proof of student status. Exs. 100–101.

100.     In contrast to student IDs, other forms of eligible voter ID require obtaining documents that impose an acute expense for students and young Hoosiers. Ex. 2 at 8–11.

101.     Students and young Hoosiers are also less likely to possess eligible alternative forms of voter ID now necessary for them to vote. *Id.* at 11–13.

102.     When Indiana's voter ID law was first enacted, Indiana driver's license applicants had to present one primary form of identification (like a birth certificate); one secondary document, which could include anything from a school report card to a gun permit; and one proof of residency document, which was satisfied by any primary or secondary document that listed the applicant's address. Ex. 102 at 4–5.

103.     Now, an applicant must submit (1) at least one document proving identity, such as a U.S. birth certificate or unexpired passport; (2) at least one document proving lawful status in the United States; (3) at least one document proving the person's Social Security number; and (4) two documents proving Indiana residency, such as a bank statement or utility bill. Exs. 103–104; Ind. Code § 9-24-16-10.

104. Many students do not have ready access to their birth certificates while at school. Ex. 6 ¶ 12; Ex. 2 at 8; Ex. 4 ¶ 9.

105. Obtaining a birth certificate requires an ID that lists an address that matches the mailing address for the certificate. Ex. 105.

106. Because many students live on campus or in short-term housing, they do not have an ID that reflects their current address. Exs. 106 at 2; 107–108.

107. For example, at Purdue University, 42 percent of the nearly 45,000 undergraduate students live on campus. Ex. 108.

108. Indiana University requires all freshmen to live on campus. Ex. 106 at 2.

109. Thirty percent of Indiana University-Bloomington's approximately 38,000 undergraduate students (including freshmen) live on campus. Ex. 107.

110. It can take up to 16 weeks to obtain an Indiana birth certificate. Ex. 109.

111. As a result of the 16-week-long processing time, students who order a birth certificate after arriving on campus at the start of the school year in August may not receive it in time to obtain an alternative ID and vote in November elections. Ex. 110.

112. Other than a birth certificate, the only acceptable documents to prove lawful status are a U.S. passport (which itself requires a birth certificate) or various immigration documents. Ex. 104.

113. Indiana has one of the nation's lowest passport possession rates. Ex. 111 at 1.

114. Only 35.5 percent of Hoosiers of any age have a valid U.S. passport. *Id.*

115. Obtaining a U.S. passport can take more than six weeks. Ex. 112.

116. Obtaining a U.S. passport costs up to $165. Ex. 113.

117.    Students who live in on-campus housing often lack proof-of-residency documents like mortgage documents, rental contracts, homeowner's insurance, and utility bills in their own names. Exs. 104, 114–115.

118.    Many students remain on their parents' health insurance until age 26 and therefore do not receive medical bills at their campus address. Ex. 116.

119.    Unemployed people do not receive pay stubs or employment-based tax stubs.

120.    According to U.S. Bureau of Labor Statistics data, there is only a 39.6 employment rate for full-time college students between ages 18 and 24. Ex. 117.

121.    According to that same data, there is an 83.6 percent employment rate for individuals aged 25 to 54. Ex. 118.

122.    To prove a Social Security number, an applicant must present a Social Security card, W-2 form, or pay stub. Ex. 104.

123.    To obtain a Social Security card, an individual must present additional documentation, such as a U.S. passport, health insurance card, or an employee ID card. Ex. 119.

124.    To obtain a Social Security card, an individual must also visit a Social Security office for an appointment that can take more than a month to schedule. Ex. 120 at 10 n.29.

125.    Students also experience inflexible class schedules, limited access to transportation, and limited funds to acquire these documents. Ex. 6 ¶ 16 (Montagne Decl.); Ex. 87 ¶ 14.

126.    Travelling to the Bureau of Motor Vehicles ("BMV") for an appointment to acquire a license or ID can take hours for some students. Exs. 29 at 18–20.

127.    Indiana University faculty can exercise their attendance-policy discretion to penalize students for missing class. Ex. 121.

128.    Since Indiana's voter ID law was originally enacted, the BMV has also offered a free "Identification Card" usable as voter ID. Ex. 122.

129.    In 2007, the General Assembly increased the documentary requirements that applicants must present to obtain a free ID to include "valid documentary evidence" of their lawful status in the United States and of their Social Security number. Exs. 102 at 4;  123 at 5–6.

130.    The documents required to obtain the free ID are not free. Ex. 2 at 9–10.

131.    For example, an Indiana birth certificate costs $10 and an additional $12.95 to order online. *Id.* at 9.

132.    The cost of birth certificates in the five states that send the most students to Indiana University ranges from $13 to $45. *Id.* at 10.

133.    When it was held unconstitutional in the 1960s, Alabama's poll tax was $1.50, which is equivalent to $15.29 today. *Id.* at 10–11.

134.    The cost of a birth certificate—just one of the documents needed to obtain an Indiana free ID today—can be more expensive than Alabama's poll tax adjusted for inflation. *Id.*

135.    Voters may cast a provisional ballot if they lack voter ID when appearing at the polls. Ind. Code § 3-11.7-5-2.5(a)–(b).

136.    Absent narrow exceptions, provisional ballots are not counted unless the voter can provide proof of ID to the circuit clerk or county election board within 10 days of the election. *Id.*

137.    Indiana also permits voters to vote absentee by mail in Indiana elections under limited circumstances. *Id.* § 3-11-10-24.

138.    Student-status is not a viable reason to qualify for absentee voting by mail. *Id.*

139.    Students and young voters also move more frequently, which requires them to update their registration more often. Ex. 2 at 8.

16

140.     By virtue of their youth, students and young voters also generally have less experience with navigating the voting process. *Id.*

141.     Time and transportation constraints make voting itself more burdensome for many students. *E.g.*, Ex. 4 ¶ 12.

142.     Younger voters turn out at significantly lower rates than older voters. Ex. 2 at 8.

143.     In Indiana, turnout for voters between ages 18 and 29 has lagged behind voters aged 30 and older significantly in most elections. *Id.* at 19–20.

144.     Due to these burdens, the total "burdened population" of SB 10—those who "possess a[n eligible] student ID . . . but lack an acceptable alternative and are otherwise eligible to vote in Indiana"—totals approximately 40,000 students. *Count US IN v. Morales*, No. 1:25-cv-864, 2026 WL 1009067, at *9 & n.4 (S.D. Ind. Apr. 14, 2026) (Dkt. Nos. 98–99).

**IV.     Plaintiffs are injured by SB 10, leading to this lawsuit.**

145.     Shortly after SB 10 was enacted, Plaintiffs filed this lawsuit challenging the Ban on the grounds that it (1) unconstitutionally burdens the right to vote in violation of the First and Fourteenth Amendments; and (2) intentionally discriminates against young voters in violation of the Twenty-Sixth Amendment. Compl., Dkt. No. 1; U.S. Const. amends. I, XIV, XXVI.

146.     Plaintiff Josh Montagne is a registered Indiana voter and a junior at Indiana University-Bloomington. Ex. 6 ¶¶ 3–5.

147.     Mr. Montagne has a student ID that met the requirements of Indiana's voter ID law before SB 10 was enacted. *Id.*

148.     Mr. Montagne has no other form of ID accepted under Indiana's voter ID law. He has no Indiana driver's license, no passport, no ready access to his birth certificate or proof-of-residency documents, and no car to get to the BMV. Ex. 6 ¶¶ 5–7; 21 at 40:24–42:20, 47:11–50:3.

149.    Without the ability to use his student ID to vote, Montagne lacks any alternative form of voter ID and will be unable to vote in future Indiana elections. Ex. 6 ¶¶ 7–8.

150.    Sajida Qaddoura is an Indiana University student, registered Indiana voter, and a member of Women4Change Indiana. Ex. 124 ¶¶ 2–4 (Qaddoura Decl.).

151.    Qaddoura wants to vote using her student ID, the form of ID she regularly carries. *Id.* ¶¶ 5–7; 22 at 16:21–17:10. The Ban prevents her from using her student ID to vote.

152.    The Ban impedes Count US IN and Women4Change's core activities: registering voters (particularly students) and turning them out to vote. Ex. 5 ¶¶ 7–9; Ex. 13 ¶ 4.

153.    In their registration and turnout efforts, Plaintiffs must now explain that student ID no longer qualifies as voter ID, explain alternative options to students, and spend more time to help students who lack once-acceptable ID so that they are able to vote. Exs. 88 at 70:8–17, 83:3–20, 106:17–24 ; 125 at 50:5–22, 72:23–25, 73:1–74:12 (Klitzsch Dep.).

154.    For Count US IN, interactions with potential student voters will now take approximately ten minutes instead of five and helping each turned-away voter will take about 12 minutes or more instead of three. Ex. 88 at 108:4–9, 130:19–131:6.

155.    Organizational Plaintiffs must train their employees and volunteers to provide new information about the Ban and on how to obtain alternative forms of ID—a subject they previously did not need to address with students, since most could use their student IDs to vote. Exs. 88 at 55:10–58:11, 60:14–19; 125 at 50:11–14.

156.    In the process of that training, Organizational Plaintiffs must now update their materials to specifically address the Student ID Ban. Exs. 88 at 54:3–55:9, 56:10–20, 103:5–104:2; 1254 at 36:22–37:5, 38:19–45:24, 72:23–75:2.

18

157.    Women4Change estimates that updating its materials will consume 25 hours of staff time. Ex. 125 at 37:13–16.

158.    The Ban diminishes the impact of the Organizational Plaintiffs' efforts, because at least some of the students they help register will be turned away at the polls. Exs. 88 at 110:11–111:9; 5 ¶¶ 8–9, 12–13 (Vargas Decl.); 13 ¶¶ 13–14.

159.    Count US IN also has an election protection program where it sends volunteers to polling places near public colleges and universities to ensure that voters have the information and support they need to cast a ballot. 88 at 52:13–54:15, 128:2–129:2.

160.    Because of the Ban, more students will be turned away at the polls, and Count US IN's election protection volunteers will need to spend their time addressing those emergencies instead of performing the program's other functions, including encouraging voters in line, answering voters' questions, and ensuring that voters leave the polls with a positive experience that makes them more likely to vote again *Id.* at 52:22–23, 53:13–54:15, 129:3–132:16.

**V.    This Court issued a preliminary injunction, which the Seventh Circuit stayed.**

161.    Plaintiffs filed this lawsuit on May 5, 2025. Compl. (Dkt. No. 1).

162.    Defendants moved to dismiss, and the Court denied their motion on October 14, 2025. *See* Entry Denying Mot. to Dismiss (Dkt. No. 57) ("Order").

163.    In February 2026, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin enforcement of the Ban, including during the May 2026 primary elections and early voting period. *See* Mot. for Prelim. Inj. (Dkt. No. 85).

164.    Early voting for the Indiana 2026 primary election began on April 7, 2026. Ex. 110 at 2.

165.    On April 14, 2026, this Court granted Plaintiffs' motion and entered a preliminary injunction. *Count US IN*, 2026 WL 1009067, at *15 (Dkt. Nos. 98–99).

19

166.    On April 15, 2026, because of this Court's injunction, Mr. Montagne was able to vote early in the May 2026 primary on Indiana University-Bloomington's campus, using his student ID. Ex. 127.

167.    On April 20, 2026, the Seventh Circuit Court of Appeals stayed the preliminary injunction pending appeal, reasoning that since early voting for the primaries had already begun, the injunction was issued too close to the ongoing election. *Count US IN v. Morales*, No. 26-1783, 2026 WL 1067135, at *1–2 (7th Cir. Apr. 20, 2026) (per curiam) (App. Dkt. No. 12).

168.    Primary election day in Indiana is May 5, 2026. Ex. 110 at 2.

169.    Early voting for the Indiana 2026 general election begins October 6, 2026. *Id.* at 1.

170.    General election day in Indiana is November 3, 2026. *Id.*

### LEGAL STANDARD

Summary judgment is appropriate when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that "might affect the outcome of the suit." *Id.* at 248. Although a court must view facts in the light most favorable to the nonmovant, *id.* at 255, to survive a summary judgment motion, "the nonmov[ant] must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007) (citation omitted).

**ARGUMENT**

## I.  Plaintiffs have standing.

There is no genuine dispute of fact that all three Plaintiffs satisfy Article III's standing requirements. Defendants do not dispute any of the evidence supporting Plaintiffs' standing, and that evidence establishes standing as a matter of law.

First, this Court has already concluded—and the Seventh Circuit agreed—that Plaintiff Josh Montagne has standing. *See Count US IN*, 2026 WL 1009067, at *4; *Count US IN*, 2026 WL 1067135, at *1 (stating the Court "ha[d] no doubt that this remains a live case or controversy" because Mr. Montagne "has standing"). Mr. Montagne is an Indiana University student and a registered Indiana voter. SUMF ¶¶ 146–49. The Ban prohibits him from using his only form of ID. *Id.* That confers standing. *See Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012).

As the Seventh Circuit also recognized, Plaintiff Women4Change has associational standing. *See Count US IN*, 2026 WL 1067135, at *1 (citing *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 928–29 (7th Cir. 2013)). An organization may sue on behalf of its members when at least one member has standing in their own right, the claims are germane to the organization's mission, and the relief sought does not require individual participation. *UAW v. Brock*, 477 U.S. 274, 282 (1986). Women4Change meets this standard. Its member, Sajida Qaddoura—an Indiana University student and registered Indiana voter—wants to vote using her student ID, the form of identification she regularly carries. SUMF ¶¶ 150–51. The Ban prohibits her from doing so. *Id.* That constitutional injury establishes standing. *See Gray v. Sanders*, 372 U.S. 368, 375 (1963). Promoting student voting is central to Women4Change's mission, SUMF ¶ 152, and it seeks only equitable relief, so individual participation is unnecessary. *United Food & Com. Workers v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

21

Plaintiffs Count US IN and Women4Change both have organizational standing. An organization suffers a cognizable injury when an official action "directly affect[s] and interfere[s] with [their] core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The Student ID Ban does that. Both organizations' core work is registering voters—particularly students—and turning them out to vote. SUMF ¶ 152. The Ban makes every interaction with student voters more time-consuming and less effective. Explaining that a student ID no longer qualifies, walking students through alternatives, and helping those who lack acceptable ID must now be built into registration and turnout work that used to be straightforward. *Id.* ¶¶ 152–53. That requires training Plaintiffs' employees and volunteers to provide this information and updating their materials to specifically address the Ban and explain to students how to obtain alternative forms of ID. *Id.* ¶¶ 154–58. The Ban also diminishes Plaintiffs' impact: at least some of the students Plaintiffs have registered will be turned away at the polls because of the Ban. *Id.* ¶ 158.

The Ban also impairs Count US IN's election protection program. *Id.* ¶¶ 159–60. Count US IN sends volunteers to polling places near public colleges and universities to ensure that voters have the information and support they need to cast a ballot. *Id.* ¶ 159. Because of the Ban, more students will be turned away at the polls, and Count US IN's volunteers will be occupied addressing those emergencies, leaving less capacity to perform the program's other functions: encouraging voters in line, answering voters' questions, and ensuring that voters leave the polls with a positive experience that makes them more likely to vote again. *Id.* ¶ 160.

Federal courts have repeatedly recognized that this sort of direct interference with a voter-outreach organization's core efforts—as demonstrated by Plaintiffs' undisputed evidence—confers standing. *See, e.g., Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 41 (D.N.H.

22

2025) (holding an organization had standing where proof-of-citizenship requirement would interfere with its voter registration services); *see also, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024); *Nairne v. Landry*, 151 F.4th 666, 682 (5th Cir. 2025); *League of United Latin Am. Citizens v. Exec. Off. of the Pres.*, 808 F. Supp. 3d 29, 57 (D.D.C. 2025); *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2025 WL 2712209, at *8 (N.D. Ill. Sep. 23, 2025); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 657 (M.D.N.C. 2024).

**II.    The Student ID Ban violates the First and Fourteenth Amendments of the U.S. Constitution as an undue burden on the right to vote.**

The undisputed facts demonstrate that SB 10 violates the First and Fourteenth Amendments of the U.S. Constitution, which prohibit undue burdens on the right to vote. U.S. Const. amends. I, XIV. Courts assess such burdens under the framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Tully v. Okeson*, 977 F.3d 608, 615–16 (7th Cir. 2020) ("*Tully I*"); *see also Count US IN*, 2026 WL 1009067, at *7. The *Anderson-Burdick* analysis proceeds in two parts. First, the court assesses the "character and magnitude" of the burden. *Count US IN*, 2026 WL 1009067, at *7 (quoting *Burdick*, 504 U.S. at 428). Second, it evaluates "the precise interests put forward by the State as justifications for the burden imposed by its rule and weigh[s] these interests against the burdened rights," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019)).

**A.  The Student ID Ban burdens students' and young voters' right to vote.**

SB 10 does not burden all Indiana voters; it singles out students for exclusion. *See* SUMF ¶¶ 34–87; *Count US IN*, 2026 WL 1009067, at *8 ("[T]he effects of SB 10 clearly 'fall more heavily' on young voters and students." (quoting *Anderson*, 460 U.S. at 793 n.15)); *see also id.* at *8–12. Under *Anderson-Burdick*, this "[d]isparate impact matters." *League of Women Voters of Fla., Inc.,*

23

*v. Detzner*, 314 F. Supp. 3d 1205, 1216–17 (N.D. Fla. 2018); *accord Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 309 (3d Cir. 2025). To assess the burden that a voting restriction imposes, courts consider not only its weight but also who bears it. *See Anderson*, 460 U.S. at 793. Restrictions that "fall more heavily" on a particular "segment of the community" create a "disparity in voting power." *Id.* at 793 n.15 (quoting *Bullock v. Carter*, 405 U.S. 134, 144 (1972)). This warrants closer scrutiny—even when the burden would otherwise be small, *id.* at 793; *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 200–02 (2008); *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1215–16; *Count US IN*, 2026 WL 1009067, at *12.

Undisputed evidence proves that the Ban makes it harder for students to vote. It eliminates a common voter ID option that thousands of students had regularly relied on for 20 years. SUMF ¶¶ 5–6, 20–27. For many students, their student ID was the only form of voter ID they possessed. *Id.* ¶ 15. Now, students must use other forms of ID they are significantly less likely to possess and that are systematically more difficult for students and young voters to obtain. *Id.* ¶¶ 99–144; *see also Count US IN*, 2026 WL 1009067, at *9–11. That unequal burden is constitutionally significant: Election restrictions that "fall[] unequally" impose a weightier burden on the right to vote. *Anderson*, 460 U.S. at 793–94 & n.15 (quoting *Bullock*, 405 U.S. at 144).

By making voting more difficult for students, the Ban unquestionably burdens Indiana's young voters. Students attending Indiana's public colleges and universities are overwhelmingly young; nearly three quarters are between ages 18 and 24, far surpassing the approximately 9.5 percent of individuals who fall within that age bracket statewide. SUMF ¶¶ 28–29. Students also make up a significant segment of Indiana's youngest voters, who are concentrated on college campuses. *Id.* ¶ 30. The Ban therefore "fall[s] more heavily" on young voters. *Anderson*, 460 U.S. at 793 n.15. Burdens that are "unevenly distributed across identifiable groups 'whose members

24

share a particular' . . . age" are "'especially difficult' for [the] state to justify." *Common Cause Ind. v. Marion Cnty. Election Bd.*, 311 F. Supp. 3d 949, 968 (S.D. Ind. 2018) (quoting *Anderson*, 460 U.S. at 793), *consent decree vacated*, 925 F.3d 928 (7th Cir. 2019).

The Ban's disproportionate impact on students and young voters distinguishes this case from *Crawford*, where the Supreme Court upheld Indiana's voter ID law against a facial challenge. 553 U.S. at 202. *Crawford* emphasized the record lacked any "concrete evidence" showing the law made voting more difficult for identifiable groups of voters—and that evidentiary gap was central to its conclusion that the burden was not unconstitutional. *Id*. at 201. By contrast, "Plaintiffs have provided evidence that suggests those burdens have at least a slightly greater impact on students and young voters than they do on all Indiana voters." *Count US IN*, 2026 WL 1009067, at *11.

Moreover, "unlike the groups in *Crawford*, students cannot rely on the safety valves designed for voters who lack identification." *Id.* at *12 (citation omitted). *Crawford* found that any burden on elderly voters was mitigated because Indiana permits the elderly to vote absentee (which does not require photo ID). 553 U.S. at 201. Students do not have that option: "[a]bsentee voting is limited to voters who meet specific statutory criteria, like illness or old age, and is not normally available to younger voters outside of unique circumstances." *Count US IN*, 2026 WL 1009067, at *12 (citing Ind. Code § 3-11-10-24). The Court also found in *Crawford* that the heavier burden the law imposed on some people was "mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots *that will ultimately be counted*," 553 U.S. at 199 (emphasis added), but that is also not applicable here. A provisional ballot is counted only if the voter appears in person within 10 days of the election to present qualifying ID to the circuit clerk or county election board. Ind. Code § 3-11.7-5-2.5(a)–(b). For students who lack ID and struggle to obtain one, this is no safety valve at all. *See Fish v. Schwab*, 957 F.3d 1105, 1128–29 (10th Cir.

25

2020) (finding that the proof-of-citizenship requirement imposed a significant burden in part because voters lacked an "effective" safety valve that prevented them from being "turned away without a backup option for them to cast votes"); *Count US IN*, 2026 WL 1009067, at *12.[2]

In sum, the undisputed material facts demonstrate that the Student ID Ban targets a specific group of voters, makes voting more difficult for them, and leaves them without meaningful safeguards. Under *Anderson-Burdick*, this constitutes a significant or at least a moderate burden on students' and young voters' right to vote. *See League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216–17 (holding that a categorical ban on placing polling places on college campuses imposed a "significant" burden on the right to vote); *Count US IN*, 2026 WL 1009067, at *12.

**B.  The State's interests cannot justify the Student ID Ban.**

*Anderson-Burdick*'s second step requires the Court to weigh the burdens the challenged law imposes against the "*precise* interests put forward by the State." *Acevedo*, 925 F.3d at 948 (emphasis added) (quoting *Anderson*, 460 U.S. at 789). To do so, the Court "look[s] to the 'legitimacy and strength' of the proffered interests, as well as 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Count US IN*, 2026 WL 1009067, at *12 (quoting *Acevedo*, 925 F.3d at 948). Although Defendants have suggested several state interests, the undisputed facts show that the Ban does not serve them.

In *Crawford*, "Indiana largely relied on its interest 'in deterring and detecting voter fraud' to justify its voter ID law." *Id.* (quoting 553 U.S. at 191, 194–197). Defendants do not do so here—likely because they have failed to identify a single example of voter fraud or any other misconduct

---

[2] The Court in *Crawford* also noted that Indiana offers a "free" ID card for voting. 553 U.S. at 198. But since *Crawford*, the Legislature has made the requirements for obtaining one much more burdensome—adding documentation requirements, such as proof of a Social Security number, that students uniquely struggle to satisfy. *See* SUMF ¶¶ 129–41. And, for students, who are more likely to lack underlying documents like a birth certificate or government-issued ID, securing a "free" ID card requires spending money to obtain these prerequisites. *See id.*

26

derived from the use of student IDs in voting—in Indiana or anywhere else. SUMF ¶ 35. They argue instead that the Ban increases public confidence in elections by reducing the public's *perception* of fraud. *See Count US IN*, 2026 WL 1009067, at *12. Yet they fail to offer any evidence to support that contention. *See* SUMF ¶¶ 90–94.

Defendants rely primarily on the testimony of two experts: Dr. Brian Gaines, a political scientist, and Matthew Crane, a Colorado election administrator.[3] But in their depositions, both experts admitted that they have no factual basis to opine on whether banning student ID as voter ID has any impact on public confidence. Dr. Gaines relied on a Virginia study finding that Virginia residents reported lower perceptions of fraud after receiving a postcard describing Virginia's voter ID law. SUMF ¶ 91. But the postcard specifically named student ID as qualifying voter ID— defeating Defendants' point. *Id.*; *see also id.* ¶¶ 90–93; *Count US IN*, 2026 WL 1009067, at *13. The second expert, Colorado election administrator Matthew Crane, admitted that he had also reviewed no data showing any connection between voter confidence and banning student ID. SUMF ¶ 94. A state interest cannot justify a voting restriction that does not actually advance that interest. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 219–22 (1986).

Defendants also argue that "unlike student IDs, Indiana driver's licenses and state ID cards are issued 'pursuant to rigorous, uniform, and statutorily mandated standards,'" and that relying on these standardized options increases public confidence in election integrity. *Count US IN*, 2026 WL 1009067, at *12 (quoting Dkt. No. 91). But even after SB 10, Indiana accepts other forms of

---

[3] As their deposition testimony confirms, the opinions of Defendants' experts are not "based on sufficient facts or data," are not "the product of reliable principles and methods . . . reliably applied . . . to the facts of the case," and do not reflect "specialized knowledge [that] will help" the Court in assessing any relevant issue. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (quoting Fed. R. Evid. 702). The Court should therefore exclude—or at minimum, decline to credit—the testimony of Defendants' experts in evaluating Plaintiffs' motion.

voter ID that are *not* issued under those standards, including tribal IDs, and state employee IDs—including those issued to Indiana legislators. SUMF ¶¶ 52–53. This inconsistency "undermines [Indiana's] purported interest in uniformity." *Count US IN*, 2026 WL 1009067, at *12.

Defendants' second rationale for the Ban is that it "streamlin[es] Indiana's photo ID requirement to make the acceptable forms of identification more uniform, objective, and verifiable." *Id.* at *13. In fact, "SB 10 does the opposite, for it creates an exception for a single form of voter ID that otherwise meets the law's neutral requirements." *Id.* Plus—as Defendants' own expert admits—the characteristics Defendants argue will cause confusion for election administrators "are equally applicable to other forms of ID that the law still permits, including Veteran's Administration, military, and tribal ID cards, many of which are less uniform than student IDs." *Id.* Defendants never explain why student ID alone had to go. More fundamentally, Defendants offer no evidence that student ID actually caused any confusion in the two decades in which it was accepted. *Id.* To the contrary, the evidence shows that student ID was treated as a straightforward issue, meriting only brief mention in poll-worker trainings. SUMF ¶¶ 84–87.

III.    **The Student ID Ban violates the Twenty-Sixth Amendment of the U.S. Constitution because it discriminates on the basis of age.**

Applying the governing law, as previously set forth by this Court, to the undisputed facts demonstrates that SB 10 violates the Twenty-Sixth Amendment of the U.S. Constitution. The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI; *see also Tully v. Okeson*, 78 F.4th 377, 383 (7th Cir. 2023) ("*Tully II*"). The Twenty-Sixth Amendment not only ensures that 18-year-olds may vote, but also "guarantees that citizens who are 18 years of age or older *shall not be discriminated against on account of age*." 117 Cong. Rec. 7534 (1971) (statement of Rep. Richard

Poff) (emphasis added); *accord Tully II*, 78 F.4th at 383; Order at 19. The Student ID Ban does precisely what the Twenty-Sixth Amendment prohibits: it makes voting harder for Indiana's youngest voters, and it was enacted to do just that.

### A. The Student ID Ban abridges the right to vote on account of age.

A plaintiff may show that a voting restriction either "deni[es]" or "abridge[s]" the right to vote to succeed on a Twenty-Sixth Amendment claim. *Tully II*, 78 F.4th at 383. The Student ID Ban does both. Plaintiff Montagne and others like him who rely exclusively on their student IDs to vote and possess no alternative form of eligible voter ID cannot vote in Indiana's upcoming elections because of the Student ID Ban. SUMF ¶¶ 146–49. There is no dispute that Mr. Montagne presently lacks any other eligible form of voter ID. *Id*. Thus, SB 10 undeniably denies him, and those similarly situated to him, the right to vote in Indiana's upcoming elections.

The Student ID Ban also "abridges" the right to vote. Abridgement occurs when a law "makes voting *more difficult* for [a] person than it was before the law was enacted or enforced"— what courts refer to as "retrogression." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 190–91 (5th Cir. 2021); *see* Order at 19. A restriction also abridges the right when it "imposes a material requirement" on certain voters, meaning that it "erects a real obstacle to voting" because of their constitutionally protected activity or status. *Harman v. Forssenius*, 380 U.S. 528, 541 (1965); *see Tully II*, 78 F.4th at 385 (quoting *Harman* for same). The Ban abridges the right in both ways.

First, the undisputed material facts demonstrate that the Ban plainly "makes voting *more difficult*" for Indiana students, and by extension for young Hoosiers, "than it was before the law was enacted[.]" *Tex. Democratic Party*, 978 F.3d at 191. Over the past two decades, thousands of students have used qualifying student IDs to vote in Indiana elections. SUMF ¶¶ 1–2, 5–6, 20–27. For many of these students, a student ID was the only acceptable form of voter ID they possessed. *Id*. ¶ 15. Because of the Ban, none of the students who once relied on their student IDs to vote can

29

do so. *Id.* ¶¶ 68–69, 101–40, 146–51. By rendering this subclass of voters "worse off," the Ban "abridge[s]" the right to vote. *Tully II*, 78 F.4th at 387.

The Ban also abridges the right to vote because it "erects a real obstacle to voting." *Harman*, 380 U.S. at 541; *see also Tully II*, 78 F.4th at 385 (similar). All other Hoosiers can use the form of ID they find most accessible and carry with them, so long as it satisfies the voter ID law's requirements. SUMF ¶ 1. Indeed, the General Assembly has *expanded* the eligible options for some voters by passing legislation allowing the forms of ID they carry to satisfy the voter ID law even *without* meeting its standard requirements. SUMF ¶¶ 60–65. Instead, students—and only students—now confront a categorical ban on a *specific* form of ID they already possess and routinely carry. *Id.* ¶¶ 15, 146–51. Students who once voted with a student ID must now obtain and carry to the polls an alternative qualifying ID to vote. Imposing this "material burden" on a particular set of voters abridges their exercise of the franchise. *Tully II*, 78 F.4th at 387.

**B. The Student ID Ban was enacted with a discriminatory purpose.**

The Twenty-Sixth Amendment bars both explicit age-based classifications and facially-neutral restrictions motivated by age-based discrimination. *See One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 976–77, *aff'd in part, rev'd in part on other grounds*, *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). To demonstrate discriminatory intent, Plaintiffs need only show that "'a discriminatory purpose has been *a* motivating factor,'" even if not the sole or primary motivation. *United States v. Viveros-Chavez*, 114 F.4th 618, 622 (7th Cir. 2024) (emphasis added) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*, 429 U.S. 252, 267 (1977)). Intent may "be inferred from the totality of the relevant facts," *Washington v. Davis*, 426 U.S. 229, 242 (1976), including discriminatory impact, the historical background of the decision, and relevant legislative history. *Arlington Heights*, 429 U.S. at 266–68; Order at 21.

Here, the facts all point in the same direction. First, the Ban surgically targets students—carving out student ID even when it meets the law's neutral criteria, while accepting other forms of ID that are not closely associated with young voters, even if they do not. SUMF ¶¶ 1, 15, 146–51. This "disparit[y]" in treatment is "so glaring and so patently without justification" that it "give[s] rise to an irresistible inference that [it is] the consequence of intentional discrimination." *Smith v. Boyle*, 144 F.3d 1060, 1064 (7th Cir. 1998); *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982) (explaining that officials act with discriminatory motive when they "single out a particular group for disparate treatment").

Because the Ban targets students, it significantly affects Indiana's youngest voters. Undisputed data shows that registered voters aged 18 to 24 are heavily concentrated on Indiana's college campuses, SUMF ¶¶ 30–33, and nearly three quarters of the students at Indiana's public colleges and universities with qualifying IDs are ages 18 to 24. *Id.* ¶ 28. Because the Ban singles out students, it "bears more heavily" on young voters than on the rest of the electorate. *Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). This "stark" disparate impact is "unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1222; Order at 22. The law's "unambiguous" target and "lopsided" effects evidence discriminatory intent. *Id.*

The Ban's "historical background" underscores this conclusion. *Arlington Heights*, 429 U.S. at 267; Order at 22. Between the voter ID law's enactment in 2005 and SB 10's in 2025, the Legislature amended the voter ID law to *expand* the forms of ID that could be used to vote three separate times even though the IDs did not meet the law's neutral requirements. SUMF ¶¶ 56–63. "SB 10 thus 'stands as a shady contraction' in a context of exemptions—'the *only* contraction, in fact.'" Order at 22–23 (quoting *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1223).

31

Courts also find discriminatory intent when a law's disparate impact was "foreseeab[le]," particularly if it was unnecessary to serve state interests. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979), and *United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978)). Legislators were expressly warned about the Ban's effects: in hearings on SB 10, students, civic groups, and even Defendant Nussmeyer cautioned that the Ban would prevent students from voting. SUMF ¶¶ 67–71. The Legislature passed it anyway. *Id*. Enacting the Ban with full knowledge of its consequences shows it was adopted "because of," and not "in spite of," its predictable effects. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); Order at 22.

Finally, the sequence of events leading up to the Ban's enactment confirms the law's discriminatory purpose. The Ban was introduced in the Legislature after college students had increased their voting power and amid a nationwide pattern of voting restrictions that targets student voting, including by banning the use of student ID cards as voter ID, SUMF ¶¶ 40–44— and only months after a prominent anti-voting activist *expressly* advocated for laws like this one. *Id.* ¶¶ 45–47. While the Student ID Ban is indisputably not consistent with any of the justifications Defendants offer, *id.* ¶¶ 88–98, it falls in lockstep with these efforts to restrict the franchise for student voters. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 726 (9th Cir. 2025) ("The political climate . . . leading to [the] enactment of [the action] provides circumstantial evidence of discriminatory intent."); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 226 (4th Cir. 2016) (finding discriminatory intent where voting restrictions were enacted "in the immediate aftermath of unprecedented African American voter participation").

When the evidence is viewed cumulatively, "its direction is too powerful to conclude anything but discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005). The Student ID Ban

32

is an unprecedented measure that singles out student ID, adopted with full awareness of its effects on young voters and without any plausible, nondiscriminatory rationale. This precision targeting of Indiana's youngest voters is precisely what the Twenty-Sixth Amendment forbids.

**IV.    The Court should grant this motion and enter a permanent injunction as soon as possible after the May 5 primary election concludes.**

After the Court issued its preliminary injunction in this case, Defendants filed an immediate interlocutory appeal. The Seventh Circuit stayed this Court's order pending the resolution of that appeal based entirely on timing concerns, *Count US IN*, 2026 WL 1067135, at *2—it found the preliminary injunction violated the *Purcell* principle because it was issued after early voting for the May 2026 primary had already commenced. *Id.* (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).

Plaintiffs seek to ensure that the Court has the opportunity to issue a final judgment—and permanent injunctive relief—significantly in advance of the November 2026 general election, and thereby prevent the disenfranchisement of tens of thousands of young Hoosiers.[4] Accordingly, Plaintiffs respectfully request that this Court grant this motion and enter a permanent injunction as soon as possible after this motion is fully briefed.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

---

[4] This Court need not wait for the resolution of the appeal of its preliminary injunction order to grant this motion. *See Staffa v. Pollard*, 597 Fed. App'x 893, 895 (7th Cir. 2015) ("[A]n appeal from an interlocutory decision—here, the [grant] of a preliminary injunction—does not divest a district court of jurisdiction or prevent the court 'from finishing its work and rendering a final decision.'" (quotations omitted). Courts in this circuit regularly grant summary judgment while an interlocutory appeal is pending. *E.g.*, *Nalco Chem. Co. v. Hydro Techs., Inc.*, 809 F. Supp. 672, 676 (E.D. Wis. 1992); *Advent Elecs., Inc. v. Buckman*, No. 95 C 305, 1997 WL 83297, at *3 n.5 (N.D. Ill. Feb. 19, 1997). If this Court does so here, the appeal of the preliminary injunction order would be moot. *See Burgess v. Ryan*, 996 F.2d 180, 184 (7th Cir. 1993) (holding that appeal from preliminary injunction order is moot once the district court grants or denies permanent relief).

Dated: May 1, 2026

Respectfully submitted,

/s/ Aria C. Branch

Aria C. Branch*
Katie Chamblee-Ryan*
Derek A. Zeigler*
Max C. Accardi*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20002
abranch@elias.law
kchambleeryan@elias.law
dzeigler@elias.law
maccardi@elias.law
Tel: (202) 968-4490

Jeffrey Macey
**Macey Swanson LLP**
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN 46204
jmacey@maceylaw.com

*Attorneys for Plaintiffs*
*Admitted *Pro Hac Vice*

34